# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. A. No. 07-168 (RWR) |
| LINDA M. SPRINGER, Director, U.S. Office of Personnel Management, | ) ) ) ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR FAILURE TO STATE A CLAIM**

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

defendant Linda M. Springer, Director of the U.S. Office of Personnel Management, respectfully

moves this Court to dismiss this action for lack of subject matter jurisdiction, or, in the

alternative, for failure to state a claim upon which relief can be granted.  The grounds for this

motion are set out in Defendant's Memorandum in Support of Motion to Dismiss, filed herewith.

A proposed order is also submitted herewith.

Dated: May 2, 2007

Of Counsel:

KERRY B. McTIGUE
General Counsel

KATHIE A. WHIPPLE
STEVEN E. ABOW
RISA B. CHERRY
Office of the General Counsel
U.S. Office of Personnel Management
1900 E Street NW
Washington, D.C. 20415
(202) 606-1700

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SUSAN K. RUDY
Assistant Director

_/s/ Robert J. Katerberg_____
ROBERT J. KATERBERG
 (D.C. Bar No. 466325)
Trial Attorney

U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 6112
Washington, D.C. 20001
Telephone:     (202) 616-8298
Facsimile:      (202) 616-8460
Robert.Katerberg@usdoj.gov

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 07-168 (RWR) |
| | ) | |
| LINDA M. SPRINGER, Director, | ) | |
| U.S. Office of Personnel Management, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Of Counsel:

KERRY B. McTIGUE
General Counsel

KATHIE A. WHIPPLE
STEVEN E. ABOW
RISA B. CHERRY
Office of the General Counsel
U.S. Office of Personnel Management
1900 E Street NW
Washington, D.C. 20415
(202) 606-1700

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SUSAN K. RUDY
Assistant Director

ROBERT J. KATERBERG
 (D.C. Bar No. 466325)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 6112
Washington, D.C. 20001
Telephone:    (202) 616-8298
Facsimile:    (202) 616-8460
Robert.Katerberg@usdoj.gov

Attorneys for Defendant

## TABLE OF CONTENTS

Page

BACKGROUND ................................................................................................ 1

    A.    Federal Civil Service Law Generally ................................................ 1

    B.    Executive Order 13,162 Establishes the Federal Career Intern Program ............... 4

    C.    OPM Interim and Final Regulations Implementing the Program ........................ 6

    D.    The Instant Litigation ............................................................... 8

ARGUMENT ................................................................................................... 9

    I.    THIS CASE SHOULD BE DISMISSED BECAUSE NTEU
        FAILED TO RAISE ITS CURRENT ISSUES DURING
        THE OPM RULEMAKING ............................................................ 11

    II.    NTEU'S CLAIMS ARE BARRED BY THE DOCTRINE
        OF LACHES ............................................................................ 14

    III.    NTEU LACKS STANDING ......................................................... 17

        A.    General Standing Principles ................................................ 17

        B.    The Complaint Fails to Identify Any
            NTEU-Represented Employee Who Has Standing to
            Challenge the FCIP ........................................................ 19

            1.    NTEU-Represented Career Interns ............................. 20

            2.    Current Non-FCIP Employees Represented by NTEU ............... 23

            3.    Current IRS Employees ........................................... 27

        C.    To the Extent Any NTEU-Represented Employees Would
            or Could Have Standing, This Lawsuit Cannot Proceed
            Without Their Joinder ..................................................... 29

    IV.    THE CIVIL SERVICE REFORM ACT PRECLUDES
        NTEU'S CLAIMS .................................................................... 33

CONCLUSION ................................................................................................ 42

## TABLE OF AUTHORITIES

**CASES**                                                                    Page(s)

Alaska Legislative Council v. Babbitt,
    181 F.3d 1333 (D.C. Cir. 1999) ................................................................. 18

Albuquerque Indian Rights v. Lujan,
    930 F.2d 49 (D.C. Cir. 1991) ................................................ 10, 24, 25, 26, 29

Am. Immigration Lawyers Ass'n v. Reno,
    18 F. Supp. 2d 38 (D.D.C. 1998), aff'd, 199 F.3d 1352 (D.C. Cir. 2000) ............... 19, 32

Appalachian Power Co. v. EPA,
    251 F.3d 1026 (D.C. Cir. 2001) ................................................................. 9, 11

Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,
    397 U.S. 150 (1970) .............................................................................. 26

Assoc. Gen. Contractors v. Otter Tail Power Co.,
    611 F.2d 684 (8th Cir. 1979) ................................................................... 31

Barnhart v. Devine,
    771 F.2d 1515 (D.C. Cir. 1985) ............................................................. 35, 41

Brotherhood of Locomotive Engineers and Trainmen v. STB,
    457 F.3d 24 (D.C. Cir. 2006) ............................................................. 10, 28, 29

Burka v. Aetna Life Ins. Co.,
    56 F.3d 1509 (D.C. Cir. 1995) .................................................................. 14

Carducci v. Regan,
    714 F.2d 171 (D.C. Cir. 1983) ........................................................... 11, 35, 37

Conley v. Gibson,
    355 U.S. 41 (1957) (12(b)(6) .................................................................. 11

Energy Cooperative, Inc. v. U.S. Dep't of Energy,
    659 F.2d 146 (Temp. Emer. Ct. App. 1981) ................................................. 9, 15

Fornaro v. James,
    416 F.3d 63 (D.C. Cir. 2005) ............................................................... 11, 41

Gas Appliance Mfrs. Ass'n, Inc. v. Sec'y of Energy,
    722 F. Supp. 792 (D.D.C. 1989) ................................................................. 16

Graham v. Ashcroft,
    358 F.3d 931 (D.C. Cir. 2004) ................................................................. 37

Gray v. OPM,
    771 F.2d 1504 (D.C. Cir. 1985) ........................................................... 35, 41

Harrison v. Bowen,
    815 F.2d 1505 (D.C. Cir. 1987) ........................................................... 35, 37

Honeywell Int'l, Inc. v. EPA,
    372 F.3d 441 (D.C. Cir. 2004) ................................................................. 11

Hunt v. Washington State Apple Adver. Comm'n,
    432 U.S. 333 (1977) ........................................................................... 18, 29

Independent Bankers Ass'n v. Heimann,
    627 F.2d 486 (D.C. Cir. 1980) ................................................................. 9, 15

Kickapoo Tribe of Okla. v. Lujan,
    728 F. Supp. 791 (D.D.C. 1990) ................................................................. 31

Linemaster Switch Corp. v. U.S. EPA,
    938 F.2d 1299 (D.C. Cir. 1991) ................................................................. 12

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) ................................................................. 18, 19, 21, 22

Mid-Tex Elec. Coop., Inc. v. FERC,
    822 F.2d 1123 (D.C. Cir. 1987) ................................................................. 16

Nader v. Nuclear Regulatory Comm'n,
    513 F.2d 1045 (D.C. Cir. 1975) ........................................................... 11, 13

Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior,
    134 F.3d 1095 (D.C. Cir. 1998) ................................................................. 13

Nat'l Maritime Union of Am., AFL-CIO v. Commander, Military Sealift Command,
    824 F.2d 1228 (D.C. Cir. 1987) ................................................................. 31

Nat'l Mining Ass'n v. Dep't of Labor,
    292 F.3d 849 (D.C. Cir. 2002) ................................................................. 9, 11

NTEU v. Chertoff,
　　385 F. Supp. 2d 1 (D.D.C. 2005), aff'd in part, rev'd in part on other grounds,
　　452 F.3d 839 (D.C. Cir. 2006) ..................................................................... 40

NTEU v. Devine,
　　577 F. Supp. 738 (D.D.C. 1983), aff'd, 733 F.2d 114 (D.C. Cir. 1984) ........................ 40

NTEU v. Devine,
　　733 F.2d 114 (D.C. Cir. 1984) ........................................................... 38, 39, 40

NTEU v. Horner,
　　659 F. Supp. 8 (D.D.C. 1986), later opinion aff'd,
　　852 F.2d 490 (D.C. Cir. 1988) ........................................ 19, 21, 22, 27, 32, 33

NTEU v. MSPB,
　　743 F.2d 895 (D.C. Cir. 1984) ................................................................ 36, 37

NTEU v. Seidman,
　　786 F. Supp. 1041 (D.D.C. 1992) ................................................................ 32

NTEU v. U.S. Dep't of Treas.,
　　Civ. A. No. 92-1150(HHG), 1993 WL 835593 (D.D.C. Feb. 12, 1993) ...................... 32

Nat'l Wildlife Fed'n v. EPA,
　　286 F.3d 554 (D.C. Cir. 2002) .................................................................... 12

Natural Resources Defense Council v. Thomas,
　　805 F.2d 410 (D.C. Cir. 1986) ............................................................... 12, 13

Natural Resources Defense Council v. U.S. EPA,
　　25 F.3d 1063 (D.C. Cir. 1994) .................................................................. 13

P&V Enters. v. Army Corps of Engineers,
　　466 F. Supp. 2d 134 (D.D.C. 2006) ............................................................. 16

Patterson v. Dep't of Interior,
　　424 F.3d 1151 (Fed. Cir. 2005) ................................................................... 3

Prewitt v. MSPB,
　　133 F.3d 885 (Fed. Cir. 1998) ................................................................... 35

Railroad Yardmasters of Am. v. Harris,
　　721 F.2d 1332 (D.C. Cir. 1983) ................................................................. 13

Renne v. Geary,
       501 U.S. 312 (1991) ........................................................................ 19

Simmons v. Burlington, C.R. & N. Ry. Co.,
       159 U.S. 278 (1895) ........................................................................ 16

Simon v. E. Ky. Welfare Rights Org.,
       426 U.S. 26, 41-42 (1976) .............................................................. 19

Spannaus v. U.S. Dep't of Justice,
       824 F.2d 52 (D.C. Cir. 1987) .......................................................... 16

Steel Co. v. Citizens for a Better Environment,
       523 U.S. 83 (1998) .......................................................................... 18

United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,
       517 U.S. 544 (1996) .................................................................. 18, 29

United States v. Fausto,
       484 U.S. 439 (1988) ................................................................. passim

United States v. L.A. Tucker Truck Lines,
       344 U.S. 33 (1952) ..................................................................... 12, 13

United States v. Students Challenging Regulatory Agency Procedures (SCRAP),
       412 U.S. 669 (1973) .................................................................. 18, 21

Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,
       454 U.S. 464 (1982) ....................................................... 17, 24, 25, 27

Warth v. Seldin,
       422 U.S. 490 (1975) ........................................................................ 22

## STATUTES, EXECUTIVE ORDERS, AND REGULATIONS

Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 111 ................................ passim

Civil Service Due Process Amendments, Pub. L. No. 101-376, 104 Stat. 461-63 (1990) .......... 22

5 U.S.C. § 553(d)(3) ..................................................................................................... 7

5 U.S.C. § 1204(f) ................................................................................. 11, 36, 37, 39, 40

5 U.S.C. § 1212(a)(2) .......................................................................................... 11, 35, 39

5 U.S.C. § 1214 ............................................................................................... 39, 41

5 U.S.C. § 2102 ..................................................................................................... 1

5 U.S.C. § 2103 ..................................................................................................... 2

5 U.S.C. § 2108 ................................................................................................... 20

5 U.S.C. § 2301 ............................................................................................ passim

5 U.S.C. § 2302 ............................................................................................. 34, 39

5 U.S.C. § 3302 ................................................................................................. 2, 4

5 U.S.C. § 3304 ................................................................................................. 1, 2

5 U.S.C. § 3308 ..................................................................................................... 1

5 U.S.C. § 3313 ..................................................................................................... 1

5 U.S.C. § 3318 ..................................................................................................... 2

5 U.S.C. § 3319 ................................................................................................. 1, 2

5 U.S.C. § 7103(a)(9) ......................................................................................... 29

5 U.S.C. § 7121(a)(1) ......................................................................................... 29

5 U.S.C. § 7511(a)(1) ............................................................................. 20, 21, 22

5 U.S.C. § 7703 ................................................................................................... 36

28 U.S.C. § 536 ..................................................................................................... 2

28 U.S.C. § 2401(a) ........................................................................................... 16

Exec. Order No. 10,577 (Nov. 22, 1954) ............................................................. 2

Exec. Order No. 13,162 (July 6, 2000) ........................................................ passim

5 C.F.R. § 6.1 ........................................................................................................ 2

5 C.F.R. § 213.3101 ............................................................................................. 2

5 C.F.R. § 213.3102 ............................................................................................. 5

5 C.F.R. § 213.3201 ............................................................................................. 2

5 C.F.R. § 213.3202(o) ............................................................................... passim

5 C.F.R. § 213.3301 ............................................................................................. 2

5 C.F.R. Part 302 ......................................................................................... 3, 6, 7

5 C.F.R. § 302.101 ............................................................................................... 7

5 C.F.R. § 315.201 ............................................................................................... 6

5 C.F.R. § 315.712 ............................................................................................... 6

65 Fed. Reg. 78,077 (Dec. 14, 2000) .......................................................... 6, 7

70 Fed. Reg. 44,219 (Aug. 2, 2005) .......................................................... 7, 12

## OTHER MATERIALS

H.R. Rep. No. 101-328 (1989), 1990 U.S.C.C.A.N. 695 ............................. 4

U.S. Merit Systems Protection Board, Building a High-Quality Workforce:
    The Federal Career Intern Program (2005), available at http://www.mspb.gov/
    studies/fcip_10_23_05/FCIP%20Final%20Report_10_20_05.pdf ............................ 8, 14

In this case, plaintiff National Treasury Employees Union ("NTEU") challenges the regulations of the U.S. Office of Personnel Management ("OPM") regarding the Federal Career Intern Program ("FCIP"), a hiring program that aims to attract highly qualified candidates to two-year internships that can serve as a foundation for a career in public service.  NTEU, however, never raised its current issues -- or, for that matter, any issues at all -- during OPM's notice-and-comment rulemaking process.  Nor has it availed itself of any of several possible mechanisms for review of its allegations under the Civil Service Reform Act.  Instead, NTEU delayed for the over six years the program has been in effect, only to bring a lawsuit based on theories of injury that are not only entirely abstract and conjectural, but also tangled in internal logical conflicts. The complaint should be dismissed for lack of jurisdiction or failure to state a claim.

## BACKGROUND

A.      **Federal Civil Service Law Generally**

Federal civil service employees, other than those in the Senior Executive Service, are generally employed in either the "competitive service" or the "excepted service."  See generally United States v. Fausto, 484 U.S. 439, 441 n.1 (1988).  Competitive service positions consist of all civil service positions other than Senior Executive Service positions, positions for which Senate confirmation is required, and positions that are specifically excepted from the competitive service by or under statute.  Id.; 5 U.S.C. § 2102.  Applicants for employment in the competitive service are generally required to take a competitive examination.  See 5 U.S.C. §§ 3304-3308. The applicants are then ranked on the appropriate civil service register or list of eligibles on the basis of their examination scores or placed into quality categories.  See 5 U.S.C. §§ 3313, 3319. When an agency needs to fill a competitive service position, it must select from among the top three applicants on the list of eligibles for that position or from the top category established under

5 U.S.C. § 3319.  See 5 U.S.C. §§ 3318, 3319.

Excepted service positions are those that are excepted from the competitive service by or under statute.  Fausto, 484 U.S. at 441 n.1; 5 U.S.C. § 2103.  Some positions are placed in the excepted service by statute.  See, e.g., 28 U.S.C. § 536 (making all positions in FBI excepted service).  In addition, Congress has authorized the President to prescribe rules governing the competitive service which "shall provide, as nearly as conditions of good administration warrant, for (1) necessary exceptions of positions from the competitive service; and (2) necessary exceptions from the provisions of section 2951, 3304(a), 3321, 7202 and 7203 of this title."  5 U.S.C. § 3302.[1]  Accordingly, OPM, acting pursuant to authority delegated by the President, has made a number of such exceptions, classifying excepted positions and types of appointment on three schedules.[2]  The President also retains the ability to directly exercise his authority under § 3302 to make new exceptions himself.

Excepted service employees who are encompassed by Title 5 of the U.S. Code have pay and fringe benefits identical to their similarly-situated competitive service counterparts.  The principal difference between excepted and competitive service positions covered by Title 5

---

[1]  Of relevance here, 5 U.S.C. § 3304(a) provides for competitive examination as a prerequisite for appointment of an individual into the competitive service.  The other provisions cross-referenced in 5 U.S.C. § 3302(2) are not relevant here.

[2]  See generally Exec. Order No. 10,577, § 6.1 (Nov. 22, 1954), codified as amended at 5 C.F.R. § 6.1 (general delegation to OPM to "except positions from the competitive service when it determines that appointments thereto through competitive examination are not practicable"); 5 C.F.R. § 213.3101(a) (establishing Schedule A for positions "for which it is not practicable to examine"); 5 C.F.R. § 213.3201(a) (Schedule B for positions "for which it is impracticable to hold open competition or to apply usual competitive examining procedures"); 5 C.F.R. § 213.3301(a) (Schedule C for positions "which are policy-determining or which involve a close and confidential relationship with the head of an agency or other key appointed officials").

2

relates to how individuals are recruited and selected for these positions. When hiring into the excepted service, agencies are not required to follow all of the specific procedures mandated for competitive service hiring. Instead, OPM has promulgated general rules governing selection and appointment to the excepted service. See 5 C.F.R. Part 302.

However, excepted service hiring, no less than competitive service hiring, is governed by the overarching merit system principles. See 5 U.S.C. § 2301 (listing merit system principles applicable to hiring in executive agencies). Specifically, "[r]ecruitment should be from qualified individuals from appropriate sources in an endeavor to achieve a work force from all segments of society, and selection and advancement should be determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity." 5 U.S.C. § 2301(b)(1). Moreover, among other principles, "all employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation, race, color, religion, national origin, sex, marital status, age, or handicapping condition, and with proper regard for their privacy and constitutional rights." 5 U.S.C. § 2301(b)(2).

Thus, it is important to distinguish between use of the word "competitive" to describe specific competitive service hiring procedures, and the general vernacular sense of the word. Excepted service positions are "non-competitive" only in the sense that hiring for such positions is exempt from the specific "procedures utilized in the competitive service." Patterson v. Dep't of Interior, 424 F.3d 1151, 1159 (Fed. Cir. 2005). Such hiring remains governed by the general merit system principle of "fair and open competition," 5 U.S.C. § 2301(b)(1), and the methods that agencies use to select for excepted service positions must comport with this and all other

merit system principles.  See, e.g., H.R. Rep. No. 101-328, at 4 (1989), 1990 U.S.C.C.A.N. 695,

698 (pointing out that "it is not true that excepted service employees are not competitively

selected," only that the particular "examination-based hiring procedures which apply to the

competitive service are not applicable to the excepted service").

**B.**      **Executive Order 13,162 Establishes the Federal Career Intern Program**[3]

In 2000, faced with growing difficulties throughout the federal government in attracting

highly qualified entry-level candidates to careers in public service, coupled with the projected

departure of hundreds of thousands of federal employees likely to retire over the next decade,

President Clinton exercised his authority under 5 U.S.C. § 3302 by issuing Executive Order

13,162, which created the FCIP as a new excepted service hiring authority.  See Exec. Order No.

13,162, 65 Fed. Reg. 43,211 (July 6, 2000), reprinted as note following 5 U.S.C.A. § 3301 (Supp.

2006).

The purpose of the FCIP was "to provide for the recruitment and selection of exceptional

employees for careers in the public sector," and, more specifically, "to attract exceptional men

and women to the Federal workforce who have diverse professional experiences, academic

training, and competencies, and to prepare them for careers in analyzing and implementing

public programs."    Exec. Order No. 13,162 preamble, § 1.  The program was intended as

"complementary to existing programs that provide career enhancement opportunities for Federal

employees."  Id. § 2. The President directed OPM to "develop appropriate merit-based

procedures for the recruitment, screening, placement, and continuing career development of

---

[3] The complaint in this case inexplicably omits any discussion of the Executive Order creating the FCIP.  See Compl. at p. 2 and ¶ 11 (beginning discussion of history of FCIP with OPM's promulgation of interim regulations in December 2000).

Career Interns," as well as to assure equal employment opportunity and application of veterans' preference criteria.  Id. § 3.  As discussed above, the general merit system principles are, after all, applicable to competitive service and excepted service hiring alike.

The Executive Order generally authorized appointment of successful candidates to two-year internships in positions at the GS-5, 7, or 9 levels.[4]  Exec. Order No. 13,162, § 4(a).  Notably, unlike certain other excepted service hiring authorities, the FCIP does not place any specific positions permanently in the excepted service.  Compare 5 C.F.R. § 213.3102(d) (placing attorney positions generally in Schedule A of the excepted service).  Rather, the FCIP simply provides an additional, alternative hiring authority that can be used for a variety of positions in appropriate circumstances.

Upon satisfactory completion of the internship, the Career Intern would be eligible for conversion to competitive civil service status.  Exec. Order No. 13,162, § 4(b)(4).  However, continuation in the FCIP was made "contingent upon satisfactory performance by the Career Intern throughout the internship period," with FCIP service "confer[ring] no rights to further Federal employment in either the competitive or excepted service upon the expiration of the internship period."  Id. § 4(b)(2), (b)(5).

The Executive Order required that "[a] Career Intern shall participate in a formal program of training and job assignments to develop competencies that the OPM identifies as core to the Program, and the employing agency identifies as appropriate to the agency's mission and needs."  Exec. Order No. 13,162, § 5.  Further, "[a]ssigned responsibilities shall be consistent with a

---

[4]  The length of the appointment may be extended to three years with the concurrence of OPM, and appointment to "other trainee level[s] appropriate for the Program" may be permitted.  See Exec. Order No. 13,162, § 4(a).

5

Career Intern's competencies and career interests, and the purposes of the Program." <u>Id.</u>
§ 4(b)(1).

Finally, the President directed OPM to "prescribe such regulations as it determines necessary to carry out the purpose of this order," and to "provide oversight of the Program." Exec. Order No. 13,162, §§ 6, 7.

**C.    OPM Interim and Final Regulations Implementing the Program**

Pursuant to this directive, on December 14, 2000, OPM issued such regulations on an interim basis, with a request for comments by January 16, 2001. <u>See</u> 65 Fed. Reg. 78,077 (Dec. 14, 2000). These regulations added a new subsection (o) to OPM's regulation listing Schedule B excepted service positions applicable to the entire executive civil service. 5 C.F.R. § 213.3202(o). The regulations also amended a separate part of 5 C.F.R. to provide for conversion to competitive civil service status following successful completion of an FCIP internship, <u>see</u> 5 C.F.R. § 315.712, and made appropriate technical changes to 5 C.F.R. § 315.201 governing service requirements for career tenure.

The December 14, 2000 OPM interim regulations tracked the parameters of the FCIP as set forth in Executive Order 13,162: appointments were generally to be for a period not to exceed 2 years, and to positions in grades GS-5, 7, or 9. <u>See</u> 5 C.F.R. § 213.3202(o)(1). The regulations allowed coverage of additional grades, and extensions to 3 years "for additional training and/or developmental activities," only upon OPM approval. <u>See id.</u> § 213.3202(o)(1), (o)(2)(i).

The interim regulations required agencies to use the regulations at 5 C.F.R. Part 302 when making appointments under the FCIP. <u>See</u> 5 C.F.R. § 213.3202(o)(1). 5 C.F.R. Part 302

contains general regulations applicable to employment in the excepted service, including

provisions relating to qualification requirements, accepting, rating, and arranging applications,

selection and appointment, and application of veterans preference criteria.  See 5 C.F.R.

§§ 302.101 to 302.501.  The interim FCIP regulations also required agencies to evaluate

candidates for FCIP appointments according to OPM qualification requirements or OPM-

approved, agency-specific qualification requirements.  See 5 C.F.R. § 213.3202(o)(3).

Other provisions in the interim regulations governed, inter alia, classification into an

excepted service tenure group, eligibility for promotions, conversion to competitive service upon

successful completion of internship or reemployment of previous career employees upon failure

to complete the internship, termination upon the expiration of the appointment, requirements that

agencies give Career Interns formal training and development opportunities, and the

responsibilities of individual agencies that utilize the FCIP hiring authority.  See 5 C.F.R.

§ 213.3202(o)(4), (5), (6), (7), (8), (9).

OPM's interim regulations were made effective immediately, based on a finding of good

cause by the Director of OPM.  See 65 Fed. Reg. at 78,077 (noting that the Executive Order was

signed on July 6, 2000 and that employing agencies had already begun developing their

respective intern programs).  Thus, "[a]gencies [were] able to make appointments immediately

upon publication of the regulations" on December 14, 2000.  Id.; see also 5 U.S.C. § 553(d)(3).

The regulations were published in the Code of Federal Regulations beginning with its 2001

edition.

On August 2, 2005, OPM issued its final regulations.  70 Fed. Reg. 44,219 (Aug. 2,

2005).  The issuing release reflects that OPM had received written comments from eight

7

agencies, as well as "a number of oral comments and questions from agencies asking for additional information and/or clarification," but not from any entities outside the government, such as plaintiff NTEU.  Id.  No commenter questioned the underlying need or justification for the FCIP.  Nor did any of the commenters challenge placement of the FCIP in the excepted service.

The final regulations are substantially similar to the December 14, 2000 interim regulations, with new provisions inserted to govern movement from one Career Intern position to another, see 5 C.F.R. § 213.3202(o)(8), and to clarify agency responsibilities under the FCIP. The issuing release for the final regulations answers various questions posed by commenting agencies, dealing with matters such as how to document FCIP appointments and post-internship conversions to competitive service, extensions of internships, and qualification requirements.

Since the FCIP originated in 2000, it has become widely used.  A 2005 U.S. Merit Systems Protection Board report notes that, as of fiscal year 2004, the FCIP was being used as a source of hiring authority by 29 agencies, with 13 more in the process of establishing FCIP programs.  See generally U.S. Merit Systems Protection Board, Building a High-Quality Workforce:  The Federal Career Intern Program at 27 (2005), available at http://www.mspb.gov/studies/fcip_10_23_05/FCIP%20Final%20Report _10_20_05.pdf (hereinafter "MSPB Report").  In fiscal year 2004, the last period for which data is set forth, over 7,000 appointments to federal service were made under the FCIP.  Id. at 25.

**D.    The Instant Litigation**

NTEU filed this facial challenge to OPM's FCIP regulations on January 24, 2007, over six and a half years after the program was originally established by Executive Order 13,162, and

over six years after it let the notice-and-comment period for OPM's regulations expire without

submitting any comments.  NTEU did not join any individual federal employees it represents as

co-plaintiffs or otherwise identify any such individuals as having been adversely affected by the

FCIP.  Rather, NTEU seeks to proceed on the basis of supposed injury to broad subsets of federal

employees that it represents, including, somewhat paradoxically, current Career Interns

themselves.  NTEU proceeds under the Administrative Procedure Act ("APA") and seeks a

declaration that OPM's FCIP regulations are "arbitrary, capricious, contrary to law, null, and

void" and an injunction "[p]rohibiting federal agencies from continuing to exercise any of the

authority granted by such regulations."  Compl. at 14.

## ARGUMENT

This action should be dismissed for four separate and independent reasons.  First, NTEU

failed to raise its current issues during the OPM rulemaking process.  Indeed, NTEU did not

submit any comments on OPM's FCIP rule.  Nor did any other party object to the FCIP or

OPM's rules on the grounds presently advanced by NTEU.  Under scores of D.C. Circuit cases,

NTEU has therefore forfeited its ability to bring this lawsuit.  See, e.g., Nat'l Mining Ass'n v.

Dep't of Labor, 292 F.3d 849, 874 (D.C. Cir. 2002); Appalachian Power Co. v. EPA, 251 F.3d

1026, 1036 (D.C. Cir. 2001).

Second, NTEU's claims are barred by the equitable doctrine of laches.  See Independent

Bankers Ass'n v. Heimann, 627 F.2d 486, 488 (D.C. Cir. 1980); Energy Cooperative, Inc. v. U.S.

Dep't of Energy, 659 F.2d 146, 150 (Temp. Emer. Ct. App. 1981).  The FCIP was created almost

seven years ago during a previous Administration, and went into effect beginning December 14,

2000 under interim OPM rules substantially similar to the current ones.  In addition to not

participating in OPM's rulemaking process, NTEU delayed unreasonably in not bringing its claims until 2007. This delay prejudices both government agencies who rely on FCIP to help meet their human resources needs, and Career Interns themselves who have applied and been hired under the FCIP.

Third, NTEU has failed to demonstrate Article III standing in this matter. NTEU purports to proceed on the basis of various, different alleged injuries to different subsets of its membership. But each of its theories of injury is inherently conjectural and speculative, and suffers from a lack of traceability and redressability. See, e.g., Albuquerque Indian Rights v. Lujan, 930 F.2d 49, 57 (D.C. Cir. 1991); Brotherhood of Locomotive Engineers and Trainmen v. STB, 457 F.3d 24, 28 (D.C. Cir. 2006). Furthermore, NTEU's separate theories of injury to various subsets of employees are in internal conflict with one another. Thus, even if hypothetically there might be one or more federal employees somewhere with standing to challenge OPM's FCIP rules, NTEU has not shown that it should be permitted to pursue this lawsuit on an associational standing basis without the participation of such employees.

Fourth, NTEU's claims are precluded because they are outside the framework created by the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 111, for administrative and judicial review of employee challenges to agency action relating to personnel matters. The statute provides specific mechanisms to address claims, such as made here (Compl. 2-3, ¶ 21), that OPM rules and regulations violate merit system principles. Where such mechanisms apply, they are exclusive and preclusive of the courts' general jurisdiction to review agency action under the Administrative Procedure Act. However, it does not appear that NTEU has availed itself of the available mechanisms under the statute. As a result, the Court lacks jurisdiction to entertain

10

NTEU's claims.  See e.g., United States v. Fausto, 484 U.S. 439, 445-47 (1988); Fornaro v.

James, 416 F.3d 63, 63 (D.C. Cir. 2005); Carducci v. Regan, 714 F.2d 171, 175 (D.C. Cir. 1983);

5 U.S.C. § 1204(f); 5 U.S.C. § 1212(a)(2).[5]

## I.    THIS CASE SHOULD BE DISMISSED BECAUSE NTEU FAILED TO RAISE ITS CURRENT ISSUES DURING THE OPM RULEMAKING

"It is black-letter administrative law that absent special circumstances, a party must

initially present its comments to the agency during the rulemaking in order for the court to

consider the issue."  Appalachian Power Co. v. EPA, 251 F.3d 1026, 1036 (D.C. Cir. 2001)

(internal quotation marks omitted); accord Honeywell Int'l, Inc. v. EPA, 372 F.3d 441, 449 (D.C.

Cir. 2004) (holding that litigant "forfeited its substantive challenge" because "it submitted no

comments during the rulemaking process"); Nat'l Mining Ass'n v. Dep't of Labor, 292 F.3d 849,

874 (D.C. Cir. 2002) ("Like the District Court, . . . we decline to consider this claim, because

NMA failed to raise it during the notice-and-comment period.").  Indeed, even thirty years ago,

the D.C. Circuit "ha[d] long adhered to the view that it is incumbent upon an interested person to

act affirmatively to protect himself in administrative proceedings, and that such a person should

not be entitled to sit back and wait until all interested persons who do so act have been heard, and

then complain that he has not been properly treated."  Nader v. Nuclear Regulatory Comm'n, 513

F.2d 1045, 1054 (D.C. Cir. 1975) (footnotes and internal quotation marks omitted).  As the

---

[5] Defendant is moving alternately under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure because certain of the grounds for dismissal raised herein (lack of standing and exclusivity of remedies under the Civil Service Reform Act) go to the Court's subject matter jurisdiction, whereas others (issue waiver and laches) are not jurisdictional in nature but cause the complaint to fail to state a claim upon which relief may be granted.  See, e.g., Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (12(b)(6) dismissal appropriate if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

Supreme Court has explained, "[s]imple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." United States v. L.A. Tucker Truck Lines, 344 U.S. 33, 37 (1952). This bar has been described as "near absolute." Nat'l Wildlife Fed'n v. EPA, 286 F.3d 554, 562 (D.C. Cir. 2002).

This rule has as much force with respect to legal or statutory interpretation issues as it does for other types of objections. In Linemaster Switch Corp. v. U.S. EPA, 938 F.2d 1299 (D.C. Cir. 1991), for instance, a corporation challenged EPA's statutory authority to take a particular action. The Circuit Court held that the corporation "waived this statutory challenge by failing to raise it during the rulemaking below," rejecting the corporation's argument that statutory challenges should be given greater leeway than policy or fact-based challenges. Id. at 1308-09; see also Nat'l Wildlife Fed'n, 286 F.3d at 562 ("[T]his principle does not apply only to newly raised factual issues as NWF suggests. Indeed, there is a near absolute bar against raising new issues -- factual or legal -- on appeal in the administrative context."); Natural Resources Defense Council v. Thomas, 805 F.2d 410, 428 (D.C. Cir. 1986) (rejecting argument that "statutory issues" that "go to the question of the agency's basic authority to act in certain ways at all" can be raised for the first time on judicial review).

In this case, as reflected in the Federal Register release issuing the final FCIP rules, OPM received comments only from federal agencies, and none from NTEU. See 70 Fed. Reg. 44,219 (Aug. 2, 2005). It is inconceivable that NTEU, which describes itself as representing the interests of 150,000 federal employees with regard to personnel issues, Compl. ¶ 3, was not

12

aware of the proposed FCIP rules and of its opportunity to comment on them.  NTEU

nevertheless elected to "sit back and wait until all interested persons who do so act [had] been

heard, and then," for the first time in a lawsuit over six years later, "complain that [it] has not

been properly treated."  Nader, 513 F.2d at 1054.

Moreover, both the government and incumbent Career Interns have reasonably relied on

the FCIP.  As discussed above, the Supreme Court has characterized the need to object during the

administrative process as a matter of "[s]imple fairness to those who are engaged in the tasks of

administration, and to litigants."  L.A. Tucker Truck Lines, 344 U.S. at 37.  Here, apart from

litigants, NTEU's failure to act promptly has prejudiced the current interns whom it purports to

represent; many of those interns will have embarked upon the Federal Career Intern Program

having made a considered assessment that entering Federal service through this portal will

enhance their future prospects.  NTEU's tardy challenge jeopardizes long-settled assumptions on

the part of such incumbents.

Whether NTEU's stealth approach reflects a strategic choice or merely a lack of

diligence, the Court should not countenance it.  The case should be dismissed.[6]

_____

[6]  To be sure, courts have recognized several narrow exceptions to the requirement that
objections to agency rules be presented in the first instance to the relevant agency.  For example,
a litigant might be excused for not raising an issue before the agency if "the agency made a
significant change between its proposed rule and the final interim rule and thus the complainant
did not have the opportunity to object to the change before seeking judicial review."  Nat'l Ass'n
of Mfrs. v. U.S. Dep't of Interior, 134 F.3d 1095, 1111-12 n.15 (D.C. Cir. 1998).  Likewise, a
failure to raise might be excused if another party did submit comments to the agency raising the
issue in question.  Natural Resources Defense Council v. U.S. EPA, 25 F.3d 1063, 1074 (D.C.
Cir. 1994).  And, in certain circumstances, "a challenge regarding the proper constitution of the
agency, an unusual and limited type of attack, can be raised for the first time before a court."
Thomas, 805 F.2d at 428 (citing Railroad Yardmasters of Am. v. Harris, 721 F.2d 1332 (D.C.
Cir. 1983)).  Plainly, none of these exceptions applies here:  the final rule did not differ from the
(continued...)

## II.    NTEU'S CLAIMS ARE BARRED BY THE DOCTRINE OF LACHES

NTEU's failure to comment on the FCIP rules during OPM's rulemaking proceeding, when combined with its inordinate delay in bringing this lawsuit, also calls for dismissal on the equitable ground of laches.  In this Circuit, laches will bar a claim if "it is shown that the party raising the defense was prejudiced by the other party's delay in raising the claim and that the delay was unreasonable."  Burka v. Aetna Life Ins. Co., 56 F.3d 1509, 1514 (D.C. Cir. 1995).  Here, NTEU delayed unreasonably in bringing its claim.  It was on notice at least as early as December 14, 2000 -- and likely as early as July 6, 2000, when President Clinton's Executive Order created the program -- that the federal government was instituting the FCIP as a new excepted service hiring authority.  In addition to not commenting during the rulemaking proceeding, NTEU waited over six years before bringing suit.

Moreover, the government is prejudiced by NTEU's delay.  As the Complaint alleges (Compl. at 2-3), over the almost seven years it has been in existence, the FCIP has expanded to the point where it is now widely used by numerous agencies throughout the federal government.  These agencies rely heavily on the availability of the FCIP hiring authority and have structured their recruitment and hiring strategies based on the assumption that the FCIP would continue to be available.  See generally MSPB Report, supra, at 25, 27.  In filing suit to invalidate the FCIP almost seven years after its inception, with no apparent event triggering its sudden interest, NTEU ignores the reliance that OPM and federal agencies have long placed on the program and

---

[6](...continued)
interim rule in any way material to NTEU's challenge; no other party submitted comments to OPM reflecting the issues presently raised by NTEU; and NTEU's arguments do not appear to include any contention that OPM is invalidly constituted.

their interests in the stability of the federal hiring system, as well as the significant disruptive

effects that its requested relief would cause, including repercussions for Career Interns

themselves, many of whom are not represented by NTEU.

Courts have rejected stale challenges to agency rules in similar circumstances.  In Energy

Cooperative, Inc. v. U.S. Dep't of Energy, 659 F.2d 146 (Temp. Emer. Ct. App. 1981), the

plaintiff "failed to comment at the time of the promulgation of the provision and failed to

comment during the following 31 months."  Id. at 150.  The court noted "the substantial hardship

that a challenge of the alleged improper rulemaking procedure would create at this very late

date."  Id.  Further, the plaintiff "simply could not have been seriously prejudiced by the alleged

improprieties when it participated under the program for so long without raising the issue."  Id.

Thus, the court affirmed the district court's dismissal of the complaint.  Similarly, in Independent

Bankers Ass'n v. Heimann, 627 F.2d 486 (D.C. Cir. 1980), the D.C. Circuit applied laches to bar

an action challenging an interpretive ruling by the Comptroller of the Currency.  The court noted

that the banking industry association plaintiff could reasonably be expected to monitor regulatory

trends in the industry, and that third party banks had made substantial financial commitments in

order to structure their programs to comply with the interpretive ruling.  The court held that

"[e]quity will not protect a party that through years of silence has created an impression of

acquiescence that has led others to make substantial financial commitments."  Id. at 488.

Here, as in Independent Bankers Association, NTEU is not a hapless victim of

circumstances whose inattention to the FCIP program over a protracted period can be excused.

Rather, it is a union whose very mission consists of tracking legislative and regulatory

developments affecting federal employees and raising issues that it perceives as adversely

15

affecting its membership.  As in Energy Cooperative, plaintiff failed to comment at the time of

promulgation and likewise failed to sue or otherwise raise its concerns for a lengthy period of

time after the program was up and running, even as the very employees on whose behalf it

purports to sue participated in the program.  And similar to both cases, dozens of agencies and

thousands of employees hired under the FCIP have relied on the program to the point where it

has become an important part of the federal hiring regime and has provided the foundation for

countless federal careers.  This challenge comes too late and should be dismissed.

    While the equitable defense of laches is "wholly independent of the statute of

limitations," Simmons v. Burlington, C.R. & N. Ry. Co., 159 U.S. 278, 292 (1895), it is worth

noting that this lawsuit also is untimely under the six-year statute of limitations of 28 U.S.C.

§ 2401(a).  See P&V Enters. v. Army Corps of Engineers, 466 F. Supp. 2d 134, 141-44 (D.D.C.

2006) (holding that § 2401(a) applies to lawsuits facially challenging agency regulations).  NTEU

may contend that its cause of action did not accrue until the issuance of the final regulations in

2005.  However, the interim regulations were effective immediately, and therefore whatever

harms NTEU associates with the FCIP would have commenced at that time.  "A cause of action

against an administrative agency 'first accrues,' within the meaning of § 2401(a), as soon as (but

not before) the person challenging the agency action can institute and maintain a suit in court."

Spannaus v. U.S. Dep't of Justice, 824 F.2d 52, 56 (D.C. Cir. 1987).  NTEU could have

instituted and maintained a suit in court at least as early as the issuance of the December 14, 2000

interim rule because "[a]n interim rule is reviewable as a final agency action."  Gas Appliance

Mfrs. Ass'n, Inc. v. Sec'y of Energy, 722 F. Supp. 792, 794 n.1 (D.D.C. 1989) (citing Mid-Tex

Elec. Coop., Inc. v. FERC, 822 F.2d 1123 (D.C. Cir. 1987)).  Moreover, as NTEU appears to

concede, see Compl. ¶ 12, the final regulations were not different from the interim regulations in any way material to the issues in this litigation. In any event, even if not barred by the statute of limitations, NTEU's claims are still barred by the equitable doctrine of laches.[7]

## III.    NTEU LACKS STANDING

In addition to the reasons discussed above, this action should be dismissed for lack of Article III standing. Although the complaint alleges three distinct theories of injury to different subsets of employees NTEU represents, each of those theories is inherently speculative and conjectural. NTEU essentially asks this Court to assume standing, based on hypotheticals that may or may not exist. Moreover, NTEU's multiple theories of standing inescapably conflict with each other. For this reason, even if one or more NTEU-represented employees who has standing exists, NTEU does not have standing as an association to proceed on their behalf. At a minimum, NTEU should be required to join the individual employees it claims are concretely and adversely affected by the FCIP as co-plaintiffs in this lawsuit.

### A.    General Standing Principles

The "judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts," but is limited to the resolution of actual "cases" and "controversies." Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 471 (1982). The doctrine of

---

[7] It should be noted that application of equitable doctrine of laches or the statute of limitations to bar the instant lawsuit by NTEU does not make the FCIP permanently immune from judicial review. To the extent that the FCIP works a current and cognizable injury on any individual employee or group of employees, such employees retain all the rights described in Section IV, infra, under the Civil Service Reform Act, including in some cases the possibility of judicial review after administrative remedies have been exhausted.

"standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). And "the party invoking federal jurisdiction bears the burden of establishing its existence." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 104 (1998).

An association, including a union such as NTEU, "'has standing to bring suit on behalf of its members when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 553 (1996) (quoting Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)).[8]

The first prong of this associational standing inquiry requires NTEU to show that one or more of its members meets the traditional test for individual standing: A plaintiff first "must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (citations, footnote, and internal quotation marks omitted). Importantly, injury-in-fact requires more than " 'an ingenious academic exercise in the conceivable.' " Alaska Legislative Council v. Babbitt, 181 F.3d 1333, 1339 (D.C. Cir. 1999) (quoting United States v. Students

---

[8] A union may also have standing to sue on its own behalf if it alleges injury directly to itself, as distinguished from injury to its members, but here, the complaint does not appear to assert any theories of injury directly to NTEU. See Compl. at 3 (setting forth three theories of standing, each involving alleged injury to "NTEU-represented employees"). Should NTEU change its tack and assert a theory of standing on its own behalf, we reserve the right to respond at that juncture.

Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 688 (1973)). "Second, there must be a causal connection between the injury and the conduct complained of . . . ." Lujan, 504 U.S. at 560. In particular, "the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" Id. (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976)). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. (internal quotation marks omitted).

**B.    The Complaint Fails to Identify Any
NTEU-Represented Employee Who Has Standing to Challenge the FCIP**

The complaint fails to identify any federal employee who has suffered a cognizable injury-in-fact that is traceable to the FCIP and redressable through judicial invalidation of the FCIP. Instead, NTEU essentially asks the Court to indulge an assumption that one or more such employees must exist somewhere within its membership. But standing requires showings, not assumptions. See NTEU v. Horner, 659 F. Supp. 8, 12 (D.D.C. 1986) ("the Court cannot rest its finding of standing, and thus its exercise of jurisdiction, solely on an assumption"), later opinion aff'd, 852 F.2d 490 (D.C. Cir. 1988); see also Renne v. Geary, 501 U.S. 312, 316 (1991) (federal courts should presume that they lack jurisdiction "unless the contrary appears affirmatively from the record" (internal quotation marks omitted)). The traceable and redressable injury-in-fact demanded by Article III must be injury to actual individuals, not to some vague hypothetical composite. See Am. Immigration Lawyers Ass'n v. Reno, 18 F. Supp. 2d 38, 51 (D.D.C. 1998) (rejecting associational standing where plaintiff association can "identify only vague categories of members that might suffer harm" but "can point to no identifiable member or members for

19

which the Court can evaluate the harm"), aff'd, 199 F.3d 1352 (D.C. Cir. 2000).  As we shall

show, none of NTEU's theories of injury to various categories of employees withstands scrutiny.

        1.      NTEU-Represented Career Interns

        NTEU's claim that current Career Interns are injured by the very program that enabled

them to be appointed to their positions (Compl. ¶¶ 17-20) collapses of its own weight.  The sole

alleged injury to such employees is that they "must wait an extra year before they have the right

to appeal any decision to terminate their employment to the MSPB or through the negotiated

grievance-arbitration period."  Compl. ¶ 18; see also id. ¶¶ 19-20.  This contention is based on

the fact that competitive service employees generally have to complete a one-year probationary

period before they receive rights to appeal adverse actions to the Merit Systems Protection Board

("MSPB"), whereas non-preference eligible[9] excepted service employees, such as Career Interns,

generally have to complete a two-year probationary period before receiving such rights.  See 5

U.S.C. § 7511(a)(1).

        It is entirely unclear, however, whether the two-year probationary period feature of the

FCIP can be said to constitute a net "injury" to Career Interns.  After all, the two-year duration of

the internship provides the Career Intern with a longer opportunity both to evaluate whether the

position is a suitable long-term career fit, and to prove to his agency employer that he can

perform at a level warranting conversion to competitive service at the conclusion of the

internship.  Particularly for Career Interns who have significant potential but little work

experience, these enhanced opportunities might well be a positive, rather than a negative.

---

      [9] The terms "non-preference eligible" and "preference-eligible" refer to whether an
employee has veterans preference status under 5 U.S.C. § 2108.

In any event, even if a one-year difference in accrual of the right to appeal a termination to the MSPB constitutes an injury per se despite the countervailing benefits of a two-year probationary period for many Career Interns, such an injury could potentially apply only to a limited cross-section of Career Interns, i.e., non-preference Career Interns currently serving in their second year.[10]  Even as to this cross-section, however, the alleged injury is one that is inherently contingent and speculative, not "actual or imminent," Lujan, 504 U.S. at 560.  It cannot reasonably be controverted that for the vast majority of Career Interns, their internships will pass without ever feeling the slightest effect from the lack of a right to appeal a termination to the MSPB.  "A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action." SCRAP, 412 U.S. at 688-89.  NTEU has not identified any members who have found themselves in or reasonably expect to face this situation.[11]

---

[10]  This asserted "injury" cannot even potentially apply to Career Interns who are currently in the first year of their internship.  Even if they were in the competitive service, first-year Career Interns would lack such MSPB appeal rights because, as plaintiffs concede (Compl. ¶ 17), competitive service employees generally do not possess such rights during their first year of service.  Further, contrary to NTEU's contention in paragraphs 19 and 20 of the Complaint, Career Interns serving an internship extended to three years do not suffer this "injury" during their third year.  Under the statute, excepted service employees automatically obtain the right to appeal their termination to the MSPB when they have "completed 2 years of current continuous service in the same or similar positions in an Executive agency under other than a temporary appointment limited to 2 years or less." 5 U.S.C. § 7511(a)(1)(C)(ii).  Consequently, Career Interns serving a third year of a three-year internship have the same MSPB appeal rights that they would have if they were in the competitive service.  The asserted "injury" also does not affect preference-eligible Career Interns, who, like competitive service employees, can appeal a termination to the MSPB after one year of current continuous service.  See 5 U.S.C. § 7511(a)(1)(B).

[11]  Because all that is at stake is the difference between one-year and two-year vesting of MSPB appeal rights, the standing issue here is distinguishable from NTEU v. Horner, 659 F.

(continued...)

Further, even supposing that some hypothetical non-preference, NTEU-represented, second-year Career Intern is subject to a termination that would be appealable to the MSPB but for his excepted service status, there is an even more critical fallacy in NTEU's theory of standing:  an utter lack of redressability.  Plaintiff is required to show that it is "likely" that the specific injury alleged "will be redressed by a favorable decision."  Lujan, 504 U.S. at 560; see also Warth v. Seldin, 422 U.S. 490, 508 (1975) (plaintiff must show that "he personally would benefit in a tangible way from the court's intervention").  Here, a decision in NTEU's favor would consist of facial invalidation of the FCIP.  See Compl. at Prayer for Relief (asking that OPM's FCIP regulations be declared "arbitrary, capricious, contrary to law, null and void" and that federal agencies be enjoined "from continuing to exercise any of the authority granted by such regulations").  That relief, of course, would do nothing to ameliorate the supposed plight of a second-year Career Intern aggrieved by her inability to appeal a termination to the MSPB.  Such an individual would go from having a federal job (and being less than a year away from acquiring MSPB appeal rights) to having no current federal job, but being free to reapply for her old job through the competitive service hiring process, with the consolation prize that if selected and reemployed, she will then acquire MSPB appeal rights on a quicker schedule than when she

---

[11](...continued)
Supp. 8, where the district court held that excepted service employees had standing to challenge the placement of their jobs in the excepted service because excepted service status "deprived them of certain privileges and protections," id. at 10.  Under the law in effect at the time of Horner, excepted service employees generally were permanently denied MSPB appeal rights.  In 1990, however, Congress amended the statute to give most excepted service employees MSPB appeal rights after two years service.  See Civil Service Due Process Amendments, Pub. L. No. 101-376, 104 Stat. 461-63 (1990) (codified in principal part at 5 U.S.C. § 7511(a)(1)(C)).  Thus, what was previously a difference between having MSPB appeal rights versus lacking them throughout one's entire career is now reduced to a difference between accruing them after one year or two.

was a Career Intern.  One might question whether many Career Interns would consider this "redress."

Based on similar considerations, NTEU's theory of injury to Career Interns also fails the traceability prong of the standing analysis.  A Career Intern's inability to appeal his termination to the MSPB during the second year is causally linked to the FCIP only if an underlying assumption is made that, absent the FCIP, that individual would have been appointed to the same position in the competitive service.  Such an assumption is purely speculative, and, as discussed below, is at odds with NTEU's separate theory that current non-FCIP employees would benefit from having hiring done through competitive procedures rather than through the FCIP.

2.    Current Non-FCIP Employees Represented by NTEU

NTEU's theory of standing on behalf of current non-FCIP employees is even more attenuated.  NTEU alleges that the FCIP injures such employees "because they are deprived of their statutory rights to compete for the [FCIP] vacancies on the basis of their relative skills and abilities, in a fair and open process."  Compl. ¶ 21.  However, this contention makes no sense in light of two admissions NTEU simultaneously makes.  First, in the very same paragraph, NTEU freely admits, as it must, that "[c]urrent NTEU-represented employees are permitted to apply for FCIP vacancies through the external application procedure on the same footing as members of the general public."  Id.  Thus, current employees are not "deprived" of an opportunity to compete for FCIP vacancies.  They are, rather "permitted" to apply for those vacancies through a process that is required, by the very terms of the FCIP, to be "in accordance with merit system principles," 5 C.F.R. § 213.3202(o)(10), i.e., "on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity," 5 U.S.C.

23

§ 2301(b)(1).

Second, NTEU concedes that Career Interns "frequently work side-by-side in the same jobs with non-FCIP new hires." Compl. ¶ 15. If the same jobs are "frequently" occupied simultaneously by both FCIP-hired Career Interns and non-FCIP new hires, then the FCIP must not be the exclusive hiring authority available or used for those jobs, so current non-FCIP employees have other avenues for seeking the desired positions. Of course, an employee who is free to seek appointment to a desired position under authority other than the FCIP does not experience any cognizable injury-in-fact merely because their agency simultaneously uses the FCIP as authority to appoint others to that position. See Valley Forge, 454 U.S. at 473 ("The federal courts have abjured appeals to their authority which would convert the judicial process into no more than a vehicle for the vindication of the value interests of concerned bystanders." (internal quotation marks omitted)).

NTEU's theory of standing on behalf of current non-FCIP employees is also flawed because the complaint contains no allegation that any such employee it represents is actually interested in, qualified for, and has applied but was not selected for an FCIP position. Under Circuit precedent, this omission alone is fatal. In Albuquerque Indian Rights v. Lujan, 930 F.2d 49 (D.C. Cir. 1991), an association representing American Indian employees of the Department of Interior sued to challenge Interior's refusal to apply statutory Indian hiring preferences to a certain subset of positions. The D.C. Circuit held that the association lacked standing because it "failed to assert that any of its members actually applied for or otherwise sought to fill vacant OCM positions." Id. at 55. The association named some members who were "interested," but failed to allege that they would be qualified for the positions in question. Id. at 56. "Unadorned

24

statements that AIRA members were 'interested' in positions or 'would have applied' for positions," the court held, "do not satisfy the burden of showing that any of plaintiff's members 'personally . . . suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant[s].'"  Id. at 57 (quoting Valley Forge, 454 U.S. at 472 (emphasis and alterations in original)).  The association did identify two members who were qualified; however, because those individuals had failed to apply, it was purely a matter of speculation whether the agency's refusal to apply Indian hiring preferences would have made any difference in the outcome of such an application.  Id. at 56.

In this case, NTEU's allegations are even more sparse than those the D.C. Circuit found insufficient in Albuquerque Indian Rights.  NTEU fails to identify any member who is either interested in, qualified for, or has applied for an FCIP position but been rejected, let alone a member who meets all three conditions.  The "unadorned statement" that certain positions covered by the FCIP "are often sought by lower graded employees in order to advance their careers" (Compl. ¶ 25) is far too vague and general to meet the requirement that NTEU identify specific situations where its members have "personally . . . suffered some actual or threatened injury" from the allegedly unlawful application and selection process.  Albuquerque Indian Rights, 930 F.2d at 57.[12]

In any event, even assuming arguendo (although NTEU has not alleged) that the FCIP is

_____

[12] The court in Albuquerque Indian Rights mentioned possible exceptions that would allow a non-applicant to have standing to challenge a "disqualifying statute or regulation," i.e., a law or regulation that prevents them from even applying for the position.  Albuquerque Indian Rights, 930 F.2d at 57.  Here, of course, that exception cannot possibly apply, because NTEU forthrightly admits that "[c]urrent NTEU-represented employees are permitted to apply for FCIP vacancies . . . ."  Compl. ¶ 21.

the exclusive hiring authority for certain desirable jobs, and that as-yet-unidentified NTEU-represented employees are interested in, qualified for, and have applied for FCIP vacancies but been rejected, that still would not be sufficient to establish standing on behalf of such employees. Given that current employees are indisputably <u>permitted</u> to apply for positions through the FCIP process, NTEU's claim of injury to such employees necessarily reduces to a hypothesis that using FCIP selection, instead of traditional competitive service selection, inherently disfavors internal applicants. But there is no basis for making such a sweeping categorical judgment.[13] Some current competitive service employees might fare worse under FCIP hiring, but some might fare better. A weak candidate might be equally unlikely to get the job under either hiring method, just as a strong candidate may be a shoo-in either way.

The point is that whether the FCIP is good, bad, or neutral for the promotion prospects of current non-FCIP federal employees depends on individual situations, and is simply not capable of facile generalization. In this respect, NTEU's theory of standing is even weaker than the one rejected in <u>Albuquerque Indian Rights</u>, where it could at least be reasonably assumed that Indian applicants as a class would be ineluctably better off with Indian preference criteria than without them. To be sure, it is <u>possible</u> that there is some NTEU-represented current employee out there who has applied but been rejected for an FCIP position for which he is qualified; that the same

---

[13] To the extent that the FCIP could be characterized as making it more difficult for some current employees to get promotions in the sense that it attracts or results in additional or outside applicants for those positions, that "injury" would not be one upon which they could rely for standing. An interest in limiting the field of competition is not within the "zone of interests" of the civil service laws, which of course strive for "fair and open competition" with participation "from all segments of society," 5 U.S.C. § 2301(b)(1). <u>See</u> generally <u>Ass'n of Data Processing Serv. Orgs., Inc. v. Camp</u>, 397 U.S. 150, 153 (1970) (requiring that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question").

position, absent the FCIP, would be filled through competitive examination; and that the employee could reasonably expect to fare better under competitive examination. But the Court's Article III jurisdiction must rest on more than abstract possibilities. An association like NTEU is "obligated to allege facts sufficient to establish that one or more of its members has suffered, or is threatened with, an injury." Valley Forge, 454 U.S. at 487 n.23. As in Horner, "the Court cannot rest its finding of standing, and thus its exercise of jurisdiction, solely on an assumption." 659 F. Supp. at 12.

### 3.    Current IRS Employees

NTEU alleges particular injury to current NTEU-represented employees at IRS who seek promotions to positions filled via FCIP hiring authority. See Compl. ¶¶ 22-30. According to NTEU, the 2006 NTEU/IRS National Agreement confers certain rights on current employees when applying for promotions -- namely, the posting of vacancy announcements at sources widely accessible to agency employees, see Compl. ¶ 26 (citing National Agreement Article 13, § 3), and "first consideration" preferences for internal candidates, see Compl. ¶ 28 (citing National Agreement Article 13, § 1(B)). These rights do not, however, extend to vacancies filled through the FCIP.

NTEU-represented employees at IRS, and by extension NTEU itself, lack standing to challenge the FCIP facially on this basis. Any injury that NTEU claims such employees suffer results not from anything inherent in the FCIP or OPM's regulations, but rather from the collective bargaining agreement provisions defining the scope and applicability of the rights in question. The scope of the rights enjoyed by IRS employees under Article 13 of the National Agreement is defined by Section 2 of Article 13. Section 2.A provides that "[t]he provisions of

27

this section apply to all placement actions within the bargaining unit except those specifically excluded by subsection 2B."[14]  Subsection 2B goes on to list thirteen such exclusions, including "Government-wide special emphasis programs (such as VRA, Handicapped, Worker Trainee, and Cooperative Education Programs), up to and including conversion into the competitive service."  National Agreement Article 13, § 2B6.  IRS construes this exclusion as including the Government-wide FCIP.  Thus, as NTEU alleges, the special rights that Article 13 gives IRS employees do not apply to FCIP vacancies.

But this lack of applicability flows from the particular provisions of the collective bargaining agreement that NTEU and IRS negotiated and consensually agreed to.  As a result, any "injury" IRS employees may experience from the limited applicability of Article 13 is not "traceable" to the FCIP for standing purposes.  The D.C. Circuit rejected a closely analogous theory of standing in Brotherhood of Locomotive Engineers and Trainmen v. STB, 457 F.3d 24 (D.C. Cir. 2006), where a union claimed that the Surface Transportation Board's decision to exempt a railroad transaction injured it by depriving it of the right to bargain with the railroad concerning the transaction.  This lack of bargaining rights, however, flowed from a provision in the union's collective bargaining agreement with the railroad in which the union waived the right to bargain concerning transactions exempted by the STB.  The Court held that "[t]he Board's decision means the Union is not entitled to bargain over the effects of the transaction only because the Union agreed to that limitation in its CBA.  This injury was not in any meaningful way 'caused' by the Board; rather, it was entirely self-inflicted and therefore insufficient to

_____

[14] The provisions of the National Agreement cited herein are contained in the excerpt from the National Agreement appended to the complaint in this matter.

confer standing upon the Union." Id. at 28.

Brotherhood of Locomotive Engineers is controlling here. The special rights conferred by the National Agreement do not apply to FCIP vacancies for the simple reason that the union agreed to a provision in the National Agreement making exceptions to those rights.[15] Thus, any "injury" flowing from such "self-inflicted" limitations can hardly confer standing upon NTEU. NTEU's claims on behalf of IRS employees are also deficient for the same reasons as its claims on behalf of current non-FCIP employees generally: NTEU fails to allege that any particular IRS employee is interested in, qualified for, and has actually been rejected for an FCIP vacancy. Thus, whether the non-application of Article 13 first-consideration rights has actually made a difference in any particular case is purely a matter of speculation, upon which Article III jurisdiction cannot rest. See Albuquerque Indian Rights, 930 F.2d at 55-57; supra § III.B.2.

### C.    To the Extent Any NTEU-Represented Employees Would or Could Have Standing, This Lawsuit Cannot Proceed Without Their Joinder

The third prong of the Hunt test for associational standing asks whether "the claim asserted [or] the relief requested requires the participation of individual members in the lawsuit." United Food & Commercial Workers, 517 U.S. at 553 (internal quotation marks omitted). Here,

---

[15] To the extent that NTEU may take the position that it did not agree to this limitation, i.e., that IRS's interpretation of the contract is erroneous, that issue would be subject to the detailed grievance procedures set forth in the collective bargaining agreement. See National Agreement Article 41 (Employee Grievance Procedure); id. Article 42 (Institutional Grievance Procedure); see generally 5 U.S.C. § 7121(a)(1) ("[A]ny collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability . . . . [which] shall be the exclusive administrative procedures for resolving grievances which fall under its coverage."); 5 U.S.C. § 7103(a)(9) (defining "grievance" to include any complaint by an employee or labor organization concerning "the effect or interpretation, or a claim of breach, of a collective bargaining agreement"). Furthermore, that would be a matter between IRS and NTEU, as to which OPM would not be a proper defendant.

to the extent any individual members are alleged to have standing, their participation should be required.

In a typical associational standing case, where an association proceeds on behalf of common interests shared by its members generally. This case is very different: NTEU juggles theories of injury, affecting discrete subsets of its membership, that are riven with internal conflicts and contradictions. NTEU seeks simultaneously to vindicate injuries on behalf of current non-FCIP employees who contend that their promotion opportunities have been displaced by Career Interns, and injuries on behalf of Career Interns who are the current incumbents of those positions, having obtained them through the FCIP. These two theories are at cross-purposes. For either theory to be logically coherent requires assumptions that are mutually exclusive with the other.

For example, in order for the so-called injury experienced by a Career Intern (i.e., not getting MSPB appeal rights on the same schedule as a competitive service employee) to be traceable to the FCIP, it must be assumed that in the absence of the FCIP, competitive selection procedures necessarily would have resulted in that individual being hired into the same position anyway. See supra at 23. That assumption, however, puts the lie to NTEU's theory of injury to competitive service employees: if the Career Intern's occupancy of the desired position is a fait accompli no matter which hiring authority is used, then current non-FCIP employees suffer no injury-in-fact even if their only route to a promotion is through FCIP rather than traditional competitive service hiring processes. Conversely, if non-FCIP current employees would enjoy some advantages under competitive service hiring that they lack under FCIP, then it cannot be taken for granted that an FCIP hire would get the same appointment absent the FCIP authority.

30

In the same way, redressability for either category of represented employees necessarily comes at the expense of the other category.

Moreover, even taking the alleged injury to Career Interns in isolation, it is remarkable that NTEU is trying to vindicate contingent interests that matter to an unknown and likely small minority of Career Interns, at the expense of the jobs of all of them. Indeed, most Career Interns might well question whether their interests are served by a lawsuit that uses an ephemeral "injury" they never realized they were suffering as a basis to attack the validity of their jobs.

Because NTEU's theories of standing are so internally tangled in contradictions and conflicts, it should not be permitted to proceed as the sole plaintiff in this litigation via associational standing. See Kickapoo Tribe of Okla. v. Lujan, 728 F. Supp. 791, 796 & n.8 (D.D.C. 1990) (denying Indian tribe standing where "the interests of at least some members of the Band conflict with the interests the Tribe claims to assert on their behalf") (citing Assoc. Gen. Contractors v. Otter Tail Power Co., 611 F.2d 684, 691 (8th Cir. 1979)). We acknowledge that in National Maritime Union of Am., AFL-CIO v. Commander, Military Sealift Command, 824 F.2d 1228 (D.C. Cir. 1987), the D.C. Circuit held that "the mere fact of conflicting interests among members of an association does not of itself defeat the association's standing to urge the interests of some members in litigation, even though success may harm the legal interests of other members." Id. at 1234. The situation in this case, however, is not merely one where success by NTEU "may harm the legal interest of other members" (emphasis added). This is a case where the core interests upon which NTEU's standing is predicated are diametrically opposed to one another. Nothing in National Maritime Union requires the Court to extend associational standing to a theory that essentially involves robbing Peter to pay Paul.

31

The participation of individual members should also be required in a case, like this, where standing rests on assumptions and conjecture about whether such individuals actually exist. Without actual individuals in court as to whom injury-in-fact, traceability, and redressability can be meaningfully tested, standing takes on an abstract quality and becomes little more than an academic contest of suppositions and hypotheticals. It unduly dilutes Article III's "case or controversy" requirement to give NTEU a free pass on standing based on the vague notion that within a membership of 150,000 there must be someone somewhere who has standing to sue. See Am. Immigration Lawyers Ass'n, 18 F. Supp. 2d at 51 (rejecting associational standing where plaintiff association can "identify only vague categories of members that might suffer harm" and "can point to no identifiable member or members for which the Court can evaluate the harm"); NTEU v. U.S. Dep't of Treas., Civ. A. No. 92-1150(HHG), 1993 WL 835593, *4 (D.D.C. Feb. 12, 1993) (rejecting NTEU's associational standing in case where challenged program would affect different employees in different ways, because "in order to decide the important constitutional and administrative law issues raised by this lawsuit, participation of individual members is necessary").

Joining individual affected members as co-plaintiffs should pose no great burden to NTEU, assuming that such members exist and agree with NTEU that they are adversely affected by the FCIP. In fact, NTEU's failure to join individual co-plaintiffs in this case is a marked departure from its past practice in the other lawsuits it has brought challenging excepted service hiring programs. See, e.g., NTEU v. Seidman, 786 F. Supp. 1041, 1042 & n.1 (D.D.C. 1992) (action brought by NTEU and four individually-named plaintiffs hired under the challenged excepted service authority); Horner, 659 F. Supp. at 9 (action by NTEU and four named

32

individuals).  Indeed, in <u>Horner</u>, after the claims of the four originally named individual plaintiffs

became moot, the court <u>required</u> NTEU to amend the complaint to name other affected

individual employees, as "the Court cannot rest its finding of standing, and thus its exercise of

jurisdiction, solely on an assumption" that such affected employees exist.  <u>Id.</u> at 12.

Accordingly, if the Court permits this case to proceed despite all of the other arguments herein, it

should at a minimum hold NTEU to its past practice and the standard in <u>Horner</u>, and require it to

amend its complaint within 30 days to add appropriate individual plaintiffs.

## IV.    THE CIVIL SERVICE REFORM ACT PRECLUDES NTEU'S CLAIMS

Finally, this action should be dismissed because it is outside the framework set up by the

Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 111 (codified in

scattered sections of 5 U.S.C.), for administrative and judicial review of employee challenges to

agency action relating to personnel matters.  As discussed below, the Supreme Court and D.C.

Circuit have held that the CSRA's scheme precludes employees from filings such challenges

directly in federal district court under general statutes such as the APA.  The CSRA does provide

several mechanisms for review of NTEU's complaints about the FCIP, including possible

judicial review once administrative remedies are exhausted.  But just as NTEU neglected to

participate in the notice-and-comment proceedings for OPM's rulemaking, so too it has failed to

avail itself of these potential remedies provided by the CSRA.

The CSRA establishes a comprehensive, reticulated scheme for administrative and

judicial review of a federal agency's personnel actions, both individual and programmatic.  <u>See</u>

<u>generally</u> <u>United States v. Fausto</u>, 484 U.S. 439, 444-45 (1988).  In the CSRA, Congress

"replaced the [previous] patchwork system with an integrated scheme of administrative and

judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." Id. at 445.

This remedial scheme has a number of facets. Of relevance here, the CSRA rewrote Chapter 23 of Title 5 to forbid federal agencies from engaging in "prohibited personnel practices" with respect to competitive service employees and most excepted service employees. See 5 U.S.C. § 2302; Fausto, 484 U.S. at 446. "Prohibited personnel practices" are any of twelve listed items, including to "take or fail to take any [] personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in section 2301 of this title." 5 U.S.C. § 2302(b)(12). The term "personnel action" includes appointments, promotions, transfers, and reassignments, among other things. See 5 U.S.C. § 2302(a)(2)(A). As discussed earlier, one of foremost "merit system principles contained in section 2301 of [Title 5]" is that "selection and advancement should be determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity." 5 U.S.C. § 2301(b)(1). Here, the stated basis for NTEU's lawsuit is that "[t]he FCIP program undermines the public interest in the merit based civil service, contrary to statutory merit systems principles," which "require, among other things, that 'selection and advancement' in the civil service be determined 'on the basis of relative ability, knowledge and skills, after fair and open competition which assures that all receive equal opportunity." Compl. at 2-3 (quoting 5 U.S.C. § 2301(b)(1)).[16] Moreover, NTEU specifically alleges that its members are injured in obtaining appointments and promotions because of the alleged deprivation of the right to "compete for the [FCIP] vacancies on the basis

---

[16] The Complaint mis-cites the quoted language to 5 U.S.C. § 2302(b)(1).

of their relative skills and abilities in a fair and open process."  Compl. ¶ 21.

Significantly, however, Chapter 23 does not give employees the type of individual right of action that the CSRA provides in other sections, which enable defined categories of employees to personally litigate unacceptable-performance actions and major adverse personnel actions before the MSPB.  See Fausto, 484 U.S. at 445-47 (surveying and comparing the various parts of the CSRA); Harrison v. Bowen, 815 F.2d 1505, 1511-12 (D.C. Cir. 1987); Carducci v. Regan, 714 F.2d 171, 175 (D.C. Cir. 1983).  Rather, for a prohibited personnel practice or violation of merit system principles that does not constitute a specific action appealable under some other provision of the CSRA, an aggrieved employee's sole remedy is to file charges with the Office of Special Counsel.  See Harrison, 815 F.2d  at 1511-12; Barnhart v. Devine, 771 F.2d 1515, 1527 (D.C. Cir. 1985); Gray v. OPM, 771 F.2d 1504, 1510 (D.C. Cir. 1985); Carducci, 714 F.2d at 175.  The Special Counsel investigates the charges and, if deemed appropriate, seeks remedial action from the agency and/or the MSPB.  See 5 U.S.C. § 1214; Barnhart, 771 F.2d at 1520-21 (describing Special Counsel investigation and review process).  Because agencies' selection and promotion decisions generally cannot be challenged under other provisions of the CSRA, see, e.g., Prewitt v. MSPB, 133 F.3d 885, 886 (Fed. Cir. 1998) ( "An agency's failure to select an applicant for a vacant position is generally not appealable to the Board."), allegations that selection or promotion decisions or practices violate merit system principles normally can be pursued only through the Special Counsel review process.[17]

The CSRA also establishes a specific system for administrative and judicial review of

---

[17] There are certain exceptions for selection or promotion decisions alleged to violate equal employment opportunity, veterans' preferences, or whistleblower protections.  None of those exceptions would appear to be implicated in the instant case.

OPM rules and regulations of general applicability that are alleged to constitute or lead to prohibited personnel practices. Here, NTEU specifically alleges that OPM's FCIP regulations are "contrary to statutory merit systems principles" and deprive employees of the ability to compete for vacancies on the basis of their relative skills and abilities in a fair and open competition, thus in essence alleging that the regulations require and result in a prohibited personnel practice. Under 5 U.S.C. § 1204(f), review of such allegations is vested in the first instance in the MSPB, which is directed to review any OPM rule or regulation (1) on its own motion, (2) on the filing of a complaint by the Special Counsel, or (3) in its discretion upon the filing of a petition for review by any interested person. See 5 U.S.C. § 1204(f)(1); see generally NTEU v. MSPB, 743 F.2d 895, 905-06 (D.C. Cir. 1984) (discussing origins and purpose of this provision, then numbered as § 1205(e)). The MSPB is empowered to declare an OPM rule invalid on its face, or invalidly implemented by a particular agency, if it would require or has resulted in a prohibited personnel practice. See id. § 1204(f)(2). The MSPB is further empowered to require agencies to cease compliance with any OPM rules or regulations found facially invalid, and to correct any invalid implementation of OPM rules or regulations. See id. § 1204(f)(4). The MSPB's order on such review is appealable to the Federal Circuit. See 5 U.S.C. § 7703. NTEU has utilized the § 1204(f) process in the past to make facial challenges to OPM rules and regulations on grounds similar to those raised here. See NTEU, 743 F.2d at 908 (appeal from MSPB order upholding OPM rule denying Chapter 75 appeal rights to certain seasonal workers for certain adverse a ctions).[18]

---

[18]  Because plaintiff complied with the statutorily prescribed review scheme in NTEU, the exclusivity of the § 1204(f) process was not directly before the D.C. Circuit in that case.

(continued...)

The case law interpreting the CSRA's detailed remedial prescriptions establishes several propositions. The first is an exhaustion principle -- parties are required to exhaust administrative remedies under the CSRA before attempting to secure judicial relief. See Harrison, 815 F.2d at 1516 (faulting plaintiff for not first seeking Special Counsel review). Second, the CSRA's specification of remedies available to certain employees for review of certain actions implicitly precludes statutory remedies for employees other than those specified, or review of actions other than those specified. See Fausto, 484 U.S. at 448-49 ("the absence of provision for [non-preference excepted service] employees to obtain judicial review is not an uninformative consequence of the limited scope of the statute, but rather manifestation of a considered congressional judgment that they should not have statutory entitlement for review"); Graham v. Ashcroft, 358 F.3d 931, 935 (D.C. Cir. 2004) (provision for review of certain personnel actions implies exclusion of review for others). Third, a litigant cannot avoid the absence of a remedy in the CSRA simply by proceeding under a different statute. See Fausto, 484 U.S. at 454-55 (precluding action under Back Pay Act); Carducci, 714 F.2d at 175 (precluding action under APA).

---

[18](...continued)
However, the D.C. Circuit's comments in that case strongly suggest that parties challenging OPM rules and regulations as giving rise to "prohibited personnel practices" are required at least to try to avail themselves of MSPB review under § 1204(f) before pursuing judicial review. While the D.C. Circuit allowed that a party could seek initial judicial review in federal district court if the MSPB, in its discretion, denied review, it observed that § 1204(f) enables the MSPB "to control whether the district courts or the courts of appeals will review challenges to the facial invalidity of OPM rules and regulations through its own unreviewable power to grant or deny administrative review." NTEU, 743 F.2d at 907-08. It would make little sense to describe the MSPB as having such "control" if a party making a challenge to OPM rules and regulations falling within § 1204(f) were free simply to cut the MSPB out of the loop entirely by filing directly in district court in the first instance, as NTEU has done here.

In this case, the CSRA precludes review of NTEU's claims both because the CSRA limits employee remedies for the types of claims made here, and because NTEU appears to have disregarded and bypassed the available review mechanisms that the CSRA does provide. First, the CSRA generally does not make non-promotions of current federal employees actionable, other than through Special Counsel review. If the CSRA limits the ability of an individual current competitive service employee to challenge a specific incident in which he is not selected for a promotion, it would make little sense to construe the CSRA as allowing an abstract challenge to a hiring authority that, at most, allegedly makes it more difficult for some unknown set of hypothetical individuals to be selected for promotions. Second, there is no indication that NTEU or any of its members have availed themselves of the Special Counsel review designed for the type of allegations it brings in this case. Third, NTEU has not sought review of OPM's FCIP regulations by the MSPB pursuant to § 1204(f), a process that it has previously used in other cases.

It is expected that NTEU will rely on <u>NTEU v. Devine</u>, 733 F.2d 114 (D.C. Cir. 1984), a case predating <u>Fausto</u> and several of the D.C. Circuit cases cited above, for the proposition that the CSRA does not preclude APA facial challenges to OPM rules and regulations of general applicability. In that case, NTEU sued OPM to block implementation of new labor-relations regulations on the ground that an intervening appropriations act passed by Congress forbade the use of any funds to administer or implement the regulations. Rejecting an argument that particular labor-relations remedial mechanisms in Chapter 71 of Title 5 precluded judicial review in that case, the court explained that "[i]t is one thing to say that when a statute provides a detailed scheme of administrative protection for defined employment rights, less significant

38

employment rights of the same sort are implicitly excluded and cannot form the basis for relief directly through the courts.  It is quite different to suggest, as appellant does, that a detailed scheme of administrative adjudication impliedly precludes preenforcement judicial review of rules."  Id. at 117 n.8.

Devine is not controlling because both the nature of the lawsuit and the identity of the specific remedial mechanisms invoked as preclusive there were far different than in the instant case.  In Devine, relief was sought on the extraordinary basis that a supervening statute expressly disapproved and blocked implementation of the regulations.  Here, in contrast, by NTEU's own allegations in the complaint, its claims are the classic type of grievance that can and must be pursued through the CSRA's array of remedies.  As  discussed above, NTEU alleges that "the FCIP program undermines the public interest in the merit based civil service, contrary to statutory merit systems principles" such as "that 'selection and advancement' in the civil service be determined 'on the basis of relative ability, knowledge and skills, after fair and open competition which assures that all receive equal opportunity.'"  Compl. at 2-3 (citing 5 U.S.C. § 2301(b)(1)); see also Compl. ¶ 21.  The Special Counsel's review of alleged "prohibited personnel practices," see 5 U.S.C. § 1214, and the MSPB's review of OPM rules for whether they cause or lead to "prohibited personnel practices," 5 U.S.C. § 1204(f), exist to deal with exactly these types of allegations.  See 5 U.S.C. § 2302(b)(12) (making it a prohibited personnel practice to take or fail to take any personnel action in a way that violates the merit system principles set forth in § 2301(b)(1)); 5 U.S.C. § 1212(a)(2) (Special Counsel's primary function is to "receive and investigate allegations of prohibited personnel practices").  Moreover, the "detailed scheme of administrative protection" to which Devine was referring consisted of a

particular set of labor-relations remedial mechanisms contained in Chapter 71 of Title 5. It was on those mechanisms, designed to adjudicate unfair labor practices and similar matters, that the <u>Devine</u> court was focused, not on the parts of the CSRA that are implicated in this case, which would have been inapposite given the nature of the challenge in <u>Devine</u>.[19]

Furthermore, it would make little sense to read <u>Devine</u> as establishing an absolute, categorical rule limiting CSRA preclusion to individualized adjudications when the CSRA's remedial scheme includes provisions designed specifically for review of rules, policies, and practices of general applicability. After all, the review process set forth at 5 U.S.C. § 1204(f) applies by its terms to OPM "rule[s] or regulation[s]." Likewise, the Special Counsel reviews

---

[19] As the district court in <u>Devine</u> put it, in that case "the Court [was] <u>not</u> confronted with the sort of controversy falling neatly within the CSRA's scheme" under Chapter 71, which it described as "exclusive for the resolution of the grievances, adverse actions, and unfair labor practices which it encompasses." <u>NTEU v. Devine</u>, 577 F. Supp. 738, 745 (D.D.C. 1983) (emphasis in original), <u>aff'd</u>, 733 F.2d 114 (D.C. Cir. 1984). In this case, the contrast could not be more clear: NTEU's challenge, as articulated by NTEU itself, <u>see</u> Compl. at 2-3, ¶ 21, <u>does</u> "fall neatly within" the scheme of the CSRA provisions we have cited.

In <u>NTEU v. Chertoff</u>, 385 F. Supp. 2d 1, 23 (D.D.C. 2005), <u>aff'd in part</u>, <u>rev'd in part</u> <u>on other grounds</u>, 452 F.3d 839 (D.C. Cir. 2006), the district court similarly held that the specific labor-relations provisions in Chapter 71 of the CSRA did not bar a pre-enforcement challenge to the Department of Homeland Security's new human resources management system. The court relied primarily, however, on the fact that the very rules being challenged had "in significant measure" waived Chapter 71 of Title 5, such that "the FLRA is without jurisdiction to adjudicate the Plaintiffs' complaint." <u>Id.</u> The court also relied on a statutory provision that it construed as providing "express congressional direction . . . [that] the Complaint is properly before the Court as a review of rulemaking under the APA." <u>Id.</u> Here, OPM's FCIP regulations do not affect any jurisdiction of the Special Counsel or MSPB, and there is no "express congressional direction" preferring APA review. In any event, the complaint in <u>NTEU</u>, unlike the complaint in this case, did not challenge the rules in question as "contrary to statutory merit system principles," <u>i.e.</u>, as "prohibited personnel practices" subject to § 1204(f) MSPB review and/or Special Counsel review pursuant to 5 U.S.C. § 1214. Thus, the parts of the CSRA that are relevant in this case were not even at issue in <u>Chertoff</u>.

"allegations of prohibited personnel practice[s]."  5 U.S.C. § 1214(a)(2) (emphasis added).

Indeed, D.C. Circuit cases after Devine have rejected the argument that "a collateral, systemwide

challenge to OPM policy" escapes preclusion.  Fornaro v. James, 416 F.3d 63, 67 (D.C. Cir.

2005).  As the court held, "[a]llowing an alternative route to relief in the district court because

plaintiffs frame their suit as a systemwide challenge to OPM policy would substitute an entirely

different remedial regime for the one Congress intended to be exclusive."  Id. at 68; see also Gray

v. OPM, 771 F.2d 1504 (D.C. Cir. 1985) (applying CSRA preclusion principles to bar suit

challenging general OPM practices regarding promotion of ALJs to GS-16 level); Barnhart v.

Devine, 771 F.2d 1515, 1527 (D.C. Cir. 1985) (applying CSRA preclusion principles to bar suit

seeking to compel OPM to do position-to-position comparison affecting sizable class of

employees).

     Accordingly, NTEU should not be permitted to bypass the mechanisms established by the

CSRA for review of its objections to the FCIP.  This case should be dismissed because NTEU's

claims are precluded by the CSRA.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that her motion to dismiss be granted and that the case be dismissed.

Dated: May 2, 2007                                Respectfully submitted,


Of Counsel:                                       PETER D. KEISLER
                                                  Assistant Attorney General
KERRY B. McTIGUE
General Counsel                                   JEFFREY A. TAYLOR
                                                  United States Attorney
KATHIE A. WHIPPLE
STEVEN E. ABOW                                    SUSAN K. RUDY
RISA B. CHERRY                                    Assistant Director
Office of the General Counsel
U.S. Office of Personnel Management
1900 E Street NW                                   /s/ Robert J. Katerberg
Washington, D.C. 20415                            ROBERT J. KATERBERG
(202) 606-1700                                     (D.C. Bar No. 466325)
                                                  Trial Attorney
                                                  U.S. Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  20 Massachusetts Avenue, N.W., Room 6112
                                                  Washington, D.C. 20001
                                                  Telephone:    (202) 616-8298
                                                  Facsimile:    (202) 616-8460
                                                  Robert.Katerberg@usdoj.gov

                                                  Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civ. A. No. 07-168 (RWR) ) |
| LINDA M. SPRINGER, Director, U.S. Office of Personnel Management, | ) ) ) |
| Defendant. | ) |

**[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

Upon consideration of defendant's motion to dismiss, plaintiff's opposition thereto, and

the entire record herein, it is hereby

ORDERED that defendant's motion is GRANTED, and it is

FURTHER ORDERED that this action is DISMISSED WITH PREJUDICE.


Dated: _____          _____

RICHARD W. ROBERTS
United States District Judge