IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

NATIONAL TREASURY EMPLOYEES UNION )
)
      Plaintiff, )
)
      v. )
)    Civ. A. No. 07-168 (RWR)
LINDA M. SPRINGER, Director, )
 U.S. Office of Personnel )
 Management, )
)
      Defendant. )
)

---

**PLAINTIFF'S OPPOSITION, IN PART, TO DEFENDANT'S MOTION TO
DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE
ALTERNATIVE, FOR FAILURE TO STATE A CLAIM**

BARBARA A. SHEEHY
Assistant Counsel

TIMOTHY B. HANNAPEL
Assistant Counsel

LARRY J. ADKINS
Deputy General Counsel

ELAINE KAPLAN
Senior Deputy General Counsel

GREGORY O'DUDEN
General Counsel
National Treasury Employees Union
1750 H Street, NW
Washington, DC 20006
Telephone: (202) 572-5500
Facsimile: (202) 572-5645

Dated April 18, 2008             Attorneys for Plaintiff

## TABLE OF CONTENTS

Page:

INTRODUCTION....................................................................................................1

SUMMARY OF ARGUMENT ...............................................................................4

ARGUMENT ...........................................................................................................7

I.    THE COURT HAS JURISDICTION OVER THIS CASE UNDER
WELL ESTABLISHED D.C.CIRCUIT AUTHORITY REGARDING
APA-BASED CHALLENGES TO THE LAWFULNESS OF OPM
REGULATIONS ............................................................................ 7

    A.    <u>The D.C. Circuit Has Repeatedly Held that the CSRA Does Not
Preclude Federal Employees or
Their Unions from Pursuing Challenges to OPM Regulations Under
the APA</u> ...................................................................................7

    B.    <u>The Cases Cited By the Government Are
Inapposite</u>..................................................................................10

    C.    <u>The Availability of MSPB Review of OPM Regulations in Some
Circumstances Does Not
Affect this Court's Authority to Hear the
Union's APA Challenge</u>.............................................................11

II.    NTEU HAS STANDING TO CHALLENGE THE REGULATIONS
ESTABLISHING THE FCIP ON BEHALF OF ITS FEDERAL
EMPLOYEE MEMBERS ...............................................................13

    A.    <u>NTEU Members Would Have Standing in their
Own Right to Challenge the Lawfulness of FCIP Hiring Authority</u>...14

        1.    NTEU Members Who Have Been Hired Through
the FCIP Have Standing to Challenge the Regulations
Because The Program Requires Them to Serve An Extended
Probationary Period, Thus Denying them Important Job
Protections ...................................................................14

        2.    NTEU members who are interested in applying for positions
covered by the FCIP have standing to challenge
the regulations because their ability to compete for the
positions is hampered by the fact that FCIP vacancies are
not widely publicized................................................... 20

3.    The FCIP regulations injure NTEU members
who are otherwise qualified and apply for positions covered
by the FCIP, by denying them the benefits of statutory
competitive procedures, including veterans preferences,
in the hiring process.......................................................................21

4.    The FCIP regulations injure IRS employees
by diminishing the value of their contract rights......................26

B.    <u>NTEU Has Met the Requirements to Serve as a Proper
Representative of its Injured Members</u> ..................................28

1.    The interests NTEU seeks to protect are germane to its
purposes .......................................................................... 28

2.    Neither NTEU's asserted claim nor
requested relief requires the
participation of individual members...........................................29

III.    THE GOVERNMENT'S MOTION TO DISMISS ON THE GROUNDS
OF LACHES IS MERITLESS ...........................................................32

CONCLUSION ...............................................................................................35

# TABLE OF AUTHORITIES

Page:

<u>**Cases:**</u>

<u>**Albuquerque Indian Rights v. Lujan,**</u>
930 F.2d 49 (D.C. Cir. 1991)...............................................................26

<u>**Allen v. Heckler,**</u>
780 F.2d 64 (D.C. Cir. 1985)............................................................... 18

<u>**Barnhart v. Devine,**</u>
771 F.2d 1515 (D.C. Cir. 1985)...........................................................11

<u>**Brotherhood of Locomotive Engineers and**</u>
<u>**Trainmen v. Surface Transportation Board,**</u>
457 F.3d 24 (D.C. Cir. 2006)........................................................27, 28

<u>**Carducci v. Regan,**</u>
714 F.2d 171 (D.C. Cir. 1983)...............................................................8

<u>**Coalition for Def. Procurement v. Fed. Prison Indus.,**</u>
365 F.3d 435 (6th Cir. 2004).............................................................. 33

<u>**Cobell v. Babbitt,**</u>
30 F. Supp. 2d 24 (D.D.C. 1998)..........................................................33

<u>**Dean v. Dept. of Agriculture,**</u> 99 M.S.P.R. 533, ¶ 14 (2005),
<u>**aff'd on reconsideration,**</u> 104 M.S.P.R. 1 (2006) ..................................24

<u>**Doe v. Department of Justice,**</u>
753 F.2d 1092 (D.C. Cir. 1985) ......................................................... 33

<u>**Energy Cooperative v. Department of Energy,**</u>
659 F.2d 146 (Temp. Emer. Ct. App. 1981) ........................................34

<u>**Energy Transportation Group v. Maritime Administration,**</u>
956 F.2d 1206 (D.C. Cir. 1992)...........................................................25

<u>**Firestone v. Firestone,**</u>
76 F.3d 1205 (D.C. Cir. 1995)............................................................33

<u>**Fornaro v. James,**</u>
416 F.3d 63 (D.C. Cir. 2005).........................................................10, 11

**Gray v. OPM,**
  771 F.2d 1504 (D.C. Cir. 1985)........................................................11

**Independent Bankers Ass'n v. Heimann,**
  627 F.2d 486 (D.C. Cir. 1980 ....................................................... 34

**Information Handling Serv., Inc. v.**
 **Defense Automated Printing Serv.,**
  338 F.3d 1024 (D.C. Cir. 2003)............................................... 13-14

**International Union, United Automobile, Aerospace,**
 **and Agricultural Implement Workers of America v. Brock,**
  477 U.S. 274 (U.S. 1986)..............................................................29

**Jones v. Rogers Memorial Hospital,**
  442 F.2d 773 (D.C. Cir. 1971)...................................................... 33

**Luevano v. Campbell,**
  1981 U.S. Dist. LEXIS 18023 (D.D.C. Nov. 19, 1981) ....................15

**Lujan v. Defenders of Wildlife,**
  504 U.S. 555 (1992)...............................................................13, 18

**N.A.A.C.P. v. N.A.A.C.P. Legal Defense and**
 **Educational Fund,** 735 F.2d 131 (D.C. Cir. 1985) ........................32

**National Federation of Federal Employees v. Weinberger**
  818 F.2d 935 (D.C. Cir 1987)........................................................10

**National Maritime Union of America v.**
 **Commander, Military Sealift Command,**
  824 F.2d 1228 (D.C. Cir. 1987)...............................................25, 30

**NTEU. v. Chertoff,** 385 F. Supp. 2d 1 (D.D.C. 2005),
 **aff'd in part and reversed in part,**
  452 F.3d 839 (D.C. Cir. 2007)...............................................8, 9, 31

**NTEU v. Cornelius,**
  617 F. Supp. 365 (D.D.C. 1985) .....................................................9

**NTEU v. Devine,** 577 F. Supp. 738 (D.D.C. 1983),
 **aff'd** 733 F.2d 114 (D.C. Cir. 1984) ........................................passim

**NTEU v. Horner,** 659 F. Supp. 8 (D.D.C. 1986),
 **aff'd,** 854 F.2d 490 (D.C. 1988) ...........................................passim

iv

NTEU v. Horner, 869 F.2d 571 (Fed. Cir. 1989) ...............................................10

NTEU v. MSPB, 743 F.2d 895, 907 (D.C. Cir. 1984) ...............................11, 12, 13

NTEU v. Seidman, 786 F. Supp. 1041 (D.D.C. 1992),
aff'd sub nom.,
NTEU v. Helfer, 53 F.3d 1289 (D.C. Cir. 2005)...............................................19

NTEU v. Von Raab, 489 U.S. 656 (1989) ...............................................10

OCONUS DOD Employee Rotation Action Group v. Cohen,
 144 F. Supp. 2d 1 (D.D.C. 2000)...............................................9

Patterson v. Department of the Interior,
 424 F.3d 1151 (Fed Cir. 2005) ...............................................24

Powell v. Zuckert,
 366 F.2d 634 (D.C. Cir. 1966)...............................................32

Richards v. Mileski,
 662 F.2d 65 (D.C. Cir. 1981)...............................................33

Spannaus v. Department of Justice,
 82 F.2d 52 (D.C. Cir. 1987)...............................................33

Sturm, Ruger & Co. v. Chao,
 300 F.3d 867 (D.C. Cir. 2002) ...............................................14

Telecommunications Research & Action Center v. Allnet
 Communication Services, Inc.,
 806 F.2d 1093 (D.C. 1986) ...............................................29

United Food & Commer. Workers Union Local 751 v.
 Brown Group, 517 U.S. 544 (U.S. 1996)...............................................13, 29

United States v. Fausto, 484 U.S. 439 (1988) ...............................................7, 11

Warth v. Seldin, 422 U.S. 490 (1975)...............................................20, 29

**Statutes:**

5 U.S.C. § 702...............................................8

5 U.S.C. § 706...............................................12

**5 U.S.C. § 1204(e)** ......................................................................................**11, 12**

**5 U.S.C. § 1204(f)(2)** ........................................................................................**7**

**5 U.S.C. § 1205(e)(2)(A)** ..................................................................................**12**

**5 U.S.C. § 2302(b)(1)** ........................................................................................**22**

**5 U.S.C. § 3302** ........................................................................................**1, 15, 24**

**5 U.S.C. § 3304** ..................................................................................................**1**

**5 U.S.C. § 3304(a)** ............................................................................................**15**

**5 U.S.C. § 3304(b)** ............................................................................................**24**

**5 U.S.C. §§ 3309-3319** ......................................................................................**22**

**5 U.S.C. § 3309** ................................................................................................**24**

**5 U.S.C. § 3313** ............................................................................................**23, 24**

**5 U.S.C. § 3317(a)** ..........................................................................................**23**

**5 U.S.C. § 3318** ................................................................................................**24**

**5 U.S.C. § 3318(a)** ..........................................................................................**23**

**5 U.S.C. § 3318(b)(1)** ......................................................................................**23**

**5 U.S.C. § 3318(b)(2)** ......................................................................................**23**

**5 U.S.C. § 3319** ................................................................................................**22**

**5 U.S.C. § 3330** ................................................................................................**20**

**5 U.S.C. § 7511(a)** ............................................................................................**15**

**5 U.S.C. § 7511(a)(1)(A)** ..................................................................................**14**

**5 U.S.C. § 7511(a)(1)(C)** ..................................................................................**16**

**Administrative Procedure Act** ..................................................................**passim**

**Civil Service Reform Act, Pub. L. No. 895-454,**

**92 Stat. 1111** ...................................................................................................... **3**

**The Homeland Security Act of 2002, Pub. L. 107-296**
**(Nov. 25, 2002)** ...........................................................................................**22, 23**

**Regulations:**

**5 C.F.R. § 213** ....................................................................................................**27**

**5 C.F.R. § 213.3202(a)(10)** ................................................................................**24**

**5 C.F.R. § 213.3202(o)(1)** ..................................................................................**14**

**5 C.F.R. § 215** ....................................................................................................**27**

**5 C.F.R. § 302.101(c)** .........................................................................................**24**

**5 C.F.R. § 315.802** ..............................................................................................**15**

**5 C.F.R. § 315.806** ..............................................................................................**15**

**C.F.R. § 332.401** ................................................................................................**23**

**5 C.F.R. § 337.101(a)** ........................................................................................ **22**

**5 C.F.R. § 337.101(b)** ........................................................................................ **22**

**5 C.F.R. §§ 337.301 et seq.** ................................................................................**23**

**Miscellaneous:**

**Issues of Merit (MSPB), Sept. 2006 at 3**
**"Category Rating: Well Liked, Still Not Well Used."** .................................................**23**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

NATIONAL TREASURY EMPLOYEES UNION )
                                                                      )
                              Plaintiff,                           )
                                                                      )
                              v.                                    )
                                                                      )          Civ. A. No. 07-168 (RWR)
LINDA M. SPRINGER, Director,                       )
 U.S. Office of Personnel                                )
 Management,                                                )
                                                                      )
                              Defendant.                        )
_____)

**PLAINTIFF'S OPPOSITION, IN PART, TO DEFENDANT'S MOTION TO
DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE
ALTERNATIVE, FOR FAILURE TO STATE A CLAIM**

**INTRODUCTION**

    **A.**    This case arises out of a challenge by the National Treasury Employees Union

(NTEU) to final regulations creating the Federal Career Intern Program (FCIP) which were

issued by the Office of Personnel Management (OPM) on August 5, 2005.  NTEU's January 24,

2007 Complaint alleges that the OPM regulations are unlawful because they violate 5 U.S.C. §§

3302 and 3304.  Those provisions require that specific statutory competitive procedures be used

to hire employees into the federal civil service, unless departure from those rules is "necessary"

for purposes of "good administration."  As the court of appeals for the D.C. Circuit observed in a

similar case, Congress intended hiring pursuant to statutory competitive procedures to serve as

"the norm rather than the exception."  National Treasury Employees Union v. Horner, 854 F.2d

490, 495 (D.C. Cir. 1988).  NTEU's complaint alleges that FCIP hiring authority, in defiance of

Congressional intent, has turned the norm of competitive hiring into the exception, rather than the rule.

As described in NTEU's complaint, the FCIP program bestows broad discretion upon federal agencies to depart from important and long standing civil service requirements that are designed to ensure that federal jobs are filled on the basis of a fair and open competition.   These include the statutory requirement that vacancy announcements be posted in a centralized location available to all potential applicants; the stringent rules that mandate the objective numerical rating and ranking of candidates; and a specific point system for awarding veterans' preference to qualified candidates.

NTEU's Complaint alleges that the OPM violated statutory requirements when it promulgated the FCIP regulations, because it failed to even articulate a basis for the broad exception and sweeping departure from statutory competitive procedures authorized through the use of FCIP hiring authority.  Cf. National Treasury Employees Union v. Horner, 854 F.2d at 499   (striking down use of "Schedule B" excepted service hiring authority because OPM failed to provide any basis for its claim that an exception to competitive hiring procedures was necessary).  NTEU alleged that the regulations are arbitrary, capricious and contrary to law, and therefore violate the Administrative Procedure Act (APA), 5 U.S.C. § 706.

Although characterized as a narrow hiring authority designed to attract "exceptional" candidates and nurture them through special mentoring programs, the FCIP program is fast becoming the hiring method of choice for federal agencies for a broad range of positions.  This increasing use of the FCIP as a hiring authority for federal positions has caused NTEU members several distinct injuries, as alleged in the Complaint and described in greater detail below.

NTEU is seeking a declaration that the regulations establishing FCIP hiring authority are unlawful, and an injunction against continued hiring under the program. It does not seek to divest current FCIP hired employees of their positions. To the contrary, NTEU seeks relief for its members who are currently serving as career "interns" — specifically, it seeks an order requiring that federal agencies immediately provide those interns with the job protections, described in greater detail below, that they would have enjoyed had they been hired through statutory competitive procedures.

**B.**     On May 2, 2007, the government filed a Motion to Dismiss For Lack of Subject Matter Jurisdiction or, in the Alternative, For Failure to State a Claim. The Motion alleges four grounds for dismissal.

First, the government claims that the Court is precluded from exercising jurisdiction over the Union's Complaint by the administrative procedures set forth in the Civil Service Reform Act, Pub. L. No. 895-454, 92 Stat. 1111, for challenging so-called prohibited personnel practices. In addition, it claims that the Union lacks standing to pursue this action, contending: 1) that the Union has not alleged concrete injury to its members; 2) that the injuries alleged are not redressable; and 3) that, in any event, the participation of individuals is necessary, so that NTEU may not assert standing as the representative of its members.

 In addition to these two jurisdictional defenses, the government's motion to dismiss asserts the affirmative defense of laches. Finally, the government argues that the Union is barred from pursuing an APA action because it did not submit comments on the regulations it challenges during the notice and comment period.

**C.**     On June 13, 2007, NTEU filed a Motion for Order Requiring Defendant to File the Administrative Record. NTEU explained that it needed access to the administrative record in

order to address the government's claim that it could not pursue this suit because it did not

comment on the proposed FCIP rules.  Among other things, the Union contended, it needed the

administrative record to test OPM's claim that it lacked notice during the rulemaking process of

the legal objections the Union is presenting in this case.[1]

On June 26, 2007, the government opposed NTEU's motion to compel the filing of the

administrative record.  The government urged the court to decide the motion to dismiss

preliminarily and delay a decision regarding the filing of the administrative record until the Court

reached the merits of the dispute.  On July 5, 2007, NTEU filed a Reply to the government's

Opposition.

The government's Motion to Dismiss For Lack of Subject Matter Jurisdiction or, in the

Alternative, For Failure to State a Claim and NTEU's Motion for Order Requiring Defendant to

File the Administrative Record are both pending before this Court.  In the interest of moving the

matter forward, NTEU is filing its opposition, in part, to the government's Motion to Dismiss,

responding to all of the government's grounds for dismissal except the government's objection

based on the Union's failure to comment on the proposed FCIP regulations.  This objection is

predicated on the notion that OPM did not otherwise have notice of the legal defects identified in

NTEU's complaint.  The Union simply cannot respond to that objection without access to the

administrative record.

## **SUMMARY OF ARGUMENT**

A.      There is no merit to the government's claim that this court lacks subject matter

jurisdiction over NTEU's complaint on the grounds that APA review is precluded by the

CSRA's remedial framework for adjudicating challenges to unlawful personnel actions, and for

---

[1] NTEU's motion also sought an enlargement of time to respond to the government's Motion to
Dismiss pending the filing of the administrative record.

challenging OPM regulations that are alleged to result in the commission of prohibited personnel practices.  Its arguments are refuted by twenty-five years of precedent in this circuit in which the district courts and the court of appeals have rejected this precise argument, which the government reflexively and repeatedly has pressed in numerous similar cases between these same parties.  See, e.g., NTEU v. Devine, 577 F. Supp. 738 (D.D.C. 1983), aff'd, 733 F.2d 114 (D.C. Cir. 1984).

**B.**     There is also no merit to the government's claim that NTEU lacks standing to challenge FCIP hiring authority on behalf of its members.  As alleged in NTEU's complaint, the illegally implemented FCIP regulations have caused immediate concrete injury to NTEU represented employees in a number of respects.

First, NTEU members who have been hired under the program are required to serve an extended probationary period, thus denying them important job protections.  This injury, which has been held sufficient to establish NTEU's standing in analogous cases, is traceable to the illegal hiring authority.  Further, the injury could be remedied by an order of this Court shortening the probationary period currently being served by so called "career interns" and by an order prospectively barring continued hiring under the program.

Second, NTEU members who are interested in applying for positions that are covered by the program are injured by the exercise of FCIP hiring authority because, in contrast to the statutory competitive hiring process, job vacancies filled under the program need not (and frequently are not) widely advertised or posted on OPM's USA JOBs website.  The FCIP regulations also injure NTEU members who apply for positions covered by the FCIP, by denying them the benefits of statutory competitive procedures, including veterans' preferences, in the hiring process.  Finally, the use of FCIP hiring authority has resulted in the loss of contractual

benefits enjoyed by NTEU members at the Internal Revenue Service who apply for positions covered under the program.

All of these injuries are traceable to the illegal hiring authority and would be redressable by an order from this Court. The government's arguments to the contrary are meritless, as is its claim that NTEU cannot sue on behalf of its members because those members allegedly do not have common interests. In fact, once the government's misstatements of the nature of the relief being sought here are corrected, it is clear the interests of all of NTEU's members, including those who have been hired under the FCIP and those who seek positions covered by the program, are entirely consistent with one another.

**C.**     The government's claim that laches bars NTEU's suit is without merit. The Union did not delay unreasonably in bringing this case; it filed suit about 18 months after the challenged regulations were finalized.  That period of time is not only entirely reasonable, it is well within the statute of limitations for challenging regulations, which is six years.  Further, the government's laches defense cannot be litigated in the context of a motion to dismiss.  As the courts have consistently held, issues of timeliness should almost never be resolved on a motion to dismiss because resolving such issues will invariably require the consideration of evidence relevant to whether the defendant has met its burden of showing unreasonable delay and/or prejudice.

## ARGUMENT

I. **THE COURT HAS JURISDICTION OVER THIS CASE UNDER WELL ESTABLISHED D.C. CIRCUIT AUTHORITY REGARDING APA-BASED CHALLENGES TO THE LAWFULNESS OF OPM REGULATIONS**

### A. **The D.C. Circuit Has Repeatedly Held that the CSRA Does Not Preclude Federal Employees or Their Unions from Pursuing Challenges to OPM Regulations Under the APA**

Citing U.S. v. Fausto, 484 U.S. 439 (1988), and related cases, the government claims that this Court lacks jurisdiction over NTEU's challenge to the OPM regulations establishing the FCIP. See Def. Mot. to Dismiss at 33-41. It argues that NTEU is required to pursue its legal claims under the CSRA's remedial framework for adjudicating challenges to unlawful personnel actions, or by challenging the regulations before the Merit Systems Protection Board (MSPB).

The government's claims are refuted by over twenty years of precedent in the D.C. Circuit. See NTEU v. Devine, 577 F. Supp. 738 (D.D.C. 1983), aff'd, 733 F.2d 114 (D.C. Cir. 1984). That precedent makes it crystal clear that this Court has jurisdiction over the Union's challenge to the validity of OPM's regulations, and that its jurisdiction is not affected by either the CSRA's provisions for adjudicating the lawfulness of individual personnel actions, nor the fact that the MSPB is authorized to determine the validity of OPM regulations alleged to result in the commission of a "prohibited personnel practice." See 5 U.S.C. 1204(f)(2).

In Devine, NTEU challenged OPM regulations governing RIF procedures, performance management systems, and pay administration in the federal sector. Devine, 577 F. Supp. at 745. NTEU alleged that the implementation of the regulations violated an appropriations law then in effect which barred OPM from spending appropriated funds to "implement, promulgate, administer, or enforce" its regulations. Id. at 742. OPM argued that the CSRA's exclusive

7

procedures provided the only possible means for review of the lawfulness of the regulations.  Id. at 745.

In rejecting the government's argument, the district court noted that "[t]his is not the typical sort of labor altercation between a federal employee and his federal employer."  Id.  Nor was it "an action alleging by way of a grievance, adverse action or unfair labor practice, that a federal agency has violated either a provision of a collective bargaining agreement or one of its own regulations, or that the agency has infringed on the collective bargaining rights of a union."  Id.  Rather, the union sought to enforce a ban on specific agency action that was contained in an appropriations law.  The district court determined that the claim was therefore not covered by the CSRA's exclusive administrative scheme and was cognizable under § 702 of the APA.  Id.

The court of appeals affirmed the district court's decision.  See NTEU v. Devine, 733 F.2d 114 (D.C. Cir. 1984).  Judge Edwards, writing for the court, explained the defects in the government's position, noting that:

> It is one thing to say that when a statute provides a detailed scheme of administrative protection for defined employment rights, less significant employment rights of the same sort are implicitly excluded and cannot form the basis for relief directly through the courts.  Cf. Carducci v. Regan, 714 F.2d 171 (D.C. Cir. 1983).  It is quite different to suggest . . . that a detailed scheme of administrative adjudication impliedly precludes pre-enforcement judicial review of rules.

Id. at 117 n.8.

The principles enunciated in Devine remain good law.  Subsequent rulings similarly hold that federal courts will entertain challenges to rulemaking that involve conditions of employment in the federal sector if such action is inconsistent with a statute or the Constitution.  In NTEU v. Chertoff, for example, the district court rejected the government's argument that provisions of the CSRA governing labor relations disputes precluded the district court from adjudicating the

lawfulness of joint regulations issued by OPM and the Department of Homeland Security (DHS) establishing a new personnel system for DHS employees. <u>NTEU. v. Chertoff</u>, 385 F. Supp. 2d 1, 23 (D.D.C. 2005), <u>aff'd in part and reversed in part</u>, 452 F.3d 839 (D.C. Cir. 2007). Notwithstanding the CSRA, the court observed, "the APA has often been found to provide jurisdiction for a federal court to hear union challenges to agency regulations or policies of general application on the grounds that they were inconsistent with a statute or the Constitution." <u>Id</u>.

Similarly, in <u>OCONUS DOD Employee Rotation Action Group v. Cohen</u>, 144 F. Supp. 2d 1 (D.D.C. 2000), the plaintiff federal employee organization challenged as contrary to law an agency rule that changed the amount of time civilian employees could serve overseas. The government moved to dismiss the complaint alleging, among other reasons, that the CSRA precluded the plaintiffs' cause of action. The court denied the motion to dismiss, recognizing that the plaintiffs were "<u>not</u> challenging individual reassignment and transfer decisions made by the agency" but were instead pursuing "the type of classic pre-enforcement challenge to the lawfulness of agency regulations . . . which was recognized and sanctioned by our Court of Appeals in [<u>Devine</u>]." <u>Id</u>. at 6 (emphasis in original). "For that reason," the court stated, "defendant's lengthy arguments about the availability and exclusivity of review before the Merit Systems Protection Board and the Office of Special Counsel are unconvincing." <u>Id</u>. at 7.

Finally, in <u>NTEU v. Cornelius</u>, 617 F. Supp. 365 (D.D.C. 1985), the union challenged an OPM regulation that eliminated the mandatory use of a collective bargaining grievance procedure to review reconsideration of a denial of a within grade increase. The government moved to dismiss the case, asserting that the CSRA precluded the court's jurisdiction. The court disagreed:

> The exclusivity of the CSRA's procedures has been well-recognized in cases involving individual employee's rights.  Thus, courts have recognized that aggrieved federal employees must pursue civil service remedies and cannot denominate their claim as an APA claim in order to seek relief in district court. . . .  This does not, however, insulate OPM from direct judicial review of challenges to rulemaking under the APA.  The Court of Appeals made this clear in [Devine].

Id. at 370 (internal citations omitted).[2]

## B.    The Cases Cited By the Government Are Inapposite

In the face of this Circuit's consistent rejection of the identical jurisdictional objections, the government cites a series of inapposite cases, including, for example, Fornaro v. James, 416 F.3d 63 (D.C. Cir. 2005).  See Def. Mot to Dismiss at 41.  In that case, a group of eight plaintiffs seeking to represent a class of retired and disabled federal law enforcement officers and firefighters filed an APA action claiming that OPM violated the law by failing to provide them with higher disability benefits.  The court observed that the CSRA provides that OPM "shall adjudicate all claims" for retirement benefits.  Id. at 64 (citations omitted).  Pursuant to the CSRA, claimants had the option of seeking MSPB review of an adverse OPM decision, with further limited judicial review available in the Court of Appeals for the Federal Circuit.  Id.

The court rejected the Fornaro plaintiffs' attempt to re-cast their claims as a system-wide challenge to OPM policy, recognizing that the gravamen of the complaint was a challenge to how OPM had calculated their civil service benefits.  Id. at 68-69.  Here, by contrast, NTEU presents a true facial challenge to regulations that are government wide, and seeks prospective

---

[2] Other cases further demonstrate that federal courts have jurisdiction over APA actions like the present one in which unions challenge agency regulations or policies of general application on the ground that they are inconsistent with a statute or the Constitution.  See, e.g., NTEU v. Von Raab, 489 U.S. 656 (1989) (challenging constitutionality of Customs Services drug-testing program); NTEU v. Horner, 869 F.2d 571 (Fed. Cir. 1989) (challenging regulation governing pay increases for employees paid special salary rates).  National Federation of Federal Employees v. Weinberger, 818 F.2d 935 (D.C. Cir. 1987) (challenging mandatory urinalysis drug testing program as violative of Constitution).

class-wide relief to enjoin them.  Accordingly, <u>Fornaro</u> does not support the government's preclusion argument.

Similarly, the cause of action in <u>Barnhart v. Devine</u>, 771 F.2d 1515 (D.C. Cir. 1985), another case upon which the government relies (<u>see</u> Def. Mot. to Dismiss at 35) involved review of an individualized personnel action, not an APA challenge.   Accordingly, the CSRA precluded the plaintiffs' suit in district court.  In <u>Gray v. OPM</u>, 771 F.2d 1504 (D.C. Cir. 1985), the plaintiffs filed a suit challenging OPM's failure to promote them.  The court determined that it did not have subject matter jurisdiction because the plaintiffs needed to pursue their personnel action claims preliminarily with the OSC.

None of these cases presents the kind of claim at issue here — a facial challenge to a government-wide regulation.  Such claims are governed by the line of cases described above, which have consistently rejected similar efforts by the government to deny federal employees and the unions that represent them access to the federal courts to challenge such regulations under the APA.

C.    **The Availability of MSPB Review of OPM Regulations in Some Circumstances Does Not Affect this Court's Authority to Hear the Union's APA Challenge**

In addition to its misplaced reliance upon <u>Fausto</u>, the government cites 5 U.S.C. § 1204(e), in support of its argument that this Court lacks jurisdiction over this case.  That provision gives the MSPB the authority to review the lawfulness of OPM rules and regulations which have required or would require the commission of a "prohibited personnel practice."  The government cites <u>NTEU v. MSPB</u>, 743 F.2d 895, 907 (D.C. Cir. 1984), for the proposition that this procedure supplies the exclusive avenue for the challenge NTEU pursues here.

This argument finds no support in <u>NTEU v. MSPB</u>.  To the contrary, the D.C. Circuit's decision in that case expressly contemplates that parties may challenge OPM regulations in either forum, and that the availability of the MSPB process does not preclude an APA rulemaking challenge in district court.

In <u>NTEU v. MSPB</u>, the union had obtained MSPB review of an OPM regulation allowing federal agencies to place "seasonal" employees in "nonduty, nonpay" status without affording them the adverse action protections required by the CSRA for employees furloughed for thirty days or fewer.  <u>Id</u>. at 902.  The MSPB issued a final decision, finding that the regulation was valid on its face because it did not require agencies to commit a prohibited personnel practice, as the Union alleged.  <u>Id</u>. at 903.  The union appealed that final MSPB decision to the D.C. Circuit.  There, the MSPB and the government argued that the circuit court lacked jurisdiction.  <u>Id</u>. at 903-04.  The court rejected this argument and determined that it had jurisdiction over all final MSPB orders, including those issued under section 1204(e).  <u>Id</u>. at 907.

In determining that it had jurisdiction, and relevant to the issues before this Court, the court in <u>NTEU v. MSPB</u> explicitly acknowledged that despite the availability of MSPB review when OPM rules result in the commission of prohibited personnel practices, parties may also secure relief in district court under the APA on a theory that the regulations are arbitrary, capricious or contrary to law.  It stated:

> The original statutory scheme as we have interpreted it would result in the possibility that actions challenging the same OPM rule or regulation on different grounds might be split between two different forums.  Review of § 1205(e)(2)(A) orders would take place in the courts of appeals, which could not take account of other aspects of the rule or regulation that might render it invalid.  <u>Other challenges to a particular rule or regulation, including whether its issuance observed legally required procedures or was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," would still have to be brought in the district courts</u>.

<u>Id</u>. (Emphasis added).

Therefore, NTEU v. MSPB stands for the proposition that final MSPB orders regarding facial challenges to an OPM rule are properly appealable to the circuit court and other actions (e.g., those actions challenging whether OPM's rule is consistent with the APA) properly lie with the district court.   In light of that ruling, and the consistent line of precedent that followed the Devine decision, the government's argument that the action should be dismissed on the basis of CSRA preclusion must be rejected.

## II.    NTEU HAS STANDING TO CHALLENGE THE REGULATIONS ESTABLISHING THE FCIP ON BEHALF OF ITS FEDERAL EMPLOYEE MEMBERS

Article III of the Constitution limits the jurisdiction of the federal courts to "cases and controversies."   That limitation requires, among other things, that a plaintiff establish his "standing" to sue.   The elements of standing consist of an "injury in fact" which is "fairly traceable to the challenged act," and is "likely to be redressed by a favorable decision."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotations and citations omitted).

It is well-established that organizations may have standing to sue on behalf of their members.  To establish its standing on behalf of its members, an organization must show that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 553 (1996).

In considering whether NTEU has standing to challenge the legality of the FCIP regulations, the Court "must assume that [NTEU] states a valid claim . . . and 'must accept the factual allegations in the complaint as true.'"  Information Handling Serv., Inc. v. Defense

<u>Automated Printing Serv.</u>, 338 F.3d 1024, 1029 (D.C. Cir. 2003) (quoting <u>Sturm, Ruger & Co. v. Chao</u>, 300 F.3d 867, 871 (D.C. Cir. 2002)) (other citations omitted).

In light of this principle and measured against the standards set forth above, NTEU's Complaint contains sufficient allegations to satisfy each of the applicable standing requirements. Accordingly, for the reasons set forth in greater detail below, the government's motion to dismiss for lack of standing should be denied.

  **A.**  <u>**NTEU Members Would Have Standing in their Own Right to Challenge the Lawfulness of FCIP Hiring Authority**</u>

As alleged in NTEU's Complaint, the illegally implemented FCIP regulations have caused immediate concrete injury to NTEU represented employees in a number of respects. <u>See</u> Pl's Compl. at ¶¶ 17-21, 26, 30. Any one of these injuries would be sufficient to establish injury in fact for purposes of Article III. Further, each of these injuries is fairly traceable to the illegal FCIP regulations and is redressable by this Court.

    **1.**  **NTEU Members Who Have Been Hired Through the FCIP Have Standing to Challenge the Regulations Because The Program Requires Them to Serve An Extended Probationary Period, Thus Denying them Important Job Protections**

  **a.**  NTEU represents thousands of employees who have been hired through the FCIP program. <u>See</u> Declarations of Thomas O'Keefe, Shelley Caspary, Frank Heffler, Andrew G. Lovett, and Stephen J. Keller. These employees must serve a longer probationary period than they would have served had they been hired through statutory competitive procedures. <u>Compare</u> 5 U.S.C. § 7511(a)(1)(A) (one year probationary period for competitive service positions) and 5 C.F.R. 213.3202(o)(1) (career internship lasts two years, after which interns converted to permanent competitive service positions). Further, because the probationary period for a position in the competitive service may be served through one year of continuous service in any

competitive service position, an employee moving from one competitive service position that he has held for at least one year into another, would not ordinarily be required to serve any probationary period at all in his new position.  See 5 C.F.R. § 315.802.  As a result, employees serving as career interns must wait one, or in some cases two additional years, to obtain the right to appeal any decision to terminate their employment to the Merit Systems Protection Board or through a negotiated grievance/arbitration procedure.  See 5 U.S.C. § 7511(a); 5 C.F.R. § 315.806.

The loss of these competitive service privileges and protections is sufficient to confer standing on current career interns under the reasoning of NTEU v. Horner, 659 F. Supp. 8 (D.D.C. 1986), aff'd, 854 F.2d 490 (D.C. 1988); see also NTEU v. Devine, 577 F. Supp. 738 (D.D.C. 1983).  In Horner, OPM converted 118 competitive service positions to "Schedule B" excepted service positions.  OPM argued that the exception to competition was "necessary" within the meaning of 5 U.S.C. § 3302 because it claimed it would be too expensive to develop new competitive examinations for the positions in the wake of a court decision finding that the federal government's "PACE" exam violated Title VII of the Civil Rights Act.[3]  NTEU, suing on behalf of its members, argued that the failure to conduct competitive examinations for the 118 positions violated the same statutory provisions at issue in this case (5 U.S.C. §§ 3302 and 3304(a)), because OPM had not shown that an exception to competition was "necessary" for conditions of good administration.  Horner, 159 F. Supp. at 14.

In Horner, as here, OPM claimed that NTEU lacked standing to pursue its claims.  Again, as in this case, NTEU argued that it had standing on the grounds that excepted service status deprived its members of privileges and protections that they would have enjoyed as competitive

---

[3] Luevano v. Campbell, 1981 U.S. Dist. LEXIS 18023 (D.D.C. Nov. 19, 1981).

service employees.  Specifically, NTEU emphasized that excepted service employees could not appeal an agency decision removing them or demoting them for alleged unacceptable performance.[4]   Further, NTEU contended, these members would not "enjoy the procedural rights afforded competitive service employees such as notice and a right to representation in unacceptable performance cases." Id. at 10.

The court rejected OPM's claim that the plaintiffs lacked standing.  As the court recognized, "the threats facing plaintiffs are several: a lack of procedural protections in the event of an adverse performance appraisal, inferior job retention rights in the event of a RIF, and increased competition for promotions within career ladders, to name the most significant." Id. at 12.  The loss of these procedural protections, the court held, established NTEU members' injury in fact. Id.

The court reached a similar result in Devine.  In that case, as described supra, NTEU challenged certain personnel regulations on the ground that they were promulgated in violation of an appropriations law.  NTEU argued that the regulations injured its membership by effecting significant changes to the performance management system and by altering rules for RIFs and overtime pay. Devine, 577 F. Supp. at 744.  As in Horner, the court rejected OPM's argument that these injuries were insufficient to establish NTEU's standing.  Indeed, it observed, "[i]f the [plaintiff] has no standing to contest regulations which are claimed to have a far reaching impact on day-to-day working conditions and an employee's career . . . it is difficult to conceive of a more appropriate representative." Id. at 744-45.

---

[4] Excepted employees were, until 1990, permanently denied MSPB appeal rights.  Congress later amended the statute to grant most excepted service employees appeal rights, subject to a two year probationary period. See 5 U.S.C. § 7511(a)(1)(C).

**b.**    The government attempts to distinguish <u>Horner</u> by arguing that the employees whose positions were converted to the excepted service in <u>Horner</u> were permanently deprived of MSPB appeal rights, while FCIP hires will secure those rights after the end of their two year "internship."  <u>See</u> Def. Mot. to Dismiss at 21, n.11.  But OPM cannot plausibly deny that the loss of job protections, even for shorter periods of time, is still an injury in fact.  Indeed, to those who must spend one or two additional years in their jobs without the security of civil service protections, the injury is substantial.

The government also posits that NTEU lacks standing to sue on behalf of its members because the extended probationary period may not constitute a "net" injury to the FCIP hires the Union represents.  <u>See</u> Def. Mot. to Dismiss at 20.  It claims that some interns will benefit from having an additional year of probation to enable them to "evaluate whether the position is a suitable long-term career fit" and that some career interns will benefit by having a longer period of time to prove themselves worthy of a permanent appointment.  <u>Id</u>.

The government's argument that employees will benefit from the extended probationary period because it will give them more time to evaluate whether a position is a "suitable" one is puzzling.  FCIP hires are not indentured servants; they are free to determine whether a position suits them at any time – whether they are in a probationary period or whether they have completed it.  More importantly, even if some employees may benefit from having an extra year to prove themselves worthy of a permanent position, that benefit does not cancel out the injury others suffer by being denied tenured status for an extra one or even two years.  And there is simply no requirement in law that NTEU allege or establish that its members as a group have suffered a "net" injury in order to establish standing.

Finally, the government asserts that the alleged injury to employees subjected to an extended probationary period is speculative and not "actual or imminent."  Def. Mot to Dismiss at 21, quoting Lujan, 504 U.S. at 560.  Contrary to this assertion, the loss of job protections is real and immediate.  See Horner, 659 F. Supp. at 15 (the threat of suffering an adverse employment action is "sufficiently immediate to confer standing on plaintiffs, without the necessity of waiting until a given plaintiff is demoted, fired RIFed, or denied a promotion.").  It is irrelevant how many career interns will actually have to invoke their appeal rights.  See Def. Mot. to Dismiss at 21 (claiming that the majority of interns will not feel any effect from the absence of job protections).   The reality is that — whether an employee ever needs to use them – these civil service protections provide insurance that serves as a valuable benefit in and of itself to federal employees, for much the same reason that college professors cover a "tenured" position.   Cf. Allen v. Heckler, 780 F.2d 64 (D.C. Cir. 1985) (plaintiffs suffered unlawful discrimination because their excepted service status provided them with inferior job protections).

**c.**    In addition to contesting that NTEU members suffer an injury in fact as a result of the extended probationary period they must serve, the government argues that this injury is not traceable to OPM's violation of the statutory requirement that only "necessary" exceptions to competitive procedures are permitted.   It contends that the injury is traceable to the FCIP regulations "only if an underlying assumption is made that absent the FCIP, that individual would have been appointed to the same position in the competitive service."  Def. Mot. to Dismiss at 23.

Of course, the same argument could have been made in the Horner case; nonetheless, the court there found that employees who were hired into positions without competitive examination, as well as those who already occupied the positions at the time of their conversion

to the excepted service, had standing based on their loss of job protections.  Further, many

NTEU members who are serving as career interns, such as those who were hired to be Customs

and Border Patrol Officers, or those hired by the FDIC as Financial Institution Specialists had no

choice but to accept the inferior status conferred upon them by the FCIP, because such positions

have been filled exclusively through the FCIP.  See Declarations of Thomas O'Keefe, Stephen J.

Keller.  Because of the use of FCIP hiring authority, these employees never even had the chance

to apply for competitive service positions.  See NTEU v. Seidman, 786 F. Supp. 1041, 1044

(D.D.C. 1992), aff'd sub nom, NTEU v. Helfer, 53 F.3d 1289 (D.C. Cir. 2005) (rejecting

government's argument that NTEU lacked standing because employees were beneficiaries of

allegedly unlawful excepted service hiring authority, rather than its victims; noting that

employees suffered injury from being denied the opportunity to apply for the same position with

the benefits of competitive status).

          For similar reasons, the government is simply mistaken when it argues (Def. Mot. to

Dismiss at 22) that this Court cannot redress the injury suffered by career interns who must serve

an extended probationary period, because it would require the invalidation of their existing

appointments and the loss of their jobs.  To the contrary, NTEU's Complaint requests a

declaration that the government's FCIP regulations are "arbitrary, capricious, contrary to law,

null and void" and a prohibition on their continued use in the future by any federal agency.

NTEU does not seek an invalidation of existing appointments, because that would be grossly

unfair to current employees.

          As the court observed in Seidman, the court has "equitable powers . . . which could allow

it to craft an order that would not adversely affect those employees who, through no fault of their

own, might be deemed to have been improperly hired into the excepted service."  Id. at 1045.

Once the Court determines that the regulations are contrary to law, it could certainly order that any probationary employee who has been employed for at least one year or any employee who was hired already possessing one year of employment in a competitive service position has fulfilled any probationary period requirement and should be granted career status.[5]  And even if the court did not order this relief to current employees, it could certainly issue a prospective order enjoining continued use of FCIP hiring authority.

Under these circumstances, there can be no doubt that a favorable decision would redress the injuries suffered by FCIP hires, prevent similar future injury, and that these employees "personally would benefit in a tangible way from the court's intervention."  Warth v. Seldin, 422 U.S. 490, 508 (1975).   Accordingly, NTEU members who are currently career interns would have standing in their own right to challenge the lawfulness of the FCIP regulations.

> **2.    NTEU members who are interested in applying for positions covered by the FCIP have standing to challenge the regulations because their ability to compete for the positions is hampered by the fact that FCIP vacancies are not widely publicized**

Pursuant to 5 U.S.C. § 3330, federal agencies must announce vacancies to the public through OPM's USAJOBS website.   As outlined in NTEU's Complaint, the FCIP regulations eliminate the requirement for agencies to post vacancies through OPM's USAJOBS website.  Pl. Compl. ¶ 14.  This lack of notice clearly disadvantages NTEU members and constitutes an injury in fact for purposes of standing analysis.  Indeed, the government does not even address this injury in its motion to dismiss.

---

[5]In Horner, the court of appeals declined to order that the Schedule B employees be converted to the competitive service because there was no competitive examination available for the positions.  Horner, 854 F.2d at 28.  Circumstances here are different because, in fact, competitive examinations do exist for all FCIP positions.  In fact, career interns are converted to the competitive status once they complete their two year "internship."  This court, accordingly, would not run afoul of the limitation that existed in Horner by simply directing that career interns be converted to competitive status more expeditiously.

Further, the allegations of injury in NTEU's complaint are supported by the attached declaration from both Shelley Caspary and Andrew Lovett.  As both Ms. Caspary and Mr. Lovett describe, NTEU members who are qualified for and interested in FCIP covered positions have routinely been unaware of the existence of vacancies for such positions until after they have been filled.  Rather than posting such vacancies on the readily accessible OPM USAJOBS website, agencies like IRS, for example, have targeted their recruitment only to college campuses or graduate schools, thereby limiting the pool of applicants for positions that would ordinarily be filled through open competition.  See Declarations of Shelley Caspary and Andrew Lovett.

There can be no question that there exist NTEU members who have been interested in applying for these jobs but who have been prevented from doing so by the failure of employing agencies to post vacancies widely, as is required for competitive service positions.  This injury is directly traceable to the illegal FCIP hiring authority for if such authority did not exist, agencies would be required to post all vacancies on OPM's USA JOBS site.  Further, the injury is redressable by an order from the Court precluding the use of FCIP hiring authority for future vacancies.

> **3.    The FCIP regulations injure NTEU members who are otherwise qualified and apply for positions covered by the FCIP, by denying them the benefits of statutory competitive procedures, including veterans preferences, in the hiring process**

In addition to injuring employees who are hired through the program, and those who would apply for covered positions but lack notice that vacancies exist, the FCIP regulations also injure NTEU members who seek advancement into FCIP positions by denying them the advantages of statutory competitive procedures.  Such procedures place strict rating and ranking requirements on agencies in order to ensure fairness and transparency in the selection process.

Further, NTEU members who have served in the military and are qualified for FCIP positions lose important preferences when statutory competitive procedures are not used.

Statutes and regulations prescribe appointments to the competitive service and require that "selection and advancement" be determined on the basis of "relative ability, knowledge, and skills after fair and open competition which assures that all receive equal opportunity." 5 U.S.C. § 2302(b)(1). The statutes provide defined procedures that must be followed when filling vacancies in the competitive service. 5 U.S.C. §§ 3309-3319. They require agencies to assign numerical scores to all candidates who are minimally qualified, and to then rate and rank candidates according to those scores. 5 U.S.C. § 3309; 5 C.F.R. § 337.101(a).[6]

This process provides an important benefit to applicants because it enables them to understand the basis for selection decisions by reference to objective criteria. Further, preference-eligible veterans enjoy specific benefits under this numerical system because they are entitled to have five additional points added to their passing scores. Disabled veterans (as well as selected survivors, dependents, and parents of certain veterans and military service members) are entitled to ten additional points. See 5 U.S.C. § 3309; 5 C.F.R. § 337.101(b).

Under this integrated system, once the candidates' scores have been calculated, including any additional points for preference-eligibles, the names of qualified applicants are entered onto "registers or lists of eligibles" in rank order. The examining authority certifies "enough names from the top of the appropriate register" to permit the appointing authority "to consider at least

---

[6] The Homeland Security Act of 2002, Pub. L. 107-296 (Nov. 25, 2002), added a new statutory provision, 5 U.S.C. § 3319. While that provision is also intended to ensure fair and open competition, it allows agencies to develop a category-based method as an alternative way of assessing and rating job applicants for positions filled through the competitive examining process, rather than assigning individual numerical scores. Under this method, qualified applicants are grouped together in categories based on their levels of qualification for a vacancy, i.e., "qualified," "highly-qualified," etc.

three names for appointment to each vacancy in the competitive service." See 5 U.S.C. § 3317(a).

As noted above, all applicants for competitive service positions receive a benefit from the ability to measure selection decisions against the rating and ranking criteria. And preference-eligibles again receive a unique benefit during the ranking process because they are entitled to be ranked above others with the same rating. See 5 U.S.C. § 3313; 5 C.F.R. § 332.401.[7]

Chapter 33 provides that an agency "shall select for appointment to each vacancy from the highest three eligibles available for appointment on the certificate furnished under § 3317(a)." 5 U.S.C. § 3318(a). While veterans' preference is not absolute, if the appointing authority "proposes to pass over a preference eligible on a certificate in order to select an individual who is not preference eligible, such authority shall file written reasons with [OPM] for passing over the preference eligible," and obtain OPM's approval. 5 U.S.C. § 3318(b)(1). Preference-eligible veterans with a 30% or more disability are further entitled to notice of the proposed pass-over and an opportunity to respond to OPM. 5 U.S.C. § 3318(b)(2). Thus, applicants with veterans' preference also enjoy special procedural protections when statutory competitive procedures are employed.

As the foregoing illustrates, veterans' preference provisions were designed to work hand in glove with statutory competitive procedures. Because appointments in the excepted service may be made without numerical (or even categorical) rating and ranking, agencies are only required to "follow the principle of veterans' preference as far as administratively possible"

---

[7] Where agencies use the category-rating system authorized by the Homeland Security Act of 2002 (see note 7, supra) they do not add a specified number of veterans' preference points or apply the "rule of three." Instead, they protect the rights of veterans by placing them ahead of non-preference eligibles within each category. See 5 C.F.R. §§ 337.301, et seq.; see also, Issues of Merit (MSPB), Sept. 2006, at 3, "Category Rating: Well Liked, Still Not Well Used."

23

when filling excepted service positions. <u>See</u> 5 C.F.R. § 302.101(c). Therefore, agencies are permitted to use a variety of other methods to recognize preference-eligibles, including, for example, considering veterans' status as an amorphous "positive factor." <u>Patterson v. Department of the Interior</u>, 424 F.3d 1151, 1156-57 (Fed Cir. 2005). These other methods are clearly not as beneficial to veterans as the specific procedures used during the statutory competitive hiring process. <u>See</u> <u>Dean v. Dept. of Agriculture</u>, 99 M.S.P.R. 533, ¶ 14 (2005), <u>aff'd on reconsideration</u>, 104 M.S.P.R. 1 (2006) (noting that "[b]y ensuring that statutes such as 5 U.S.C. §§ 3309, 3313, and 3318 are applied by agencies unless there exists an exception to examination that meets the criteria of 5 U.S.C. § 3302, § 3304(b) is <u>intrinsically connected</u> to those statutes in a way that prevents veterans' preference rights in the federal workplace from being ignored or circumvented"). <u>Dean</u>, 99 M.S.P.R. 533, at ¶ 19 (emphasis added).

The government argues that NTEU's injury argument must fail because the FCIP regulations prescribe hiring processes in accordance with merit system principles, relying on 5 C.F.R. § 213.3202(a)(10). <u>See</u> Def. Mot to Dismiss at 23. The Union's Complaint, however, is not simply that the FCIP results in the violation of merit systems principles; it is that the program departs from the specific competitive procedures Congress established to ensure that such principles are followed.

The government argues further that these injuries are not sufficient to establish standing because current employees are not prevented from applying for FCIP positions and because there is no basis for assuming that internal candidates will inherently be disfavored when they do so. <u>See</u> Def. Mot. to Dismiss at 26. To the extent that the regulations relieve federal agencies of their obligation to post vacancies, as described above, however, NTEU members are indeed "prevented" from applying for positions because they have no knowledge that vacancies exist.

24

Further, and in any event, the injury alleged by applicant members does not depend upon whether they are prevented from applying for FCIP positions or even whether they would have been selected if competitive hiring procedures were used.  Instead, the injury alleged is the loss of rights and advantages applicants suffer when FCIP hiring is used in lieu of the statutory competitive process.  Deprivation of the right to participate in a competitive process that complies with legal requirements is clearly injury in fact for purposes of Article III, at least where a plaintiff would have had "some chance" of prevailing if the legally required procedures were used.  See Energy Transportation Group v. Maritime Administration, 956 F.2d 1206, 1211 (D.C. Cir. 1992); National Maritime Union of America v. Commander, Military Sealift Command, 824 F.2d 1228, 1237-38 (D.C. Cir. 1987) and cases cited therein (disappointed bidder on a contract who is "within the zone of active consideration" may claim more than economic injury from failure to receive award; he may also "claim injury to its right to a legally valid procurement process").

Finally, the government argues that NTEU must allege that a specific employee is interested in, qualified for, and has applied but was not selected for an FCIP position to challenge the failure to use statutory competitive procedures.  See Def. Mot. to Dismiss at 24.  While NTEU did not identify specific employees in its Complaint, it clearly alleged that its members who applied for FCIP positions were denied the benefit of statutory competitive procedures.  See Pl. Compl. ¶ 21.  The attached declaration of Frank Heffler provides further detail showing that a number of NTEU members have been interested in, qualified for, and have applied for but not been selected for FCIP positions.  This declaration should put to rest any claim by the

government that the Union has failed to show that any of its members were qualified applicants for FCIP positions and were not selected for such positions.[8]

### 4. The FCIP regulations injure IRS employees by diminishing the value of their contract rights

As outlined in its Complaint, NTEU members at the Internal Revenue Service (IRS) have suffered a specific injury as a result of the implementation of the FCIP regulations.  Previously, positions in the IRS as revenue officers or revenue agents were filled through either an internal merit promotion process or through a combination of internal merit promotion and an external competitive process.  The NTEU-IRS CBA (Article 13) prescribes specific procedures for merit promotion, including a first consideration right for internal applicants and the posting of vacancy announcements on the agency intranet or other electronic medium.  Pl. Compl. ¶¶ 26, 28.[9]

The IRS has traditionally followed the parties' CBA and statute in filling Revenue Officer and Revenue Agent positions.  Id.  With the implementation of the FCIP regulations, however, the IRS has departed from this practice because when special hiring authorities like the FCIP are used, the contract procedures do not apply.  Thus, even when they have become aware of the existence of FCIP vacancies, NTEU members employed by the IRS have been denied the

_____

[8] The government's reliance on Albuquerque Indian Rights v. Lujan, 930 F.2d 49 (D.C. Cir. 1991), in support of its argument that NTEU lacks standing here is misplaced.  See Def. Mot. to Dismiss at 24-26.  The plaintiff organization in that case challenged an agency's refusal to apply an Indian hiring preference for employees for certain positions.  The court dismissed the complaint for lack of standing because the plaintiff failed to identify a member who was qualified for a position, applied for it, and was denied the position because he was denied a hiring preference.  Here, as described above, NTEU does not make a similar claim that employees were, but for the government's actions, entitled to a particular position.  Rather, NTEU bases its claim on the fact that applicants suffer an injury to their right to compete for positions under statutory procedures.

[9] Article 13, § 2B enumerates exclusions from the normal merit promotion process, including "Government-wide special emphasis programs (such as VRA, Handicapped, Worker Trainee, and Cooperative Education Programs), up to and including conversion into the competitive service."  NTEU agrees with the IRS's interpretation that the FCIP, as a program, falls within the enumerated exclusions listed in Article 13, § 2B.

right to apply for positions that are covered by first consideration and other contractual protections.

This injury is directly traceable to the government's final FCIP regulations. But for these regulations, the IRS would post and fill Revenue Agent and Revenue Officer positions through the merit promotion process and/or statutory competitive procedures to which the contractual benefits apply. Because of the existence of FCIP hiring authority, there are far fewer positions at IRS that are filled through statutory competitive procedures and/or posted internally. The loss of the contractual benefits is therefore fairly traceable to OPM's promulgation of 5 C.F.R. §§ 213, 215.

Relying upon Brotherhood of Locomotive Engineers and Trainmen v. Surface Transportation Board, 457 F.3d 24 (D.C. Cir. 2006), the government argues that this injury is not traceable to the use of FCIP hiring authority but rather to the contract itself. See Def. Mot. to Dismiss at 28-29. Its reliance is misplaced.

In Brotherhood, a union challenged the decision of the Surface Transportation Board (Board) that found that a non-carrier which sought to acquire 18.2 miles of railroad track controlled by another railway company was "exempt" from a statutory requirement that it secure a certificate of approval for the transaction. Brotherhood, 457 F.3d at 26. The union argued, that the Board erred in "exempting" the non-carrier from the certificate requirement, rather than finding that the track itself was "excepted" from the Board's authority. Id. The difference between "excepting" and "exempting" the transaction was significant to the union because it had agreed in its CBA to waive bargaining rights with respect to all transactions that the Board exempted from the certificate requirement; it did not waive such rights for "excepted" transactions. Id. On appeal, the court rejected the Union's argument that it had standing to

challenge the Board's decision, holding that the loss of the right to bargain was not traceable to the Board's action, but that it was a "self inflicted" injury, arising out of the Union's agreement to waive its bargaining rights when the Board issued an exemption.  Id.

Brotherhood is distinguishable from this case on the issue of traceability.  The injured party here is not the Union, as an institution, and the injury does not involve the Union's right to bargain.  The injured parties are employees who have lost important contractual benefits as a result of the illegal exercise of hiring authority by the IRS.  The allegation is that absent the exercise of such authority, the IRS would have been required to fill positions using statutory competitive procedures, and that internal applicants would have had more opportunities to benefit from the first consideration privilege.  The injury is not "self inflicted" and the connection between the injury and the illegal hiring authority is direct, with no superseding cause to break the chain of causation.  Furthermore, the injury can be redressed by an order from this Court invalidating the use of FCIP hiring authority.

**B.      NTEU Has Met the Requirements to Serve as a Proper Representative of Its Injured Members**

As shown above, NTEU's members would have standing in their own right to challenge the illegal FCIP regulations on several grounds, any one of which is independently sufficient for purposes of establishing this Court's jurisdiction under Article III.  As we now show, NTEU has standing on behalf of these injured members, to bring this lawsuit.

**1.      The interests NTEU seeks to protect are germane to its purposes**

In this case, NTEU seeks to ensure that federal agencies comply with statutory procedures and afford required protections in selecting and promoting employees for federal civil service positions.  As the exclusive representative of 150,000 federal employees in thirty-one (31) federal agencies and departments, it is beyond dispute that this interest is germane to

28

NTEU's purpose which is, among other things, to protect its members' legal rights.  In fact, the government does not argue otherwise.

### 2.    Neither NTEU's asserted claim nor requested relief requires the participation of individual members

The courts have long recognized that where, as here, an organization seeks prospective, injunctive or declaratory relief, the association satisfies the third prong of the associational standing test.  Warth v. Seldin, 422 U.S. 490 (1975).  As the Supreme Court explained in Warth v. Seldin, where an association "seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."  Id. at 515.

Further, as the Supreme Court has recognized, joinder of individuals is unnecessary where neither the claims asserted nor the relief sought requires the court to consider the individual circumstances of any aggrieved member.  See International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Brock, 477 U.S. 274, 287 (U.S. 1986).  In other words, associational standing is recognized where the suit "raises a pure question of law."  Id.  Here, NTEU's suit is strictly limited to the legal question of whether the government has acted arbitrarily, capriciously and in violation of law.  The court need not consider the individual circumstances of any aggrieved member in order to address the legal issue and order equitable, as contrasted with monetary, relief.[10]

The government argues, nonetheless, that joinder of individual members is necessary on the grounds that NTEU's members supposedly do not share common interests.  It claims that

---

[10]   Cf. United Food & Commer. Workers Union Local 751 v. Brown Group, 517 U.S. 544, 553 (U.S. 1996); Telecommunications Research & Action Center v. Allnet Communication Services, Inc., 806 F.2d 1093, 1094-1095 (D.C. 1986) ("Lower federal courts have consistently rejected association assertions of standing to seek monetary, as distinguished from injunctive or declaratory, relief on behalf of the organization's members").

NTEU's Complaint "juggles theories of injury affecting discrete subsets of its membership, that are riven with internal conflicts and contradictions." Def. Mot. to Dismiss at 30.

This argument is utterly meritless. NTEU's members have a shared common interest in preventing the government from authorizing federal agencies to circumvent long-standing statutory competitive procedures because that authorization results in inferior rights for the career interns themselves and also disadvantages potential and actual applicants for positions covered by the FCIP. It is only the government's mischaracterizations of NTEU's interests (claiming, for example, that a successful lawsuit could result in the dismissal of current FCIP employees) that result in "tangled contradictions and conflicts." Def. Mot. to Dismiss at 31.[11]

Lastly, the government argues that individual members must be joined as co-plaintiffs because standing here assertedly "depends on assumptions and conjecture about whether such individuals actually exist." Def. Mot. to Dismiss at 32. But this assertion is completely baseless as shown above, in our explanation of the multiple injuries inflicted on NTEU members by the FCIP. Further, and in any event, the Union is submitting Declarations with this response that should be sufficient, certainly in the context of a motion to dismiss, to establish that injured members do, in fact, "exist."

Under these circumstances, the law does not require the Union to recruit individual members who are either current interns in their probationary period or potential applicants for

---

[11] In any event, even if the government were correct and there were conflicting interests among NTEU's members "the mere fact of conflicting interests among members of an association does not of itself defeat the association's standing to urge the interests of some members in litigation, even though success may harm the legal interests of other members." National Maritime Union v. Commander, Military Sealift Command, 824 F.2d 1228, 1234 (D.C. Cir. 1987) (emphasis added). As the court noted in National Maritime Union, most organizations will be faced with circumstances where the interests of its members may conflict. Id. at 1233. Any such conflict is to be resolved internally by the association; it does not defeat the organization's standing as an association to represent its members as it sees fit. Id. at 1233-234.

federal positions to be named as plaintiffs in this lawsuit. Indeed, one of the benefits of associational standing is that individuals are not required to put themselves in jeopardy or suffer the exposure of being plaintiffs themselves, where their organization can bring suit on their behalf.

Finally, the government claims that NTEU is deviating from a "past practice" of naming individual plaintiffs in similar lawsuits. It also urges that in Horner, after the claims of four individually named plaintiffs were dismissed, the court was unwilling to assume that additional affected employees existed, and required NTEU to name additional plaintiffs. See Def. Mot to Dismiss at 33, citing Horner, 659 F. Supp. at 12.

In fact, NTEU has no "past practice" of bringing suit on behalf of named plaintiffs. It has brought many similar suits solely in its own name, on behalf of its members. See, e.g., Devine, 733 F.2d at 114; Chertoff, 385 F. Supp. 2d at 3. Further, the government fails to appreciate that the circumstances that led the court to require the addition of named plaintiffs in Horner were different. In that case, OPM converted all Customs inspectors to competitive status during the middle of the litigation, thereby mooting the claims of the four named plaintiffs all of whom were Customs inspectors. Horner, 659 F. Supp. at 10. The court required NTEU to amend its complaint because its original complaint did not clearly allege that it represented Schedule B employees other than Customs inspectors who would also have been injured by the illegal OPM regulation. Id. at 12. In this case, on the other hand, NTEU's Complaint is clear on its face and supported by the Declarations submitted with this opposition to the government's Motion to Dismiss. Both show that the Union has members who have been and continue to be injured by the illegal FCIP regulations in concrete and immediate ways. Accordingly, under established

31

principles of law, NTEU has standing to bring this action on their behalf, without naming

individual plaintiffs. [12]

### III.    THE GOVERNMENT'S MOTION TO DISMISS ON THE GROUNDS OF LACHES IS MERITLESS

A.    Laches "bars relief to those who delay assertion of their claims for an

unreasonable time." N.A.A.C.P. v. N.A.A.C.P. Legal Defense and Educational Fund, 735 F.2d

131, 137 (D.C. Cir. 1985). "The evidence must show that the delay was both unreasonable and

that it prejudiced the defendant." Powell v. Zuckert, 366 F.2d 634, 636 (D.C. Cir. 1966). The

burden of proof in demonstrating delay and prejudice lies with the defendant. Id. at 638.

In its Motion to Dismiss, the government argues that laches bars NTEU's suit.

According to the government, NTEU unreasonably delayed bringing suit against the FCIP

regulations and this delay has allegedly unfairly prejudiced the government. See Def. Mot. to

Dismiss at 14. The government's claim is baseless. The Union did not delay unreasonably in

bringing this case. In fact, it brought suit less than 18 months after the regulations in dispute

were issued in final form. The timing of NTEU's lawsuit was based on the fact that —

consistent with trends across the federal government – FCIP hiring was increasingly replacing

the use of competitive procedures in bargaining units represented by NTEU. The Union was

receiving an ever-growing number of complaints from its members about the use of the unlawful

hiring authority, and the Union based its decision to file suit in January 2007, on this

development.

Further, NTEU brought its lawsuit well within the six-year statute of limitations for filing

APA claims. As the Sixth Circuit has noted, "there is a strong presumption that a plaintiff's

---

[12] Of course, should the Court conclude that individual plaintiffs are necessary, the Union would file a motion to amend its complaint to add such individuals.

delay in bringing suit is reasonable as long as the analogous statute of limitations has not lapsed." Coalition for Def. Procurement v. Fed. Prison Indus., 365 F.3d 435, 466 (6th Cir. 2004) (citations omitted).[13]

In any event, the government's laches defense cannot be litigated in the context of a motion to dismiss. The courts generally disfavor resolving issues of timeliness in a motion to dismiss due to the necessity of determining evidentiary issues associated with such claims, including delay and prejudice. See, e.g., Cobell v. Babbitt, 30 F. Supp. 2d 24 (D.D.C. 1998); Firestone v. Firestone, 76 F.3d 1205, 1210 (D.C. Cir. 1995) (holding that the district court erred by dismissing a case with prejudice on a motion to dismiss rather than summary judgment); Doe v. Department of Justice, 753 F.2d 1092, 1115 (D.C. Cir. 1985) ("a motion to dismiss may be granted on the basis that the action is time-barred only when it appears from the face of the complaint that the relevant statute of limitations bars the action."); Richards v. Mileski, 662 F.2d 65, 73 (D.C. Cir. 1981) ("There is an inherent problem in using a motion to dismiss for purposes of raising a statute of limitations defense. Although it is true that a complaint sometimes discloses such defects on its face, it is more likely that the plaintiff can raise factual setoffs to such an affirmative defense."); Jones v. Rogers Memorial Hospital, 442 F.2d 773, 775 (D.C. Cir. 1971) ("The defense [of laches] may be raised by a motion to dismiss under Rule 12(b)(6). . . .

---

[13] There is obviously no merit to the government's claim that NTEU's suit, filed on January 24, 2007, challenging the government's final rule issued on August 2, 2005, is somehow barred by the six-year statute of limitations. The government argues that NTEU's cause of action accrued with the promulgation of the December 14, 2000 interim rule, citing Spannaus v. Department of Justice, 82 F.2d 52 (D.C. Cir. 1987). Contrary to the government's assertion, Spannaus, and the cases cited therein, do not require that a plaintiff file suit challenging an agency rule when the agency issues its interim rule. Rather, Spannaus simply clarifies the effect of exhaustion (or non-exhaustion) of statutorily required or permitted agency review on the accrual of an action. Given the fact that OPM might well have revised its interim rule substantially when it issued its final rule, it is almost ridiculous to claim that the triggering event for a challenge to the final rule was the issuance of the interim rule.

But the complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove

no state of facts in support of his claim that would entitle him to relief.") (citation omitted).

Applying this well-established principle, the government's motion to dismiss on the basis

of laches must be denied because NTEU's Complaint does not on its face establish unreasonable

delay and prejudice.  Each of the elements of a laches defense requires factual development, and

is therefore more properly resolved at a later time, such as at the summary judgment stage.

**B.**     The cases on which the government relies in support of its laches argument are

decidedly off point.  In <u>Energy Cooperative v. Department of Energy</u>, 659 F.2d 146 (Temp.

Emer. Ct. App. 1981), the defendant sought dismissal of the suit on three grounds: laches, failure

to join indispensable parties, and failure to exhaust administrative remedies.  The court only

ruled on the latter ground, the exhaustion of remedies claim, and expressly passed on the other

two grounds.  <u>Energy Cooperative</u> therefore has absolutely no bearing here on whether laches

bars NTEU's suit.

<u>Independent Bankers Ass'n v. Heimann</u>, 627 F.2d 486 (D.C. Cir. 1980) is equally

inapposite.  In that case, the plaintiff, a trade association of federal and state-chartered banks,

challenged an interpretive ruling issued by the Comptroller of the Currency.  The Comptroller

issued the ruling in 1966, and the plaintiff brought suit twelve years later in 1978.  Further, the

defendant established that certain banks had relied on the ruling and had made substantial

financial commitments.  On a motion for summary judgment, the court determined that laches

barred the plaintiff's suit.

<u>Independent Bankers</u> is distinguishable from the situation here.  Most obviously, the

cause of action in <u>Independent Bankers</u> was dismissed on summary judgment, not a motion to

dismiss.  The defendant in that case was able to carry its burden – namely, that the plaintiff's

twelve-year delay in filing suit was unreasonable and that the delay prejudiced the defendant.

Here, the government seeks dismissal at the pleading phase, years before the applicable statute of

limitations has run, and without having established any factual basis for its claims of

unreasonable delay or prejudice.  For these reasons, as well as those set forth above, the

government's motion to dismiss on the grounds of laches must be denied.


## **CONCLUSION**

On the basis of the foregoing, and for the reasons set forth in the Union's earlier

pleadings, the government's motion to dismiss should be denied, and the Court should order the

government to file the administrative record in this matter without further delay.


Respectfully submitted,


/s/ Gregory O'Duden
GREGORY O'DUDEN
General Counsel
D.C. Bar No. 254862

/s/ Elaine Kaplan
ELAINE KAPLAN
Senior Deputy General Counsel
D.C. Bar No. 292441

/s/ Larry J. Adkins
LARRY J. ADKINS
Deputy General Counsel
D.C. Bar No. 425653

/s/ Timothy B. Hannapel
TIMOTHY B. HANNAPEL
Assistant Counsel
D.C. Bar No. 412245

/s/ Barbara A. Sheehy
BARBARA A. SHEEHY
Assistant Counsel
* D.C. Bar No. pending admission

NATIONAL TREASURY EMPLOYEES UNION
1750 H Street, NW
Washington, DC 20006
Telephone:  (202) 572-5500
Facsimile:  (202) 572-5645

Date: April 18, 2008                    Attorneys for Plaintiffs

Case 1:07-cv-00168-RWR    Document 9-2    Filed 04/18/2008    Page 1 of 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES UNION )
                            )
        Plaintiff,        )
                            )
        v.           )   Civ. A. No. 07-168 (RWR)
                            )
LINDA M. SPRINGER, Director,  )
U.S. Office of Personnel     )
Management,               )
                            )
        Defendant.        )
                            )

## AFFIDAVIT OF FRANK HEFFLER

1. I am an employee of the Internal Revenue Service.  I am the Chapter President for Chapter 47 of the National Treasury Employees Union.  This Chapter represents approximately 1600 bargaining unit employees in New York City, including approximately 200 Revenue Officers (ROs) and 900 Revenue Agents (RAs).  I have been Chapter President for this Chapter since 1994.

2. As Chapter President, I am familiar with IRS's hiring practices, both nationally and for my chapter.  I make it a practice to ensure that a representative from my chapter attends all new employee orientations and meets with new hires.  My chapter also makes a point of greeting new hires, discussing the Union's role, and notifying these employees as to who the stewards and other representatives

are in the chapter.  During these meetings and orientations, we often find out the particulars surrounding an employee's hiring and often see the familiar faces of current employees at the orientations.

3. Over the years, it has been my experience that IRS has always posted RO and RA vacancies internally.  I have seen these vacancies on the Career Opportunities Listing (COL) (an electronic bulletin board of IRS jobs accessible to IRS employees only) and on USAJOBS.  It had always been the case that vacancy announcements were easily found one way or the other by internal applicants who were interested in applying for these positions.  In fact, sometimes vacancies were posted exclusively for internal applicants by posting them on the IRS COL.

4. The internal posting practice has drastically changed since 2006, when IRS began routinely using the Federal Career Internal Program (FCIP) authority to hire RAs and ROs. Since that time, the IRS does not post any FCIP RO and RA vacancies internally.  I have never seen an FCIP RO or RA posting on the COL.  I have gone to new employee orientations (or have heard from other chapter representatives who attended these meetings) where there are several newly hired career interns, who filled vacancies that no one in the Chapter even were aware of.

5. It had also always been the case before the use of FCIP hiring, that internal candidates applied for and were often selected for these types of vacancies. RA positions are particularly desirable for lower-graded employees, such as Tax Compliance Officers, Customer Service Representatives, and Secretaries because the journey level for an RA position is GS-11. When internal employees apply for these positions, they receive the full set of benefits that are provided in the NTEU-IRS National Agreement. One very important benefit is first consideration for internal employees over any external applications. Over the past two years or so, my Chapter has seen a dramatic decline in the number of internal hires for RA positions, notwithstanding that the IRS has hired dozens of RAs in my Chapter during that time period.

6. Employees are also interested in switching business units and are frustrated in this effort by the FCIP process. For example, I know that RAs in the Small Business/Self Employed (SB/SE) business unit are often looking to switch to RA positions in the Large and Midsize Business (LMSB) business unit. SB/SE employees have complained that there have not been any vacancies recently in LMSB, but I am aware of new hires off the street being hired for RA positions as FCIP hires in LMSB.

7. I am aware of bargaining unit employees who are qualified for RA positions, are interested in those positions, are not made aware of such vacancies that have been filled through the FCIP, and would have applied if the positions were posted internally.  I am also aware of current employees in my chapter who were qualified for RA FCIP vacancies, applied for such vacancies, and were not selected because the IRS hired an external candidate into the position.  Qualified internal employees are not even interviewed for FCIP positions, as opposed to external candidates who are routinely interviewed.

I declare under penalty of perjury that these statements are true and correct, to the best of my knowledge and belief. Executed at New York, New York, this 15th day of April, 2008.

Frank Heffler

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Civ. A. No. 07-168 (RWR) |
| LINDA M. SPRINGER, Director, ) | |
| U.S. Office of Personnel ) | |
| Management, ) | |
| ) | |
| Defendant. ) | |
| ) | |

AFFIDAVIT OF ANDREW G. LOVETT

1. I am an employee of the Internal Revenue Service.  I am the Chapter President for Chapter 60 of the National Treasury Employees Union.  This Chapter represents approximately 900 bargaining unit employees in the state of New Jersey, including approximately 200 Revenue Officers (ROs) and 350 Revenue Agents (RAs).  I have been Chapter President for this Chapter since 1998.

2. As Chapter President, I have extensive knowledge of IRS's hiring practices at both the national level and local level.  I make it a practice to ensure that either I or another representative from my chapter attend all new employee orientations and meet with new hires.  My chapter also makes a point of greeting new hires, discussing the Union's role, and introducing them to the stewards and

other representatives in the Chapter.  During these
meetings and orientations, we often find out the
particulars surrounding an employee's hiring and often see
the familiar faces of current employees at the
orientations.

3. Over the years, it has been my experience that IRS has
always posted all RO and RA vacancies internally.  I have
seen such vacancies on the Career Opportunities Listing
(COL) (effectively an electronic bulletin board of IRS jobs
accessible to IRS employees only), on bulletin boards, and
on USAJOBS.  It had always been the case that vacancy
announcements were easily found by internal applicants who
were interested in applying for these positions.  In fact,
sometimes vacancies were posted exclusively for internal
applicants by posting them on the IRS COL.

4. The internal posting practice has drastically changed since
2006, when IRS began routinely using the Federal Career
Internal Program (FCIP) authority to hire RAs and ROs.
Since this time, the IRS has never posted any RO or RA FCIP
vacancies internally and has not hired any internal
candidates from my Chapter for an FCIP vacancy.  Further, I
have never seen an FCIP RO or RA position posted on
USAJOBS, but have seen permanent non-FCIP RO and RA vacancy
announcements on USAJOBS.  It is not unusual for me, or a

steward from my chapter, to attend new employee
orientations where there are several newly hired career
interns, who filled vacancies that no one in the Chapter
was ever aware of.

5. It had also always been the case before the use of FCIP
hiring that internal candidates applied for and were often
selected for all RO and RA vacancies.  RO and RA positions
are particularly desirable for lower-graded employees, such
as Tax Compliance Officers, Customer Service
Representatives, and Secretaries because the journey level
for RO and RA positions is GS-9 and 11, respectively.  When
internal employees apply for these positions, they receive
the full set of benefits that are provided in the NTEU-IRS
National Agreement.  One very important benefit is first
consideration for internal employees over any external
applications.  Over the past two years or so, my Chapter
has seen a dramatic decline in the number of internal hires
for RO and RA positions, notwithstanding that the IRS has
hired dozens of ROs and RAs in my Chapter during that time
period.

6. There are bargaining unit employees in my chapter who are
qualified for RO and RA positions, who are interested in
these positions, who are unaware of any FCIP vacancies, and

who would apply if the positions were readily posted on either the COB or USAJOBS.

7. I have also seen a change in the way IRS targets employees for hire as ROs and RAs. In the past, the focus was on career advancement of internal employees. Now, however, the IRS has shifted its focus and put more resources into colleges and graduate schools for its recruitment efforts. Rather than posting FCIP jobs internally, IRS is deliberately avoiding internal candidates in favor of college and graduate students whom it targets with special recruiting programs that are unavailable to internal candidates.

I declare under penalty of perjury that these statements are true and correct, to the best of my knowledge and belief. Executed at Springfield, New Jersey, this 16th day of April, 2008.

Andrew G. Lovett

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES UNION   )
                                    )
          Plaintiff,                )
                                    )
     v.                             )
                                    )   Civ. A. No. 07-168 (RWR)
LINDA M. SPRINGER, Director,        )
U.S. Office of Personnel            )
Management,                         )
                                    )
          Defendant.                )
_____)

AFFIDAVIT OF SHELLEY CASPARY

1. I am an employee of the Internal Revenue Service.  I am the
   Chapter President for Chapter 222 of the National Treasury
   Employees Union.  This Chapter represents approximately 850
   bargaining unit employees in Houston, Texas, including 120
   Revenue Officers (ROs) and 180 Revenue Agents (RAs).  I
   have been Chapter President for this Chapter since October
   2002.

2. As Chapter President, I have extensive knowledge of IRS's
   hiring practices at both the national level and local
   level.  I make it a practice to ensure that either I or
   another representative from my chapter attend all new
   employee orientations and meet with new hires.  My chapter
   also makes a point of greeting new hires, discussing the
   Union's role, and notifying them of the stewards and other

representatives in the Chapter.  During these meetings and orientations, we often find out the particulars surrounding an employee's hiring and often see the familiar faces of current employees at the orientations.

3. Over the years, it has been my experience that IRS has always posted all RO and RA vacancies internally.  I have seen such vacancies on the Career Opportunities Listing (COL) (effectively an electronic bulletin board of IRS jobs accessible to IRS employees only), on bulletin boards, and on USAJOBS.  It had always been the case that vacancy announcements were easily found by internal applicants who were interested in applying for these positions.  In fact, sometimes vacancies were posted exclusively for internal applicants by posting them on the IRS COL.

4. The internal posting practice has drastically changed since 2006, when IRS began routinely using the Federal Career Internal Program (FCIP) authority to hire RAs and ROs. Since that time, the IRS never posted any RO or RA FCIP vacancy internally and has not hired any internal candidates from my Chapter for an FCIP vacancy.  It is not unusual for me, or a steward from my chapter, to attend new employee orientations where there are several newly hired career interns, who filled vacancies that no one in the Chapter was ever aware of.

5. It had also always been the case before the use of FCIP hiring that internal candidates applied for and were often selected for all RO and RA vacancies. RO and RA positions are particularly desirable for lower-graded employees, such as Tax Compliance Officers, Customer Service Representatives, and Secretaries because the journey level for RO and RA positions is GS-9 and 11, respectively. When internal employees apply for these positions, they receive the full set of benefits that are provided in the NTEU-IRS National Agreement. One very important benefit is first consideration for internal employees over any external applications. Over the past two years or so, my Chapter has seen a dramatic decline in the number of internal hires for RO and RA positions, notwithstanding that the IRS has hired dozens of ROs and RAs in my Chapter during that time period.

6. Employees are also interested in switching business units and are frustrated in this effort by the FCIP process. For example, I know that RAs in the Small Business/Self Employed (SB/SE) business unit are often looking to switch to RA positions in the Large and Midsize Business (LMSB) business unit. SB/SE employees have complained that there have not been any vacancies recently in LMSB, but I am aware of new hires off the street being hired for RA

positions as FCIP hires in LMSB.  Specifically, I am aware that in LMSB, the IRS hired 83 FCIP interns in 2007. Attached to this statement is an LMSB publication referencing the number of FCIP hires in 2007.

7. There are bargaining unit employees in my chapter who are qualified for RO and RA positions, who are interested in these positions, who are unaware of any FCIP vacancies, and who would apply if the positions were readily posted on either the COL or USAJOBS.

8. I have also seen a change in the way IRS targets employees for hire as ROs and RAs.  In the past, the focus was on career advancement of internal employees.  Now, however, the IRS has shifted its focus and put more resources into colleges and graduate schools for its recruitment efforts. Rather than posting FCIP jobs internally, IRS is deliberately avoiding internal candidates in favor of college and graduate students whom it targets with special recruiting programs that are unavailable to internal candidates.  The last time I attended a new employee orientation, for example, each of the newly hired ROs and RAs had just recently completed or were in the process of completing a master's program.

I declare under penalty of perjury that these statements are true and correct, to the best of my knowledge and belief. Executed at Houston, Texas, this 17 day of April, 2008.

Shelley Caspary

**From:** *LMSB Communications
**Sent:** Monday, September 17, 2007 1:51 PM
**To:** &LMSB Employees
**Subject:** LMSB Frontline for September 17, 2007



## IN THIS ISSUE –

- **See New Publication on LMSB Security for Home and Office**
- **Charging Time for Hardware Software Problems**
- **September Issue of Technology Matters**
- **Name Changes for Two LMSB Organizations**
- September 15 – **Hispanic Heritage Month Kickoff**
- September 18 and 19 – **Orientation Begins for 2007 LMSB Interns**
- **Recently Posted –** *E-Talk with the LMSB Commissioner*

---

---

## *Management and Finance*

### September 18 and 19 – Orientation Begins for 2007 LMSB Interns

Orientation for 83 new LMSB employees, hired under the 2007 Federal Career Intern Program (FCIP), will take place on Tuesday and Wednesday, September 18th and 19th at LMSB Headquarters in Washington, DC. The one and a half-day event will provide information to our interns on IRS and LMSB guidance, policies, and programs to assist them in making the transition to their new jobs.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Civ. A. No. 07-168 (RWR) |
| LINDA M. SPRINGER, Director, ) | |
| U.S. Office of Personnel ) | |
| Management, ) | |
| ) | |
| Defendant. ) | |
| ) | |

AFFIDAVIT OF THOMAS O'KEEFE

1. I am an employee of the U.S. Customs and Border Protection (CBP).  I am the Chapter President for Chapter 138 of the National Treasury Employees Union.  This Chapter represents approximately 500 bargaining unit employees in the State of New York, from Champlain to Alexandria Bay and down to Albany, including approximately 300-350 Customs and Border Protection Officers (CBPOs).  I have been Chapter President for this Chapter for the past twelve (12) years.

2. As Chapter President, I am very familiar with CBP's hiring practices at both the national and local level.  In the past, before CBP started using the Federal Career Intern Program (FCIP) to hire CBPOs, CBP used the traditional method for hiring these employees.  That is to say, the agency would post CBPO vacancies on OPM's USAJOBS website,

candidates would apply, competitive procedures would be used, and successful applicants would be hired as CBPOs to serve a one-year probationary period. After one year, these employees would have the security of full contract rights and the right to appeal any adverse action to the Merit Systems Protection Board. Since at least 2005, CBP has abandoned this traditional route and hired all CBPOs as FCIP interns and required them to serve a two-year "internship" period during which time they have no reasonable assurance of continued employment.

3. According to GAO, in 2006, CBP used the FCIP regulations to hire nearly 3200 new employees, most of whom were CBPOs. The General Accounting Office's report is available at http://www.gao.gov/new.items/d07758.pdf.

4. In my chapter, several hundred new CBPOs were hired in since 2006 under the FCIP regulations. All these employees have served or are serving a two-year "internship" period rather than the one-year probationary period served by all non-FCIP hires. It has been my experience that this extended "probationary" period has demoralized these employees. These employees are in constant fear that their employment will be terminated, which adversely affects their ability to perform their jobs.

5. Since 2006, I am aware of several employees who were hired as FCIP CBPOs, who served more than twelve (12) months and who were terminated before twenty-four (24) months of service.

I declare under penalty of perjury that these statements are true and correct, to the best of my knowledge and belief. Executed at Las Vegas, Nevada, this _14th_ day of April, 2008.

Thomas O'Keefe

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION   ) | |
|                     ) | |
|       Plaintiff,     ) | |
|                     ) | |
|       v.          ) | Civ. A. No. 07-168 (RWR) |
|                     ) | |
| LINDA M. SPRINGER, Director,  ) | |
| U.S. Office of Personnel     ) | |
| Management,            ) | |
|                     ) | |
|       Defendant.    ) | |

AFFIDAVIT OF STEVEN FLIG

1. I am an Assistant Counsel with the National Treasury
   Employees Union (NTEU).  I am responsible for
   representation matters at the chapter level, including
   grievances, arbitrations, and bargaining.  I am assigned to
   various chapters within the jurisdiction of NTEU's Atlanta
   Field Office.  Several of those chapters include Customs
   and Board Protection chapters.  I have been in this
   position since 1975.

2. As an Assistant Counsel, chapter officials keep me well
   informed on all representation matters, particularly
   adverse actions taken against employees and other potential
   grievance actions.  I have frequently represented CBPOs who
   have been subject to discipline, up to and including
   dismissal.

3. I am aware of several former CBP employees that were hired as CBP Officers pursuant to the Federal Career Intern Program and whose employment was terminated after at least 12 months of employment, but before 24 months of employment. If these employees had been hired other than under FCIP authority, they would have had appeal rights either through the negotiated grievance procedure or through the Merit Systems Protection Board. Because they were FCIP interns, however, and still serving a two-year internship period, the employees had no recourse following their termination.

4. For example, I recently learned about a CBPO who had been employed for fifteen (15) months and had been hired under CBP's FCIP authority. The Officer was traveling through Miami airport, off duty and on vacation with his family. When passing through security, the officer requested to use a chair while removing his shoes. He was denied permission to put his socks on, and apparently declined to stand up as instructed without his socks because he did not want to stand in his bare feet on the airport floor. The officer was ultimately terminated from his employment on the basis of an alleged failure to follow the instructions and procedure of TSA, disrespect for authority and lack of good judgment. In my experience, an infraction of this sort

would not trigger the removal of a CBPO.  If this employee were not, in effect, a probationary employee, he would almost certainly have been subjected to a much lesser penalty.  Since this employee was hired under FCIP, however, he had no appeal rights.  Attached to this statement is his termination letter, which has been redacted.

I declare under penalty of perjury that these statements are true and correct, to the best of my knowledge and belief. Executed at Las Vegas, Nevada, this 15 day of April, 2008.

Steven Flig

905
871 3861

NOV - 6 2006

FAX 871
3866

909 S.E. First Avenue Ste. 980
Miami, FL 33131



**U.S. Customs and
Border Protection**

Customs and Border Protection Officer
U.S. Customs and Border Protection
Miami Service Port
6601 NW 25th Street
Miami, Florida 33122

Dear ████████

On August 22, 2005, you accepted an appointment under the Federal Career Intern
Program with U.S. Customs and Border Protection, as a Customs and Border
Protection (CBP) Officer, GS-1895-05. This type of appointment requires you to serve a
trial period of two years from the date of your appointment. During this period, it is
determined if the employee is fit for continued employment in the areas of performance,
ability, conduct, dependability, and general character traits.

On August 23, 2006, you were traveling on vacation with your wife, ████████
████████, and your child. Upon arrival at the Transportation Security
Administration (TSA) checkpoint, in Miami International Airport, you were directed to
remove your shoes, you refused, stating that you wanted to get a pair of socks first.
The Transportation Security Officer denied your request and called for a TSA
Supervisor. When the Supervisor arrived, he also requested that you take your shoes
off, but you continued your defiant attitude requesting they provide a place to sit. You
informed the Supervisor that you were a fellow worker who protects the country and you
asked for common courtesy. The Supervisor escorted you to a chair where you
removed your shoes and then when asked to stand, you refused. You insisted that you
would not stand, in your bare feet, on the dirty floor. You further stated that you would
remember all of them. Considering your non-cooperative attitude and what appeared,
to the Supervisor, to be a threat, a TSA Manager, the Metro Dade Police Department
and a CBP representative were called. Upon questioning by all present, your airport
identification was taken from you, and the CBP representative instructed you to report to
your immediate Supervisor upon your return. You were then permitted to proceed to
your flight. Your actions required numerous personnel to be taken from their assigned
duties because of your refusal to follow the procedures established by TSA. Your
actions demonstrate a failure on your part to follow proper procedures and instructions
by another law enforcement agency, disrespect for authority, and a lack of good
judgement, all essential attributes for successful performance as a CBP Officer. As a
Law Enforcement Officer, you are expected to abide by all laws, regulations, and
established policies. In light of the above, I have determined that it is in the best interest
of the agency that your employment with CBP be terminated at the end of your
scheduled tour on November 17, 2006.

2

You may raise any allegation that this action was taken against you, in whole or in part, because of discrimination based on race, color, religion, national origin, sex, age, or disabling condition under the provisions of 29 CFR Part 1614. To do so, you must consult the Equal Employment Opportunity Officer at (305) 810-5952 within forty-five days of the effective date of this action.

A copy of the Employee Transcript, an exception to the Standard Form 50, documenting your termination, will be mailed to you at a later date.

Please sign and date the receipt copy of this letter. Your signature serves as documentation that you received the original letter and not that you agree with the contents of the letter.

If you have any questions about your appeal rights, you may contact John H. Breslin, Labor Relations Specialist, at (305) 810-5101.

Sincerely,

Thomas S. Winkowski
Director, Field Operations, Miami
Miami Field Office

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION )<br><br>       Plaintiff, )<br><br>            v. )<br><br>LINDA M. SPRINGER, Director, )<br>U.S. Office of Personnel )<br>Management, )<br><br>       Defendant. )<br> ) | Civ. A. No. 07-168 (RWR) |

AFFIDAVIT OF STEPHEN J. KELLER

1. I am Senior Counsel for Compensation Negotiations with the
National Treasury Employees Union (NTEU).  I am responsible
for term and midterm negotiations and grievances at the
national level for several agencies represented by NTEU,
including the Federal Deposit Insurance Corporation (FDIC).
I have been in this position and responsible for FDIC
matters since 1993.

2. In my role as Senior Counsel for Compensation Negotiations,
one of my duties is to negotiate over matters that affect
the working conditions of FDIC bargaining unit employees.
As part of this duty, I often attend agency-conducted
briefings regarding proposed changes in the terms and
conditions of employment.  On or about February 23, 2005
and June 20, 2005, I attended briefings wherein the FDIC

outlined its plan to implement a new "Corporate Employee Program" (pursuant to authority under the Federal Career Intern Program (FCIP) regulations).  According to the FDIC, the Corporate Employee Program would be used as the exclusive means to hire Financial Institution Specialists (FIS).  The FIS position did not exist prior to the establishment of this Corporate Employee Program, and under the proposed plan, FIS employees hired under the FCIP authority must serve an extended probationary or trial period.  The new FIS position was designed to replace the Examiner Trainee/Assistant Examiner position, which was a competitive service position.  The FIS position would, if not for FCIP authority, be similarly included in the competitive service.

3. Between June 2005 and September 2007, FDIC has hired approximately 340 FIS employees under FCIP authority across the United States.  These employees are represented by NTEU.  Among those 340 employees, there were at least eight employees whose employment was terminated after more than twelve (12) months of service, but fewer than 24 months.  These employees had no adverse action appeal rights -- through either the Merit Systems Protection Board or the collective bargaining agreement between FDIC and NTEU.  If they had not been hired under FCIP authority, these

employees would have had appeal rights that would have
attached after twelve (12) months of service.

I declare under penalty of perjury that these statements
are true and correct, to the best of my knowledge and belief.
Executed at Washington, D.C., this _17th_ day of April, 2008.

Stephen J. Keller