IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civ. A. No. 07-168 (RWR) ) |
| LINDA M. SPRINGER, Director, U.S. Office of Personnel Management, | ) ) ) |
| Defendant. | ) ) |

**DEFENDANT'S REPLY MEMORANDUM
IN SUPPORT OF MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    THIS SUIT IS BARRED BY LACHES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   NTEU LACKS STANDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    Current NTEU-Represented Career Interns. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    Current Non-FCIP Employees Represented by NTEU. . . . . . . . . . . . . . . . . . . . 9

      C.    Current Internal Revenue Service Employees. . . . . . . . . . . . . . . . . . . . . . . . . . 16

      D.    NTEU Cannot Sue As An Association, Or, At a Minimum,
            Should Be Required to Join NTEU-Represented
            Employees with Standing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.  THE CIVIL SERVICE REFORM ACT PRECLUDES NTEU'S CLAIMS. . . . . . . . . . . 19

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                                      Page(s)

<u>Alabama v. Bowen</u>,
    659 F. Supp. 297 (D.D.C. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

<u>Albuquerque Indian Rights v. Lujan</u>,
    930 F.2d 49 (D.C. Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 16

<u>Ass'n of Data Processing Serv. Orgs. v. Camp</u>,
    397 U.S. 150 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>Barnhart v. Devine</u>,
    771 F.2d 1515 (D.C. Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

<u>Brotherhood of Locomotive Engineers and Trainmen v. Surface Transportation Board</u>,
    457 F.3d 24 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

<u>Carducci v. Regan</u>,
    714 F.2d 171 (D.C. Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

<u>Coalition for Def. Procurement v. Fed. Prison Indus.</u>,
    365 F.3d 435 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

<u>Cobell v. Babbitt</u>,
    30 F. Supp. 2d 24 (D.D.C. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

<u>Day v. D.C. Dep't of Consumer & Regulatory Affairs</u>,
    191 F. Supp. 2d 154 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

<u>Doe v. Dep't of Justice</u>,
    753 F.2d 1092 (D.C. Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

<u>Economou v. Butz</u>,
    370 F. Supp. 361 (S.D.N.Y. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

<u>Energy Cooperative, Inc. v. U.S. Dep't of Energy</u>,
    659 F.2d 146 (Temp. Emer. Ct. App. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Energy Transp. Group v. Maritime Admin.,
    956 F.2d 1206 (D.C. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fornaro v. James,
    416 F.3d 63 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22

Galliher v. Cadwell,
    145 U.S. 368 (1892). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Gingery v. Dep't of Defense,
    105 M.S.P.R. 671 (May 30, 2007), appeal docketed, No. 2007-3292 (Fed. Cir.). . . . . . . 20

Goodman v. McDonnell Douglas Corp.,
    456 F. Supp. 874, 876 (E.D. Mo. 1978), aff'd, 606 F.2d 800 (8th Cir. 1979),
    cert. denied, 446 U.S. 913 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Goodman v. McDonnell Douglas Corp.,
    606 F.2d 800 (8th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Gray v. OPM,
    771 F.2d 1504 (D.C. Cir. 1985), cert. denied, 475 U.S. 1089 (1986). . . . . . . . . . . . 21, 22

Gruca v. U.S. Steel Corp.,
    495 F.2d 1252 (3d Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Independent Bankers Ass'n v. Heimann,
    627 F.2d 486 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The Key City,
    81 U.S. (14 Wall.) 653, 660 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Nat'l Maritime Union v. Commander, Military Sealift Command,
    824 F.2d 1228 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

NTEU v. Chertoff,
    385 F. Supp. 2d 1 (D.D.C. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

NTEU v. Devine,
    577 F. Supp. 738 (D.D.C. 1983), aff'd, 733 F.2d 114 (D.C. Cir. 1984). . . . . . . . . . 20, 22

NTEU v. Horner,
     659 F. Supp. 8 (D.D.C. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

NTEU v. Horner,
     854 F.2d 490 (D.C. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

NTEU v. MSPB,
     743 F.2d 895 (D.C. Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24

OCONUS DOD Employee Rotation Action Group v. Cohen,
     144 F. Supp. 2d 1 (D.D.C. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Patterson v. Department of the Interior,
     424 F.3d 1151 (Fed. Cir. 2005), cert. denied, 547 U.S. 1071 (2006). . . . . . . . . . . . . . 14

Ramos v. Ashcroft,
     371 F.3d 948 (7th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Simon v. E. Ky. Welfare Rights Org.,
     426 U.S. 26 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Tandy Corp. v. Malone & Hyde, Inc.,
     769 F.2d 362 (6th Cir. 1985), cert. denied, 476 U.S. 1158 (1986). . . . . . . . . . . . . . . . . 4

United States v. Fausto,
     484 U.S. 439 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

United States ex rel. Arant v. Lane,
     249 U.S. 367 (1919). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,
     454 U.S. 464 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

W.C. v. Bowen,
     807 F.2d 1502 (9th Cir.), amended on reh'g, 819 F.2d 1227 (9th Cir. 1987). . . . . . . 17, 18

Warth v. Seldin,
     422 U.S. 490 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Wash. State Grange v. Wash. State Republican Party,
     128 S. Ct. 1184 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Wrenn v. Derwinski,
    791 F. Supp. 11 (D.D.C. 1992), aff'd,
    No. 92-5224, 1993 WL 215228 (D.C. Cir. June 8, 1993). . . . . . . . . . . . . . . . . . . . . . . . . . 5

## STATUTES, REGULATIONS, AND EXECUTIVE ORDERS

Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 111. . . . . . . . . . . . . . . . . . . . . . 19

5 U.S.C. § 703. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

5 U.S.C. § 1204(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24

5 U.S.C. § 2301(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 24

5 U.S.C. § 2302(b)(12). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

5 U.S.C. § 3301(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5 U.S.C. § 3330. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Veterans Employment Opportunities Act, 5 U.S.C. § 3330a. . . . . . . . . . . . . . . . . . . . . . . . . . . 20

5 C.F.R. § 213.3202(o). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

5 C.F.R. part 302. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

5 C.F.R. § 302.101(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5 C.F.R. § 302.201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5 C.F.R. § 302.302. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5 C.F.R. § 302.304. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Exec. Order No. 13,162, 65 Fed. Reg. 43,211 (July 6, 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Defendant Linda M. Springer, Director of the U.S. Office of Personnel Management ("OPM"), respectfully submits this reply memorandum in support of her motion to dismiss this action for lack of subject matter jurisdiction, or, in the alternative, for failure to state a claim upon which relief can be granted.

## I.    THIS SUIT IS BARRED BY LACHES

As discussed in defendant's opening memorandum ("Def.'s Mem."), this challenge by the National Treasury Employees Union ("NTEU") to the Federal Career Intern Program ("FCIP") is barred by the equitable doctrine of laches because NTEU waited by the sidelines for almost seven years after the FCIP was created by executive order, and after scores of federal agencies and thousands of newly hired federal employees had come to rely on it in the interim, before bringing this facial challenge out of the blue.  Moreover, NTEU has conceded that it did not submit any comments raising its concerns during the rulemaking process.[1]  In similar circumstances, courts have dismissed unreasonably delayed suits challenging agency action.  See, e.g., Independent Bankers Ass'n v. Heimann, 627 F.2d 486, 488 (D.C. Cir. 1980); Energy Cooperative, Inc. v. U.S. Dep't of Energy, 659 F.2d 146, 150 (Temp. Emer. Ct. App. 1981);[2] Def.'s Mem. at 14-17.

NTEU's opposition ("Pl.'s Opp.") stresses that it filed suit less than 18 months after OPM issued the final rule implementing the FCIP in August 2005.  See Pl.'s Opp. at 32.  While even

---

[1]  See Pl.'s Mot. for Order Requiring Def. to File Admin. Record, and for a Second Enlargement of Time to Respond to Mot. to Dismiss (dkt. no. 6), at 4-5.

[2]  While plaintiff is correct that the court in Energy Cooperative technically rejected belated suit for failure-to-exhaust rather than laches, the court relied on the same considerations that inform a laches analysis, and cited case law involving laches.  See 659 F.2d at 150 (emphasizing "the substantial hardship that a challenge of the alleged improper rulemaking procedure would create at this very late date").  Moreover, NTEU is hard-pressed to distinguish Energy Cooperative on this basis because NTEU failed to exhaust in this case by neglecting to comment during the rulemaking.

delays of that order of magnitude have been found to result in laches if unreasonable under the circumstances and prejudicial,[3] NTEU's version of the timing ignores that the August 2005 final rule simply continued the regulatory status quo that had existed since December 2000 when the same regulations were published in interim form and went into immediate effect.  Indeed, NTEU has repeatedly urged in its submissions in this case that the ill effects that it alleges flow from the FCIP began to occur well before the August 2005 issuance of the final rule.[4]  Of course, the gravamen of NTEU's complaint here is directed not toward any particular feature of OPM's mostly mechanical implementing regulations, but toward the substantive scope of the FCIP as created by executive order in July 2000, nearly eight years ago.

NTEU also attempts to excuse its delay on the ground that its 2007 challenge of this program in existence since 2000 was prompted by more recent "complaints from its members about the use of the unlawful hiring authority."  Pl.'s Opp. at 32 (emphasis added); but see

---

[3]  See United States ex rel. Arant v. Lane, 249 U.S. 367, 371 (1919) (affirming dismissal for laches of suit brought by former federal official challenging removal from office, where suit was brought 20 months after the removal, and noting that "[s]uch a long delay must necessarily result in changes in the branch of the service to which he was attached"); Economou v. Butz, 370 F. Supp. 361, 363, 364 (S.D.N.Y. 1974) (sustaining laches defense because suit challenging agency rule brought "almost two years after the issue of the order, on alleged procedural deficiencies in its promulgation, does not commend itself to a court of equity and seems inexcusable"); cf. Energy Cooperative, 659 F.2d at 150 (31-month delay unacceptable when coupled with failure to comment at time of promulgation).

[4]  See, e.g., Compl. ¶ 18 ("In 2002, the U.S. Customs Service (now CBP) began using FCIP authority as its primary method for hiring entry-level Customs Inspectors . . . ."); Keller Aff. ¶ 2 (averring that FDIC held briefings in February 2005 and June 2005 regarding plan to implement a new FCIP-based hiring program that plaintiffs allege has caused injury); Plaintiff's Memorandum in Support of Motion for Order Requiring Defendant to File Administrative Record, and For a Second Enlargement of Time to Respond to Defendant's Motion to Dismiss (dkt. no. 6), at 6 n.3 (complaining that FCIP hiring increased from 423 hires for entry-level positions in FY 2001 to 11,000 in FY 2005, while hiring for entry-level positions under competitive examining procedures declined).

Compl. ¶ 18 (alleging that Customs Service began to use FCIP improperly in 2002).  Perhaps such complaints could explain the timing of an as-applied challenge to a particular application or allegedly abusive use of FCIP authority.  But NTEU stresses that this suit is brought as a "true facial challenge," Pl.'s Opp. at 10, which is equivalent to saying that the FCIP is invalid "in all of its applications" and that "'no set of circumstances exists under which the [FCIP] would be valid.'"  <u>Wash. State Grange v. Wash. State Republican Party</u>, 128 S. Ct. 1184, 1190 (2008) (internal quotation marks omitted) (describing nature of facial challenge).  The necessary corollary of such a theory of facial invalidity is that the FCIP must have been invalid <u>ab initio</u> at the moment it was created and implemented in 2000, not that it only became invalid later when used in a certain manner.  NTEU failed to exercise its rights under the Administrative Procedure Act ("APA") to comment on the program at the time of its origin, and slept on its rights from that time until January 24, 2007.

NTEU argues that it filed within the six-year statute of limitations for APA claims, and takes refuge in a Sixth Circuit case referring to "a strong presumption that a plaintiff's delay in bringing suit is reasonable as long as the analogous statute of limitations has not lapsed." <u>Coalition for Def. Procurement v. Fed. Prison Indus.</u>, 365 F.3d 435, 466 (6th Cir. 2004), <u>cited</u> in Pl.'s Opp. at 33.  Because the rule implementing the FCIP went into effect and was judicially reviewable when issued in interim form in December 2000 and its issuance in final form in 2005 did not change the status quo in any way material here, there is an at least colorable argument that NTEU's claims are directly barred by the statute of limitations.  <u>See</u> Def.'s Mem. at 16-17. However, even if the August 2005 date of the final rule is deemed the accrual date for statute-of-limitations purposes, that is not dispositive of the separate and distinct doctrine of laches, which

takes into account a broader set of equitable considerations.  See The Key City, 81 U.S. (14 Wall.) 653, 660 (1871) (holding with respect to laches "that no arbitrary or fixed period of time has been, or will be, established as an inflexible rule, but that the delay which will defeat such a suit must in every case depend on the peculiar equitable circumstances of that case").[5]  In this case, those equitable considerations include, in addition to sheer delay, that NTEU failed to comment on the rule at all at the time it was originally promulgated; that the program expanded greatly since 2000 while NTEU sat by the sidelines; and that numerous third parties -- including federal hiring officials and Career Interns alike -- have come to rely on the program during its over seven years of existence.[6]

 Finally, NTEU takes the position that the government's laches defense must await

---

 [5]  See also Galliher v. Cadwell, 145 U.S. 368, 373 (1892) ("laches is not, like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced -- an inequity founded upon some change in the condition or relations of the property or the parties"); Goodman v. McDonnell Douglas Corp., 606 F.2d 800, 805 (8th Cir. 1979) ("the operation of laches departs from that of statutes of limitation in that laches is more flexible," requiring "examin[ation of] all aspects of the equities affecting each case"), cert. denied, 446 U.S. 913 (1980).

 [6]  Other courts do not share the Sixth Circuit's "presumption" that compliance with a statute of limitations defeats laches, and our research has located no D.C. Circuit case adopting that approach.  See Tandy Corp. v. Malone & Hyde, Inc., 769 F.2d 362, 365-66 (6th Cir. 1985) (collecting cases from outside the Sixth Circuit that "look[] at the analogous statute as simply one factor to be weighed in a determination of unreasonable delay and prejudice," and "have concluded that unreasonable prejudicial conduct short of the limitation can bar the equitable claim."), cert. denied, 476 U.S. 1158 (1986).  The Third Circuit has held that the statute of limitations "does not determine the minimum limits of the delay necessary to invoke the [delay] element of the laches doctrine" and "[i]n given circumstances, a shorter time period [than statute of limitations] may be sufficient to give rise to inexcusable delay and prejudice to the defendant." Gruca v. U.S. Steel Corp., 495 F.2d 1252, 1259 n.8 (3d Cir. 1974).  The Eighth Circuit has noted that "[t]o a large extent even courts [such as the Sixth Circuit] applying a rule of a rebuttable presumption based upon an analogous statute of limitations have treated the presumption more as a permissive inference and have fully examined the peculiar facts of the cases before them." Goodman, 606 F.2d at 805 n.12.

-4-

summary judgment instead of being resolved on this motion to dismiss.  See Pl.'s Opp. at 33-34.

This contention is misplaced and is directly refuted by case law in this District.  See Alabama v.

Bowen, 659 F. Supp. 297, 302 n.10 (D.D.C. 1986) (rejecting "plaintiffs' technical contention that

. . . laches is an affirmative defense inappropriate for resolution in a motion to dismiss" as

"without merit").  All but one of the cases cited by NTEU on this point address statutes of

limitations, rather than laches.  Even if the two defenses are treated interchangeably, the cases

NTEU cites merely stand for a principle that is inapplicable here:  that a timeliness defense

cannot be adjudicated on a Rule 12(b)(6) motion to dismiss if it pivots on disputed factual issues

that require development.  These cases do not pose any obstacle to assertion on a 12(b)(6) motion

of a laches or statute-of-limitations defense that is evident on the face of the complaint.  In one of

them, the D.C. Circuit actually affirmed dismissal because "it is clear from the face of the

complaint that the statute of limitations bars these claims."  Doe v. Dep't of Justice, 753 F.2d

1092, 1116 (D.C. Cir. 1985); cf. Cobell v. Babbitt, 30 F. Supp. 2d 24, 45 (D.D.C. 1998) (holding

that laches defense to certain trust claims could not be resolved on a motion to dismiss because

the laches period for trust law does not begin "until a repudiation of the trust has occurred and

the plaintiffs have actual notice of it," and complaint was silent on the timing of those events).[7]

    Here, in contrast to the cases NTEU cites, the pertinent facts establishing the laches

defense plainly appear on the face of the complaint, appear to be undisputed, and are bolstered by

---

[7] Courts have dismissed suits for laches on Rule 12(b)(6) motions where the elements of
the defense were clear on the face of the complaint.  See, e.g., Wrenn v. Derwinski, 791 F. Supp.
11, 14 (D.D.C. 1992), aff'd, No. 92-5224, 1993 WL 215228 (D.C. Cir. June 8, 1993); Goodman
v. McDonnell Douglas Corp., 456 F. Supp. 874, 876 (E.D. Mo. 1978), aff'd, 606 F.2d 800 (8th
Cir. 1979), cert. denied, 446 U.S. 913 (1980).

NTEU's own filings and other facts of which the Court may take judicial notice.[8]  Therefore, there is no obstacle to dismissing this case for laches on a 12(b)(6) motion, and the Court should do so here.

## II.     NTEU LACKS STANDING

Defendant's opening memorandum analyzed each of the three theories of injury to NTEU's members that the complaint asserts as a basis for NTEU's Article III standing, and identified numerous deficiencies in them.  See Def.'s Mem. at 17-33.  Responding to these arguments, NTEU attempts to resolve some of these issues, but highlights other flaws in the process of doing so, and fails meaningfully to address other weaknesses in its standing theories.

### A.     Current NTEU-Represented Career Interns

NTEU has submitted affidavits alleging one specific instance and referring vaguely to other alleged instances in which NTEU members hired through the FCIP were terminated during the second year of their internships, and did not have the same procedural rights to challenge that action that would have been available if they had been hired into the same position in the competitive service under competitive examining procedures.  See, e.g., Flig Aff. ¶ 4.  We may assume arguendo that the inability to appeal a termination to the Merit Systems Protection Board ("MSPB") during the second year of one's internship constitutes an injury-in-fact, and that

---

[8] The Court may take judicial notice of NTEU's admissions in its filings in this case, such as its admission that it failed to comment on the FCIP rule, and that "[t]he use of FCIP hiring has expanded tremendously over the last several years" while it withheld filing suit, see Plaintiff's Reply to Defendant's Opposition to Motion for Order Requiring Defendant to File Administrative Record, and for a Second Enlargement of Time (dkt. no. 8), at 1.  The Court may also take judicial notice of matters of public record, such as that the FCIP was created and its scope was defined by executive order in July 2000.  See Exec. Order 13,162, 65 Fed. Reg. 43,211 (July 6, 2000), reprinted as note following 5 U.S.C.A. § 3301 (Supp. 2006).  See also supra note 4 (collecting relevant admissions in NTEU's submissions in this case).

NTEU's submissions support an inference that there are one or more current Career Interns among its membership who may face the same situation as the former employees discussed in the affidavits.[9]  NTEU's standing theory on behalf of current NTEU-represented Career Interns still founders, however, on the traceability and redressability prongs of the standing analysis.

To find a second-year Career Intern's inability to appeal a termination to the MSPB "traceable" to the FCIP requires an assumption that but for the FCIP, the same individual would have been selected for and appointed to the same position through competitive examining procedures and obtained MSPB appeal rights after one year.  NTEU offers no basis to support that assumption, and its standing theory on behalf of its competitive-service members demands precisely the opposite assumption:  that use of a hiring authority other than FCIP would have at least potentially led to a different person being selected.  In fact, several of the affidavits submitted by NTEU strongly suggest that positions filled through the FCIP would, absent the FCIP, have largely been filled not by the same individuals who were hired as Career Interns, but rather by internal candidates.  See, e.g., Lovett Aff. ¶ 5 ("It had also always been the case before the use of FCIP hiring that internal candidates applied for and were often selected for all RO and RA vacancies."); Heffler Aff. ¶¶ 3, 4 (alleging that prior to FCIP "vacancies were posted exclusively for internal applicants" but FCIP changed this practice).  NTEU's theory of standing on behalf of current Internal Revenue Service ("IRS") competitive-service employees

---

[9]  NTEU presumably introduces these incidents to show a likelihood of similar harm affecting current Career Interns prospectively, rather than to establish standing directly from historical injury to former Career Interns terminated in the past.  It is unclear whether the previously terminated Career Interns even remain NTEU members at this time (as would be necessary in order for NTEU to have associational standing derived from their injury), and even the broad relief NTEU has sought herein does not include reinstatement of former employees and would not redress any injury from their inability to appeal a past termination.

presupposes that, in the absence of the FCIP, the first-consideration provisions of IRS's

collective-bargaining agreement with NTEU would have resulted in many of those positions

going to internal applicants rather than their current occupants.  See Compl. ¶ 28.  Thus, NTEU's

own assertions refute traceability as to the alleged injury suffered by current Career Interns.[10]

      With respect to redressability, our opening memorandum pointed out that the relief

requested by plaintiff -- invalidation of the FCIP and an injunction against its further use -- would

not redress the alleged injuries of current Career Interns, because it would undermine the very

basis for their employment, leaving them without a job.  See Def.'s Mem. at 22-23.  NTEU's

response is striking in its irony.  Despite that its fundamental legal theory is that an exception to

competitive examining authorized by statute, ordered by the President, and implemented by OPM

was illegal and invalid, NTEU now strangely argues that the remedy for that alleged violation is

for the Court to order that individuals hired under the FCIP be deemed to have completed their

probationary period and acquire a permanent competitive-service position without undergoing

competitive examining.  See Pl.'s Opp. at 19-20.  If the Court were to impose such a remedy, the

---

[10] The best response to this point that NTEU can muster is that "the same argument could have been made in the Horner case" yet the district court found standing there.  Pl.'s Opp. at 18-19.  Of course, Horner cannot reasonably be cited as precedent against an argument that was not made in that case and was not considered by the court.  Moreover, in Horner, unlike here, NTEU based standing only on injury to current excepted-service employees and did not undercut its theory of traceability on behalf of those employees by simultaneously appearing on behalf of other employees supposedly injured by not being able to compete for the same positions.  See NTEU v. Horner, 659 F. Supp. 8, 9, 10 (D.D.C. 1986).  NTEU also complains that "these employees never even had the chance to apply for competitive service positions," Pl.'s Opp. at 19, but fails to explain how that is relevant to traceability.  Traceability requires that but for the FCIP, the employees would have accrued MSPB appeal rights on the quicker schedule afforded to new competitive service hires -- which, in turn, has to be predicated on an assumption that they would have been hired into the competitive service, not merely that they would have had a "chance to apply" for such positions.

Court itself would be creating the very sort of exception to competitive examining procedures

that NTEU so vigorously opposes.  Even the Court of Appeals in <u>NTEU v. Horner</u>, 854 F.2d 490

(D.C. Cir. 1988), upon which NTEU centrally relies in this case, said that it would be "without

regard for the statutory scheme established by Congress," "clearly [] inappropriate" and

"anomalous" for a court to wield its remedial power to create <u>ad hoc</u> exceptions to competitive

examination in this manner.  <u>See</u> <u>id.</u> at 499.[11]

Understandably declining to rest on such a far-reaching and discredited theory, NTEU's

fallback is that "even if the court did not order this relief to current employees, it could certainly

issue a prospective order enjoining continued use of FCIP hiring authority."  Pl.'s Opp. at 20.

But this fallback argument directly demonstrates the flaw in NTEU's theory of standing.  A

"<u>prospective</u> order enjoining <u>continued</u> use of FCIP hiring authority" would prevent the hiring of

<u>new</u> Career Interns, but would do nothing at all to remedy <u>current</u> Career Interns' alleged injury

from not having MSPB appeal rights during their second year, which is the injury-in-fact NTEU

has relied on to support standing.  Because NTEU has not shown how the current Career Interns

on whose behalf it purports to sue would "personally benefit in a tangible way from the court's

intervention," <u>Warth v. Seldin</u>, 422 U.S. 490, 508 (1975), its standing argument fails.

### B.    Current Non-FCIP Employees Represented by NTEU

In the complaint, NTEU alleged that current, non-FCIP employees represented by NTEU

---

[11] Contrary to NTEU's argument (Pl.'s Opp. at 20 n.5), the <u>Horner</u> court's incredulity at the idea of such a remedy was not merely a reaction to the fact that competitive examinations did not then exist for the positions at issue in <u>Horner</u>.  Rather, the court explained that to "simply order" a category of positions converted back into the competitive service would be fundamentally inconsistent with the statutory scheme, which grants OPM limited authority to make appointments to the competitive service without using a competitive examination but does not contemplate courts ordering their own exceptions.  <u>See</u> <u>Horner</u>, 854 F.2d at 499.

"are injured because they are deprived of their statutory rights to compete for the vacancies on the basis of their relative skills and abilities, in a fair and open process." Compl. ¶ 21. In our opening memorandum, we pointed out that this contention is a non sequitur because NTEU admits in the very same paragraph that such employees "are permitted to apply for FCIP vacancies . . . on the same footing as members of the general public," id., and FCIP hiring, no less than competitive-service hiring, is governed by the very merit systems principles that NTEU invokes, see 5 C.F.R. § 213.3202(o)(10). See Def.'s Mem. at 23-24.

     1. In its opposition to defendant's motion to dismiss, NTEU argues first that such individuals are nevertheless disadvantaged by the FCIP because FCIP vacancies "are not widely publicized" and they do not receive adequate notice of vacancies for which they might wish to apply. See Pl.'s Opp. at 20-21. NTEU relies on affidavits to the effect that prior to the use of the FCIP, one particular agency posted certain vacancies on "exclusive" media that were accessible only to internal candidates, but now uses different, non-exclusive methods of posting FCIP vacancies. See Lovett Aff. ¶¶ 3, 4, 5, 6; Caspary Aff. ¶¶ 3, 4, 5, 7, 8.

     The traceability prong of Article III standing analysis requires that the plaintiff's injury be "fairly traceable to the challenged action of the defendant, and not the result of independent action of some third party not before the court." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). Here, any injury that would-be applicants may experience from lack of adequate notice of vacancies flows not from OPM's actions, but from how a particular agency using the FCIP has chosen to advertise for the position in question. While NTEU is correct that posting on the USAJOBS website is not required for excepted-service positions, see 5 U.S.C. § 3330, nothing in the FCIP prohibits hiring agencies from posting vacancies in a manner readily

-10-

accessible to internal candidates.  Any alleged shortcomings in that regard would be attributable

to the hiring agency's advertising and posting practices, not to anything inherent in the FCIP.

See Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 42-43 (1976) (where independent action

of third party causes plaintiff's injury, it is not sufficient to base traceability on defendant's mere

failure to prevent that action, even if defendant can be said to have "encouraged" or permitted

third party's action).  These allegations might support, at most, standing to bring an as-applied

challenge to how a particular agency was implementing the FCIP, but not a lawsuit against OPM

challenging the very existence of the FCIP on a facial basis.

    Moreover, NTEU's affidavits suggest that its core grievance is not so much that the

posting of a particular vacancy at a particular time was inadequate, but rather general

dissatisfaction with what is perceived as a general trend away from hiring for certain positions

mainly or exclusively from internal applicants.  See, e.g., Lovett Aff. ¶ 5 ("It had also always

been the case before the use of FCIP hiring that internal candidates applied for and were often

selected for all RO and RA vacancies."); id. ¶¶ 3, 4 (alleging that prior to FCIP "vacancies were

posted exclusively for internal applicants" but FCIP changed this practice); Caspary Aff. ¶¶ 3, 4

(same).  These affiants lament what they see as a shift of focus that previously had been on

"career advancement of internal employees," see, e.g., Caspary Aff. ¶ 8, and ominously observe

that there is an increasing number of "new hires off the street," id. ¶ 6, who tend to come from

colleges and graduate schools, id. ¶ 8.

    Even if these allegations could support Article III standing, they would fail to pass the

prudential standing hurdle, which requires that "the interest sought to be protected by the

complainant is arguably within the zone of interests to be protected or regulated by the statute or

-11-

constitutional guarantee in question." Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153 (1970). The federal civil service is not a guild system designed to give incumbent federal employees a sinecure or insulate them from competition from outside applicants. To the contrary, the civil service laws upon which NTEU relies strive for "fair and open competition," with participation from "all segments of society," 5 U.S.C. § 2301(b)(1), and the paramount value is the "efficiency of [the] service" in carrying out governmental functions, 5 U.S.C. § 3301(1). Therefore, limiting the field of competition or preserving de facto exclusivity in certain career paths for current federal employees are outside the zone of interests protected by the statutory provisions upon which NTEU relies in the complaint.

2. NTEU also argues that current non-FCIP employees are injured by not receiving "the benefits of statutory competitive procedures" in applying for desired FCIP positions, and that the injury to such would-be applicants does not depend on "whether they would have been selected if competitive hiring procedures were used." Pl.'s Opp. at 21, 25. We agree that for purposes of standing NTEU need not show that these individuals necessarily would have been selected but for the FCIP. However, because standing requires a concrete harm rather than merely an abstract interest in compliance with the law, see Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 483 (1982), NTEU must at least show that statutory competitive examining procedures are in some way inherently more favorable to current non-FCIP employees than FCIP hiring methods. See Def.'s Mem. at 24-27.[12] Other than its

---

[12] NTEU cites two cases involving challenges by losing bidders to agency decisions to award a contract to another for the proposition that "[d]eprivation of the right to participate in a competitive process that complies with legal requirements" is itself injury-in-fact. See Pl.'s Opp.'s Mem. at 25 (citing Energy Transp. Group v. Maritime Admin., 956 F.2d 1206, 1211

(continued...)

argument about inadequate notice of FCIP vacancies, which is without merit for the separate

reasons discussed supra, and its argument about inadequate application of veterans' preference in

FCIP hiring, which is without merit for the separate reasons discussed infra, NTEU offers no

colorable basis for the Court to make such an assumption and no concrete examples.[13]

Moreover, any assumption the Court might make to that effect would necessarily undercut the

traceability assumption embedded in NTEU's separate theory of standing on behalf of the

incumbent Career Interns, which is that the FCIP made a difference only in the timing of their

accrual of MSPB appeal rights but not in their selection for the underlying position, which they

would be occupying with or without the FCIP.  See supra at 7-8.

    3.  That leaves NTEU's argument that the FCIP disfavors veterans because the methods

for effectuating veterans' preference in excepted-service hiring are allegedly "not as beneficial to

---

[12](...continued)
(D.C. Cir. 1992); Nat'l Maritime Union v. Commander, Military Sealift Command, 824 F.2d
1228, 1237-38 (D.C. Cir. 1987)).  These cases are distinguishable because the injury at issue was
concrete and obvious:  there were specific plaintiffs whose bids had been rejected, and they
alleged that there were defects in the procurement process that led to those rejections.  These
cases might help NTEU establish standing if it were bringing this suit as an after-the-fact
challenge to a specific non-selection of an applicant for an FCIP position (although there might
well be separate CSRA preclusion obstacles to such a suit), but that would be a much different
case than this one.

    [13] The single sentence in the Affidavit of Frank Heffler that "I am . . . aware of current
employees in my chapter who were qualified for RA FCIP vacancies, applied for such vacancies,
and were not selected because the IRS hired an external candidate into the position." (Heffler
Aff. ¶ 7), is far too short on detail to permit any kind of meaningful inference that FCIP selection,
as opposed to competitive-examination selection, discriminates against or has a disparate impact
on internal candidates.  And  the other two affidavits containing similar statements (see Lovett
Aff. ¶ 6; Caspary Aff. ¶ 7) stop short of saying that any of their chapter members ever actually
applied for an FCIP vacancy -- an omission that makes them indistinguishable from the
allegations found insufficient in Albuquerque Indian Rights v. Lujan, 930 F.2d 49, 57 (D.C. Cir.
1991) (statements that members of association "would have applied" for position do not suffice
to show standing, when they did not actually apply).  See Def.'s Mem. at 24-27.

veterans as the specific procedures used during the statutory competitive hiring process." Pl.'s Opp. at 24. This argument rests on a misapprehension of the controlling veterans' preference regulations. NTEU states that "agencies are only required to 'follow the principle of veterans' preference as far as administratively possible' when filling excepted service positions," citing 5 C.F.R. § 302.101(c). Pl.'s Opp. at 23-24. This statement is erroneous; a plain reading of the regulation shows that the quoted language does not apply to excepted-service positions generally, but rather only to eleven specified categories of excepted-service positions that are exempted generally from part 302. See 5 C.F.R. § 302.101(c). These eleven categories exempted from part 302 do not include FCIP appointments, see 5 C.F.R. § 302.101(c)(1)-(11), and the FCIP regulation itself makes clear that part 302 governs FCIP hiring. See 5 C.F.R. § 213.3202(o)(1) ("Agencies will use part 302 of this chapter when making appointments under this Program."). As such, when hiring under the FCIP, agencies must apply the specific veterans' preference procedures for recognizing veterans' preference in 5 C.F.R. §§ 302.201, 302.302, and 302.304, not merely "follow the principle of veterans' preference as far as administratively possible."[14] NTEU fails even to cite or acknowledge the existence of these procedures, let alone articulate any reasoned argument that they are intrinsically less advantageous to preference eligibles than the procedures used in competitive-service hiring.

Moreover, even if the Court could assume -- in the absence of any argument by NTEU --

---

[14] For this reason, NTEU's criticism of the approach of "considering veterans' status as an amorphous 'positive factor'" (see Pl.'s Opp. at 34) and its citation of Patterson v. Department of the Interior, 424 F.3d 1151 (Fed. Cir. 2005), cert. denied, 547 U.S. 1071 (2006), are inapposite. The "positive factor" approach is one that may used in hiring for the eleven categories of exempted positions listed in 5 C.F.R. § 302.101(c), such as attorneys, the issue in Patterson. However, FCIP hiring must comply with the rigorous procedures of 5 C.F.R. §§ 302.201, 302.302, and 302.304.

that the procedures for recognizing veterans' preference specified in 5 C.F.R. part 302 are less advantageous, that assumption would merely place this case in a similar posture, for purposes of this issue, to <u>Albuquerque Indian Rights v. Lujan</u>, 930 F.2d 49 (D.C. Cir. 1991). That case involved statutory American Indian hiring preferences, which it can be assumed would be generally advantageous to American Indians. Even so, the D.C. Circuit held that an association representing American Indian employees lacked standing to challenge the total <u>non</u>-application of statutory Indian hiring preferences to certain positions, because it "failed to assert that any of its members actually applied for or otherwise sought to fill vacant OCM positions." <u>Id.</u> at 55; <u>see</u> Def.'s Mem. at 24-27. This holding makes eminent sense, because without anyone having applied, it was a matter of speculation whether the non-application of Indian preference would have made any difference; the employees may well have been hired anyway, obviating the need to rely on the preference. <u>See id.</u> at 56.

Similarly here, although NTEU has had a year to gather evidence and submitted numerous affidavits to support standing, not one of those affidavits identifies any qualified preference-eligible NTEU member who applied for an FCIP position but was not selected. Only one of NTEU's six affiants, Frank Heffler, states that he is aware of <u>any</u> current competitive-service employees who have applied for a FCIP position, but he does not aver that any of those applicants were preference eligibles. <u>See</u> Heffler Aff. ¶ 7. Thus, NTEU has not provided this Court with any basis for assuming that the differences in veterans' preference procedures for FCIP hiring as compared to those for competitive-service hiring have actually affected any hiring decision involving one of its members. If, in the absence of actual applicants, there is no standing to challenge the utter <u>non</u>-application of statutory Indian preferences to a certain class of

-15-

positions, see Albuquerque Indian Rights, 930 F.2d at 55-56, surely there cannot be standing to challenge the application of one set of procedures for applying veterans' preference instead of another.[15]

## C.    Current Internal Revenue Service Employees

NTEU argues that current Internal Revenue Service ("IRS") employees suffer injury from the FCIP because when IRS hires through the FCIP, such employees do not benefit from their first-consideration rights under the NTEU-IRS collective bargaining agreement. However, that result is a function of language in the collective bargaining agreement that NTEU concedes (Pl.'s Opp. at 26 n.9) intentionally excludes the FCIP, along with certain other hiring programs, from the first-consideration provisions. Under Brotherhood of Locomotive Engineers and Trainmen v. Surface Transportation Board, 457 F.3d 24 (D.C. Cir. 2006), the lack of first-consideration rights for FCIP vacancies does not confer standing because it flows from the bargained-for agreement between IRS and NTEU, rather than from the FCIP itself. See Def.'s Mem. at 27-29.

Grasping at straws, NTEU attempts to distinguish Locomotive Engineers on the ground that it involved harm directly to the union rather than to the union's members. See Pl.'s Opp. at 28. But the precise nature of the harm or by whom it was suffered is irrelevant to the traceability analysis, which is the same in both cases. In each case, the plaintiff claims that the agency's action deprived it of certain rights (in Locomotive Engineers, the right to collectively bargain;

---

[15] NTEU relegates Albuquerque Indian Rights to a footnote, attempting to distinguish it from this case on the ground that "NTEU does not make a similar claim that employees were, but for the government's actions, entitled to a particular position." Pl.'s Mem. at 26 n.8. But the plaintiff organization in Albuquerque Indian Rights made no such claim either. Rather, analogous to NTEU's theory of injury to veterans in this case, "the injury alleged by [plaintiff] [was] DOI's failure to apply the Indian hiring preference to OCM, a failure supposedly preventing [plaintiff's] members from gaining the benefit of that preference." 930 F.2d at 55.

here, first-consideration rights) that would otherwise apply to a particular matter (in <u>Locomotive Engineers</u>, a railroad transaction; here, FCIP vacancies).  However, in each case, the plaintiff had agreed to a collective bargaining agreement that qualified the rights in question by expressly providing that those rights would <u>not</u> apply to the particular matter at issue.  As the D.C. Circuit held, the plaintiff in this situation is not entitled to the rights invoked "only because the Union agreed to that limitation in its CBA.  This injury was not in any meaningful way 'caused' by the Board; rather, it was entirely self-inflicted and therefore insufficient to confer standing upon the Union."  <u>Locomotive Engineers</u>, 457 F.3d at 28.

> **D.    NTEU Cannot Sue As An Association, Or, At a Minimum, Should Be Required to Join NTEU-Represented Employees with Standing**

NTEU argues that there is no problem of conflicting interests among subsets of its membership or conflicting assumptions in its theories of standing, and that any such conflict results from the government mischaracterizing the relief NTEU seeks.  <u>See</u> Pl.'s Opp. at 30.  However, the complaint was clear that it sought a judgment declaring that the FCIP hiring authority is "null, and void" and "[p]rohibiting federal agencies from continuing to exercise any of the authority granted by [the FCIP] regulations," Compl. at p. 14, and said nothing about preserving FCIP appointments already made.  Any reasonable reader of this complaint could only conclude that the sweeping declaratory and injunctive relief sought by NTEU would place current FCIP appointments in jeopardy, or at least cast a substantial cloud over the validity of such appointments.  <u>Cf.</u> <u>W.C. v. Bowen</u>, 807 F.2d 1502, 1505 (9th Cir.) ("Agency action taken

-17-

under a void rule has no legal effect."), amended on reh'g, 819 F.2d 327 (9th Cir. 1987).[16]  It was

only after the internal contradictions in its dueling theories of standing were pointed out that

NTEU clarified that it would seek to have current Career Interns retain their positions (and, to

boot, be automatically elevated to competitive-service status without having to compete, and

sooner than if they had continued under the FCIP).

However, NTEU's clarification of the relief sought goes only to the redressability issue,

and does nothing to mitigate the other inconsistencies in its dueling standing theories (e.g., with

respect to traceability, see supra at 7-8, 13).  Further, it serves to highlight the tensions between

the interests NTEU purports to represent.  On the one hand, NTEU seeks to proceed on behalf of

current competitive-service employees who are reportedly aggrieved by extensive past FCIP

hiring in their agencies that they feel has displaced their own opportunities.  See, e.g., Heffler

Aff. ¶ 5 (complaining that "[o]ver the past two years or so, my Chapter has seen a dramatic

decline in internal hires for RA positions, notwithstanding that the IRS has hired dozens of RAs

in my Chapter during that time period"); id. ¶ 7 ("Qualified internal employees are not even

interviewed for FCIP positions, as opposed to external candidates who are routinely

interviewed.").  On the other hand, the newly clarified relief NTEU is seeking, far from

redressing such past harm, would provide a windfall to the beneficiaries of the past FCIP hiring

that Mr. Heffler and NTEU's other affiants so vigorously protest.  See Pl.'s Opp. at 20 n.5

(urging that the Court order Career Interns "converted to competitive status more expeditiously"

---

[16]  Defendant does not mean to suggest that voiding of prior FCIP appointments would be necessary or even appropriate if the Court were to hold in favor of NTEU on the merits, an issue that is obviously premature.  What is relevant for present purposes is that the legal theory NTEU is pursuing in this case ineluctably implicates such issues.

-18-

than could occur under the FCIP). NTEU's novel approach to reconciling the various interests at stake gives new meaning to the expression "split the baby."

Particularly in light of the uniquely divergent and irreconcilable nature of the interests NTEU seeks to represent in this case, the case should be dismissed for lack of proper associational standing. At a minimum, NTEU should be required to join individual federal employee/NTEU members as co-plaintiffs in order to permit a proper individualized assessment of standing as well as to assure that any conflicts of interest may be appropriately addressed. This should be no burden at all for NTEU because (a) NTEU offers to do so in its opposition (Pl.'s Opp. at 32 n.12); (b) NTEU has had a year since defendant's motion to dismiss was filed to seek out interested co-plaintiffs; (c) several of NTEU's affiants claim to know of individuals in their chapters who have been adversely affected by the FCIP; and (d) in two prior cases in which NTEU has challenged the validity of excepted-service hiring authorities, it has sued together with affected individual employees as co-plaintiffs (see Def.'s Mem. at 32-33).[17]

## III.    THE CIVIL SERVICE REFORM ACT PRECLUDES NTEU'S CLAIMS

We also showed in our opening memorandum that the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 111, precludes NTEU's claims in this lawsuit. See Def.'s Mem. at 33-41. The CSRA establishes a comprehensive framework for administrative and judicial review of employee challenges to agency action relating to personnel matters,

---

[17] NTEU insists that it has "no past practice" of joining individual employees as co-plaintiffs in cases challenging excepted-service hiring programs and that it has brought "many similar suits" without joining individual members, Pl.'s Opp. at 31, but the only two cases it cites (a) were not challenges to excepted-service hiring programs and (b) were cases in which NTEU based its standing at least in part on injury to itself in its capacity as a union rather than purely by virtue of injury to its members.

-19-

particularly allegations -- as made by plaintiffs here -- that OPM rules and regulations violate

merit system principles.  Courts have held that the CSRA's procedures are exclusive and often

operate to preclude similar challenges under other statutes, including the APA.  See, e.g., United

States v. Fausto, 484 U.S. 439, 445-55 (1988); Fornaro v. James, 416 F.3d 63, 66-69 (D.C. Cir.

2005); Carducci v. Regan, 714 F.2d 171, 175 (D.C. Cir. 1983).  Here, the types of injuries to

individual employees that NTEU claims give it standing would generally arise, if at all, in the

context of the selection and appointment process, for which the CSRA provides a carefully

calibrated set of review mechanisms.[18]  Moreover, the statute includes a specific procedure

through which a party who wishes to challenge an OPM rule on the types of grounds NTEU

raises here can do so before the MSPB and ultimately the Federal Circuit.

1.  In its opposition brief in this case, NTEU takes the position that defendant's CSRA

preclusion argument is "refuted by over twenty years of precedent in the D.C. Circuit."  Pl.'s

Opp. at 7.  As defendant anticipated, see Def.'s Mot. at 38-41, NTEU relies heavily on NTEU v.

Devine, 577 F. Supp. 738 (D.D.C. 1983), aff'd, 733 F.2d 114 (D.C. Cir. 1984), a case that

predated the Supreme Court's decision in Fausto.  NTEU construes Devine as establishing that

the CSRA precludes only lawsuits involving individualized personnel actions, and that

challenges to OPM rules and regulations can always be brought in federal district court under the

---

[18] Since the time defendant's opening brief was filed, the MSPB upheld the FCIP in a case before it pursuant to the Veterans Employment Opportunities Act, 5 U.S.C. § 3330a, one of the review mechanisms in the civil service laws.  See Gingery v. Dep't of Defense, 105 M.S.P.R. 671, 675 (May 30, 2007) (concluding that FCIP is "a valid exception to the competitive examination requirement"), appeal docketed, No. 2007-3292 (Fed. Cir.).  In Gingery, a disabled veteran argues, similar to the argument advanced at Section II.A.3 of NTEU's opposition brief in this case, that his statutory veterans' preference rights were violated when he was not selected for a position that was ultimately filled through the FCIP.  NTEU has filed an amicus brief challenging the validity of the FCIP with the Federal Circuit in Gingery.

APA. See Pl.'s Opp. at 7-9. This categorical reading, however, is overly broad and simplistic and conflicts with other, subsequent D.C. Circuit authority. See, e.g., Fornaro, 416 F.3d at 67 (rejecting argument that exclusivity applies only to individual actions and not to "collateral, systemwide challenge to OPM policy"). The D.C. Circuit's case law as a whole establishes that CSRA preclusion questions must be analyzed on a case-by-case basis with attention to how the particular claims made in the lawsuit relate to the CSRA scheme.[19]

NTEU portrays Fornaro as finding the claims precluded by the CSRA only because it disagreed with plaintiffs' characterization of their claims as system-wide. See Pl.'s Opp. at 10. To the contrary, the Court of Appeals in Fornaro recognized the system-wide nature of the plaintiffs' class action challenge, but held that "[n]othing about the fact that plaintiffs' action is a systemic challenge to OPM policy" enabled it to escape applicable preclusion principles. Fornaro, 416 F.3d at 69 (emphasis added). Similarly, while plaintiff dismisses Barnhart v. Devine, 771 F.2d 1515 (D.C. Cir. 1985), as involving "an individualized personnel action, not an APA challenge," and Gray v. OPM, 771 F.2d 1504 (D.C. Cir. 1985), cert. denied, 475 U.S. 1089 (1986) as involving a mere "failure to promote," these cases cannot be so easily pigeonholed. Barnhart was a putative class action attacking an OPM classification practice that was not "individualized," but rather affected all of a group of 45 (a greater number of employees than

_____

[19] NTEU does not address defendant's point that "Devine is not controlling because both the nature of the lawsuit and the identity of the specific remedial mechanisms invoked as preclusive there were far different than in the instant case." Def.'s Mot. at 39. In Devine, the issue was whether a particular set of labor-relations mechanisms contained in Title 5, Chapter 71 barred an APA challenge to OPM regulations on the ground that a supervening statute barred their implementation. Here, in contrast, the issue is whether other CSRA remedial schemes specifically designed for review of whether OPM rules constitute or lead to "prohibited personnel practices" bar an APA lawsuit challenging OPM regulations on expressly the same grounds.

NTEU has specifically identified as being adversely and concretely affected by the FCIP) in the same way. See 771 F.2d at 1517. Likewise, Gray did not challenge individual promotion decisions, but rather a general OPM policy regarding promotion of administrative law judges to GS-16. See 771 F.2d at 1506-07. Thus, Fornaro, Gray, and Barnhart all stand in stark tension with plaintiffs' argument that the CSRA's review mechanisms do not preclude any lawsuits other than those relating solely to individualized personnel actions.[20]

2. In our opening memorandum, we also pointed out that 5 U.S.C. § 1204(f) establishes a procedure for administrative and judicial review of OPM regulations that are alleged -- as in this case -- to be contrary to merit systems principles. See Def.'s Mem. at 35-36. NTEU does not appear to dispute that its allegations in this case are cognizable through the § 1204(f) procedure, but contends that § 1204(f) is not exclusive and that a party challenging OPM regulations as contrary to merit systems principles is free to elect to proceed either in the MSPB and Federal Circuit, on the one hand, or in federal district court, on the other. See Pl.'s Opp. at 11-13.[21] NTEU further contends that the D.C. Circuit's decision in NTEU v. MSPB, 743 F.2d 895 (D.C.

---

[20] In addition to Devine, NTEU also relies on NTEU v. Chertoff, 385 F. Supp. 2d 1, 23 (D.D.C. 2005), aff'd in part, rev'd in part on other grounds, 452 F.3d 839 (D.C. Cir. 2007). As discussed in defendant's opening memorandum, Chertoff, like Devine, is distinguishable on a number of grounds. See Def.'s Mem. at 40 n.19. Plaintiff does not even attempt to address any of the distinctions raised. In OCONUS DOD Employee Rotation Action Group v. Cohen, 144 F. Supp. 2d 1 (D.D.C. 2000), also cited by plaintiffs, the court allowed judicial review of a Department of Defense rule under the APA because otherwise the rule would have been insulated from any judicial review, which is discouraged. See id. at 7-8. Here, for the reasons discussed in text, there is no reason to assume that deferring to the CSRA's review mechanisms will place OPM's FCIP rule completely outside the scope of judicial review.

[21] NTEU mis-cites the statutory provision as 5 U.S.C. § 1204(e). The correct, current citation is 5 U.S.C. § 1204(f). The provision was formerly numbered as § 1205(e), and is cited that way in some older cases. To minimize confusion, all references herein will be to § 1204(f).

Cir. 1984), supports this notion of a dual-option system of review.

As acknowledged in defendant's opening memorandum, <u>NTEU v. MSPB</u> does not definitively address whether the § 1204(f) process is exclusive; that issue was not before the court because NTEU had complied with the § 1204(f) process in challenging the OPM regulation there.  <u>See</u> Def.'s Mem. at 36 n.18.  However, the D.C. Circuit's opinion supports a definite inference that the § 1204(f) procedure is exclusive, in the sense that a party challenging an OPM regulation on grounds cognizable under § 1204(f) must first attempt to avail itself of that procedure, and may turn to federal district court only if the MSPB denies review in its discretion.  The court described § 1204(f) as enabling the MSPB "to control whether the district courts [in an APA action brought after the MSPB denies review] or courts of appeals [on appeal from an MSPB order reviewing an OPM rule] will review challenges to the facial invalidity of OPM rules and regulations through its own unreviewable power to grant or deny administrative review."  <u>NTEU</u>, 743 F.2d at 907-08.  If plaintiffs' dual-option theory were correct, the MSPB would not have control over that question because the plaintiff could freely bypass the MSPB any time by filing suit in district court.  NTEU ignores this language.[22]

_____

[22] NTEU relies upon other language in <u>NTEU v. MSPB</u>, in which the court acknowledged that § 1204(f) review by the MSPB and courts of appeals covers only challenges cognizable under that provision, <u>i.e.</u>, allegations that an OPM rule requires or leads to prohibited personnel practices such as violations of statutory merit systems principles, and not other types of challenges, which may be brought directly in federal district court.  However, this distinction does not help NTEU because the gravamen of its claim here is that OPM's FCIP rule is invalid for allegedly subverting merit systems principles and thereby leading to prohibited personnel practices.  <u>See</u> Compl. at 2-3 ("The FCIP program undermines the public interest in the merit based civil service, contrary to statutory merit systems principles.") (citing 5 U.S.C. § 2301(b)(1)); 5 U.S.C. § 2302(b)(12) (defining "prohibited personnel practice" as including, <u>inter alia</u>, any personnel action violating any law, rule, or regulation implementing or directly concerning merit system principles).  Although NTEU does conclusorily allege that OPM's FCIP

(continued...)

Finally, the language of the APA itself undermines NTEU's position that it provides a broad, universal right to judicial review of OPM regulations in federal district court regardless of any overlap with the CSRA's various administrative and judicial review mechanisms.  5 U.S.C. § 703 provides that "[t]he form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute, or, <u>in the absence or inadequacy thereof</u>, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction" (emphasis added).  In other words, the APA's general cause of action comes into play only if there is no specialized form of review created by statute.  Here, NTEU cannot dispute that the form of proceeding created by § 1204(f) involving review in the MSPB and Federal Circuit is present and "relevant to the subject matter," nor has it made any suggestion that § 1204(f) review would be inadequate.  For this reason, as well as the others previously urged, the Court should hold that the CSRA scheme precludes plaintiff's claims in this case and dismiss the complaint.

<u>CONCLUSION</u>

For the foregoing reasons and those stated in defendant's opening memorandum in support of her motion to dismiss, defendant respectfully requests that her motion to dismiss be

---

[22](...continued)
regulation is "arbitrary, capricious, an abuse of discretion, and not in accordance with law," Compl. ¶ 32, its argument for why that is so rests entirely on its theory of alleged violation of merit systems principles, not that OPM violated any requirement imposed independently by the APA.

granted.[23]

Dated: May 12, 2008

Of Counsel:

KERRY B. McTIGUE
General Counsel

KATHIE A. WHIPPLE
STEVEN E. ABOW
RISA B. CHERRY
Office of the General Counsel
U.S. Office of Personnel Management
1900 E Street NW
Washington, D.C. 20415
(202) 606-1700

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SUSAN K. RUDY
Assistant Director

   /s/ Robert J. Katerberg
ROBERT J. KATERBERG
  (D.C. Bar No. 466325)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 6112
Washington, D.C. 20001
Telephone:    (202) 616-8298
Facsimile:     (202) 616-8460
Robert.Katerberg@usdoj.gov

Attorneys for Defendant

---

   [23] Nearly a year after defendant filed her motion to dismiss, NTEU finally filed its opposition memorandum but unilaterally elected to respond only to three of the four grounds raised in defendants' motion to dismiss, based on the premise that it cannot discuss the fourth ground -- issue waiver for failing to comment on the proposed rule -- without first receiving the administrative record. NTEU's assertion of need for the administrative record is without merit for the reasons stated in Defendant's Opposition to Plaintiff's Motion for Order Requiring Defendant to File Administrative Record and for Second Enlargement of Time to Respond to Motion to Dismiss (dkt. no. 7). Absent stipulation or leave of court, which NTEU has moved for but not obtained, defendants are unaware of any authority that would permit a litigant to elect to respond only to certain arguments of their own choosing in a "partial" opposition while reserving others for some separate future response. Under these circumstances, in addition to the other grounds for dismissal, it would be within the Court's discretion to treat plaintiff as conceding issue waiver. See, e.g., Day v. D.C. Dep't of Consumer & Regulatory Affairs, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ( "If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded."); cf. Ramos v. Ashcroft, 371 F.3d 948, 949-50 (7th Cir. 2004) (disfavoring practice of "self-help extensions").